Sheri L. Kelly, SBN 226993
E-mail: slk@sherikellylaw.com
LAW OFFICE OF SHERI L. KELLY
31 E. Julian St.
San Jose, CA 95112
Telephone: 408/287-7712
Facsimile: 408/583-4249

**Counsel for Plaintiffs**
**[Additional Counsel Listed on Signature Page]**

Filed

MAR 19 2012

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| STANLEY D. CANNON, and<br>PATRICIA R. CANNON<br>individually and for all other persons<br>similarly situated,<br><br>    Plaintiffs<br><br>vs.<br><br>WELLS FARGO BANK, N.A.,<br><br>    Defendant. | Case No. CV12-01376 DMR<br><br>CLASS ACTION COMPLAINT FOR:<br><br>1) BREACH OF CONTRACT AND IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING;<br>2) UNJUST ENRICHMENT;<br>3) CONVERSION;<br>4) EQUITABLE RELIEF<br><br>__JURY TRIAL DEMANDED__ |

### COMPLAINT

Plaintiffs Stanley D. Cannon and Patricia R. Cannon, acting individually and on behalf of all others similarly situated, for their Complaint and demand for jury trial, state and allege as follows:

1

CLASS ACTION COMPLAINT

## NATURE OF THE ACTION

1.      This is an action seeking damages and other relief against Wells Fargo Bank, N.A. ("Wells Fargo" or "Wells"). Wells Fargo is among the country's largest residential mortgage lenders and loan servicers.

2.      Plaintiffs allege that Wells Fargo derives an improper financial benefit by charging residential borrowers for the "cost" of procuring force-placed insurance from Assurant, Inc.'s and QBE's subsidiaries, but that a portion of such "cost" is returned, transferred or paid to Wells Fargo or an affiliate. Wells characterizes these hidden costs as "commissions," but in reality they are unearned kickbacks.[1]

3.      Wells Fargo is engaged in a business practice of imposing these hidden kickbacks on mortgagors' escrow accounts. These kickbacks are not permitted by the borrowers' mortgage contracts.

4.      Wells or its affiliates entered into contracts with Assurant, Inc. and QBE First Insurance Agency, Inc. ("QBE") that require Wells Fargo to purchase 100% of its borrowers' force-placed insurance policies from Assurant, Inc.'s subsidiaries, American Security Insurance Company (ASIC) and Standard Guaranty Insurance Company (SGIC) (collectively "Assurant") or QBE's subsidiaries. In return, Assurant and QBE pay Wells Fargo or its affiliates a kickback equal to 10% to 20% of the premium for force-placed insurance policies. This arrangement is an exclusive arrangement, meaning that Wells Fargo purchases all force-placed insurance from Assurant and QBE

---

[1] "**Kickback**, *n.* (1920) A return of a portion of a monetary sum received, esp. as a result of coercion or a secret agreement." Black's Law Dictionary (9th Ed. 2009).

CLASS ACTION COMPLAINT

and does not seek competitive bids for insurance policies. This arrangement is never disclosed to borrowers.

5.     Plaintiffs seek to recover damages equal to the amount of the improper and inequitable financial benefit received by Wells or its affiliate as a result of this anti-consumer practice, and to enjoin the future collection of amounts charged against the mortgage accounts of residential borrowers but not yet collected.

### JURISDICTION, VENUE, AND INTRADISTRICT ASSIGNMENT

6.     This Court has original jurisdiction over this action under the Class Action Fairness Act of 2005, 28 U.S.C. §§ 1332(d)(2) and (6), because the aggregate claims of the putative class members exceed $5 million, exclusive of interest and costs, and because at least one Plaintiff is a citizen of a different state than Wells Fargo.

7.     Venue is proper in this district pursuant to 28 U.S.C. § 139, because Wells Fargo is subject to personal jurisdiction here, because its principal place of business is 420 Montgomery Street, San Francisco, California 94163, and because a substantial part of the acts or omissions giving rise to the claims herein occurred and continue to occur in this district, and as such this action is properly assigned to the San Francisco Division of this Court.

### PARTIES

8.     Stanley D. Cannon and Patricia R. Cannon are, and, at all relevant times have been, residents of Sarasota County, Florida.

9.     Proposed class members are residents of the United States.

10.     Defendant, WELLS FARGO BANK, N.A. ("Wells Fargo Bank") is a national bank registered to do business in the State of California with its principal address in San Francisco,

3

California. As a result of a 2004 merger, Wells Fargo Bank is the successor to Wells Fargo Home Mortgage, Inc., which no longer exists. Wells Fargo Bank sometimes does business under the name Well Fargo Home Mortgage.

## FACTUAL ALLEGATIONS

### A.    Wells's Role as Servicer

13.    Wells Fargo provides services including but not limited to banking, insurance, investments, mortgage, and consumer and commercial finance across North America. It services approximately 9 million mortgages, and has assets of $1.2 trillion.

14.    As servicer, Wells Fargo's responsibilities included sending monthly mortgage statements, collecting monthly mortgage payments, collecting and maintaining escrow accounts for the payment of insurance on properties used to collateralize loans, paying for such insurance on those properties from borrower's escrow accounts, monitoring and ensuring that all required forms of insurance are in full force and effect, notifying borrowers of insurance lapses and other required actions, procuring and paying for force-placed insurance, and accounting for and remitting borrowers' payments to Wells Fargo.

### B.    Facts as to Stanley D. Cannon and Patricia R. Cannon.

15.    On September 9, 2005, Plaintiffs obtained their mortgage loan from Amerisave Mortgage Corporation.  After the closing of the loan, the note and mortgage were assigned to Ohio Savings Bank, and then to Wells Fargo.  A copy of the mortgage is attached as **Exhibit A**.

16.    On information and belief, Ohio Savings Bank serviced the loan for a very short period between November 1, 2005 and January 26, 2006, at which time Wells Fargo Home Mortgage began servicing Plaintiffs' residential mortgage loan and did so until Wells Fargo Home Mortgage

4

and Wells Fargo merged on or about May 1, 2011.  Since the merger, Wells Fargo is the note holder

and servicer.

17.     Pursuant to the mortgage, Plaintiffs are required to insure the improvements on the

real property:

> 5.      Property Insurance.  Borrower shall keep the improvements now existing or
> hereafter erected on the Property insured against loss by fire, hazards included with
> the term "extended coverage," and any other hazards including, but not limited to,
> earthquakes and floods, for which Lender requires insurance.  This insurance shall be
> maintained in the amounts (including deductible levels) and for the period that Lender
> requires...The insurance carrier providing the insurance shall be chosen by Borrower
> subject to Lender's right to disapprove Borrower's choice, which right shall not be
> exercised unreasonably...
>
> If Borrower fails to maintain any of the coverage described above, Lender may obtain
> insurance coverage, at Lender's option and Borrowers expense.  Lender is under no
> obligation to purchase any particular type or amount of coverage.  Therefore, such
> coverage shall cover Lender, but might or might not protect Borrower, Borrower's
> equity in the Property, or the contents of the Property, against any risk, hazard or
> liability and might provide greater or lesser coverage than was previously in effect.
> Borrower acknowledges that the cost of the insurance coverage so obtained_might
> significantly exceed the cost of insurance that Borrower could have obtained.  Any
> amounts disbursed by lender under this Section 5 shall become additional debt of
> Borrower secured by this Security Instrument.  These amounts shall bear interest at the
> Note rate from the date of disbursement and shall be payable, with such interest, upon
> notice from Lender to Borrower requesting payment.

(Emphasis added)

18.     Plaintiffs' mortgage was a Fannie Mae/Freddy Mac form mortgage.  Most of the

mortgages Wells Fargo serviced during the class period were, likewise, Fannie Mae/Freddy Mac

mortgages written on forms that contained provisions regarding property insurance that were

substantially similar to those in Section 5 of Plaintiffs' mortgage.

19.     While this standardized provision states that the "cost of the [force-placed] insurance

so obtained might significantly exceed the cost of insurance that Borrower could have obtained," it

does not authorize or contemplate that Wells Fargo or an affiliate will derive a hidden profit or financial benefit by procuring force-placed insurance from Assurant and QBE. Nor does it authorize Wells Fargo to add these hidden kickbacks as additional debt of the borrower.

20.     On April 6, 2006, Wells Fargo sent Plaintiffs a form letter stating "Our records indicate that the amount of coverage provided by your current flood insurance is less than the coverage required by Wells Fargo Home Mortgage." The letter went on to say that "your flood insurance coverage should provide replacement cost coverage for your structure/improvements..."

21.     On May 30, 2006, Wells sent Plaintiffs a form letter titled "NOTICE OF TEMPORARY FLOOD INSURANCE PLACED BY LENDER DUE TO DEFICIENT COVERAGE" stating that it had purchased a flood insurance binder from ASIC to obtain $79,200 in additional flood insurance coverage for him at an annual cost of $772.18. The policy was placed with ASIC.

22.     Again on April 21, 2008, ASIC sent Plaintiffs another "INSURANCE BINDER" force-placing an additional $10,200 in flood insurance for which Plaintiffs were charged $94.95.

23.     On May 29, 2008, Wells Fargo sent Plaintiffs a form letter titled "NOTICE OF PLACEMENT OF FLOOD INSURANCE," which informed him that Wells Fargo had purchased a flood insurance policy that would cost him $94.95 in annual premiums, which would be withdrawn from his escrow account. This policy was placed with ASIC.

24.     Plaintiffs lack administrative remedies to address the wrongful conduct alleged herein.

25.     All conditions precedent to the relief sought herein have been performed, occurred or been waived. Plaintiffs' contract requires pre-suit notice, but such notice would be futile. First, Wells has already filed a complaint to foreclose on Plaintiffs' property due to a default on the mortgage that

6

CLASS ACTION COMPLAINT

arose from Defendant's wrongful practices. Second, Defendant's practices that are the subject of this complaint—force-placing excessive insurance on borrowers in order to receive a kickback—are contractually mandated, such that Wells Fargo cannot correct its practices to conform with the law absent intervention of the Court.

**C.    Facts Common to the Class**

26.    Each and every mortgage at issue in this litigation which is owned and/or serviced by Wells Fargo requires borrowers, including Plaintiffs, to maintain insurance on their real property. If the borrower fails to maintain the requisite insurance, the mortgage servicer may forcibly place insurance on the property.

27.    The Federal National Mortgage Association/Federal Home Loan Mortgage Corporation ("Fannie Mae and Freddie Mac") mortgages serviced by Wells Fargo are standardized residential mortgage instruments that contain substantially identical provisions regarding flood insurance and fees that may be imposed in connection with force-placed insurance to those cited above (paragraph 5 of the mortgage).

28.    Pursuant to the mortgage contracts at issue, once an insurance policy has lapsed, the mortgage servicer can purchase insurance for the home, "force-place" it, and then charge the borrower the full cost of the premium. However, these premiums are not the actual amount that Wells Fargo pays, because a substantial portion of the premiums are refunded to Wells Fargo through kickbacks or unwarranted "commissions."

29.    In accomplishing this force-placement, Wells Fargo, in bad faith, entered into arrangements with Assurant and QBE to be the insurance providers for all force-placed policies. Under this arrangement the Defendant charges exorbitant rates to Plaintiffs and the Class who have

7

no way of refusing the force-placed charges. These premium rates or charges were not arrived at on a competitive basis and were well in excess of those which could have been obtained in the open market by Wells Fargo, Plaintiffs or the Class. Accordingly, no good faith arms-length transactions are taking place.

30. The premiums on force-placed insurance policies generally cost at least five to six times, and often up to ten times, more than what the borrower was either originally paying or what the borrower could obtain if done so on a competitive basis on the open market.

31. The force-placed insurance policies are extremely lucrative for the insurance providers and generate extremely high profit margins. Indeed, Assurant collected $2.7 billion of premiums in 2010 through its force-placed insurance division alone.

32. Wells Fargo and Assurant have reaped significant profits relating to the force-placed insurance.

33. Wells Fargo receives commissions or kickbacks from the force-placed insurance companies or the insurance brokers or agents once one of the high-priced, force-placed, insurance policies is purchased. These kickbacks are directly tied to the cost of the force-placed insurance and are usually a percentage of the total cost of the policy.

34. This arrangement provides the mortgage servicer with an incentive to purchase the highest priced force-placed insurance policy on a non-competitive basis that it can – the higher the cost of the insurance policy, the higher their commission or kickback. Ultimately, the consumer pays the bill.

35. The commission or kickback is paid by Assurant and QBE to Wells Fargo in order to maintain their pre-existing uncompetitive and exclusive relationship, to induce Wells Fargo to

8

purchase excessively-priced force-placed insurance policies, and to cause Wells Fargo to not seek competitive bids in the market.

36.     The Defendant has entered into an arrangement such that a competitively priced insurance policy is not actually "found" for any given property. Therefore, the notion that any "commission" is due to Wells Fargo or its affiliates is false. Rather, the Defendant has a pre-set arrangement by which Assurant and QBE have access to and search Wells Fargo's database to find lapsed insurance policies. Then Assurant writes to the homeowners to notify them of the force-placed coverage. Assuming there is a lapse in coverage, insurance is automatically placed—the provider of the insurance and the cost of the insurance are pre-determined under this relationship. Further, the cost of the insurance of each home bears no relation to each homeowner's individual home, rather it is pre-determined based upon Well Fargo's entire portfolio of mortgages.

37.     Therefore, Wells Fargo is not just paying Assurant and QBE for force-placed insurance; rather it is paying Assurant and QBE for a bundle of services including performing Well Fargo's job of administering and servicing the mortgages (monitoring Wells Fargo's entire portfolio for lapses and providing proper notification to homeowners under the mortgage). This bundle of administrative services includes Wells Fargo's cost of monitoring and servicing its entire portfolio of loans and is not chargeable to Plaintiffs under the mortgages.

38.     Under this arrangement, the "premiums" for insurance that are charged to the Plaintiffs are exorbitant and illegal because they not only include the excessive cost of insurance, but they also include illegal kickbacks and the cost of the bundle of administrative services that Assurant and QBE are providing to Wells Fargo.

9

CLASS ACTION COMPLAINT

39.     This arrangement insures that Assurant and QBE are the only entities providing the insurance, with Wells Fargo signing off and collecting kickback commissions, and the consumer providing the money.

40.     If the consumer cannot afford to pay the exorbitant premiums for force-placed insurance, the premiums are added to the mortgage's principal balance.

41.     In addition, the Defendant also retroactively force-places exorbitant insurance on homeowners for the periods of time in the past where coverage had lapsed. This is done despite the fact that there are no claims during the lapsed period and the homeowner has since secured standard insurance. Moreover, retroactive force-placed insurance is especially egregious given the fact that the National Association of Insurance Commissioners has stated that insurance is "prospective in nature" and that policies should not be backdated.

42.     The actions and practices described herein represent bad faith and unconscionable practices that, even if the terms of the mortgage could be construed to allow, would still be an abusive and unlawful exercise of Wells Fargo's authority under the contract. Placing these unreasonably, uncompetitively, and excessively priced insurance policies on Plaintiffs and the similarly situated Class Members' mortgages without regard for competition on the open market to obtain a commercially reasonable price, is solely to maximize Wells Fargo's own profits through kickbacks collected from the exorbitant premiums of force-placed policies. Said conduct is prohibited by state and Federal law.

43.     Wells Fargo is entitled under Plaintiffs' and each Class Member's mortgage to purchase force-placed insurance. Wells Fargo must, however, purchase force-placed insurance in good faith. Indeed, Plaintiffs do not seek to prevent or significantly interfere with Defendant's ability

CLASS ACTION COMPLAINT

to force place insurance coverage pursuant to the mortgage contracts. Rather, Plaintiffs demand that Wells Fargo perform their duties under the mortgage in good faith.

44. Defendant's manipulation of its force-placed insurance purchases has maximized the profits to themselves to the great detriment of Plaintiffs and the Class.

45. Defendant was not, and is not, authorized by any federal, state, or local governing body, contract, or agreement to manipulate its force-placed insurance purchases in bad faith as alleged above.

46. Furthermore, these fraudulent practices have recently come under fire by all fifty State Attorneys General as part of a nationwide investigation. As the State Attorneys General have recognized, this practice has greatly contributed to the foreclosure crisis.

47. A commission is a fee earned for performing a service. Defendant's letters to borrowers misrepresent the charge as a commission, when in fact it is nothing of the sort because Defendant provides no services relating to the purchase of the force-placed insurance. Moreover, the mortgage contracts do not authorize the payment of a commission in connection with force-placing insurance.

## CLASS ALLEGATIONS

48. Plaintiffs bring this action on behalf of themselves and all others similarly situated pursuant to Fed. R. Civ. P. 23. This action satisfies the numerosity, commonality, typicality, adequacy, predominance and superiority requirements of Rule 23(a)(1)-(4) and (b)(3).

49. The proposed class is defined as:

> All borrowers who had mortgages securing property located in the United States, serviced by Wells Fargo Bank, N.A., who were charged, and who either paid or who still owe, premiums for a force-placed insurance policy within the applicable statute of limitations through March 4, 2012 ("the Class Period").

11

50.     Plaintiffs reserve the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate.

51.     Excluded from the Class are Wells Fargo, their respective parents, subsidiaries, affiliates, officers and directors, as well as any entity in which they have controlling interests, and counsel for Plaintiff.

52.     The members of the Class are so numerous that joinder is impractical.  The Class are believed to consist of thousands of members, whose identities are within the exclusive knowledge of and can only be ascertained by resort to the records of Wells Fargo.

53.     There are questions of law and fact common to Plaintiffs and the Class that predominate over questions affecting individual Class members.  These common questions include:

a.      Whether Wells Fargo breached the mortgage contract with borrowers by charging borrowers a high premium "cost" for force-placed insurance when, in reality, a significant portion of this "cost" was actually returned, transferred, or paid to Wells or an affiliate of Wells;

b.      Whether Wells Fargo breached the implied covenant of good faith and fair dealing by charging their residential borrowers amounts for force-placed insurance procured from Assurant and QBE, a portion of which was returned, transferred or paid to Wells or an affiliate;

c.      Whether Wells Fargo was unjustly enriched by charging their residential borrowers amounts for force-placed insurance procured from Assurant and QBE, a portion of which was returned, transferred or paid to Wells or an affiliate;

12

CLASS ACTION COMPLAINT

d.      Whether Wells Fargo converted funds owned by borrowers by withdrawing such
        funds from borrowers' escrow accounts and requiring borrowers to pay to replenish
        their escrow accounts in order to pay the premiums for force-placed insurance
        procured from Assurant and QBE, a portion of which was returned, transferred or paid
        to Wells or an affiliate;

e.      Whether Wells Fargo acted unfairly by entering into an exclusive buying arrangement
        with Assurant and QBE in order to receive kickbacks of a portion of insurance
        premiums paid to Assurant and QBE for force-placed insurance policies;

f.      Whether Wells Fargo acted deceptively in sending form letters to borrowers that
        represent that kickbacks paid to Wells or its affiliates were commissions; and

g.      Whether Wells Fargo should be enjoined from continuing to receive kickbacks from
        Assurant and QBE, and withdrawing the amounts of these kickbacks from borrowers'
        escrow accounts.

54.     Plaintiffs' claims are typical of the claims of other members of the Class.  Plaintiffs,
like all members of the Class, were charged for force-placed insurance procured without seeking
competitive bids on the open market by Wells Fargo from Assurant and QBE to insure property
secured by a residential mortgage originated, owned or serviced by Wells.  Plaintiffs, like all Class
members, sustained damages based on the same actions of Wells and have no interest antagonistic to
the interests of any members of the Class.

55.     Plaintiffs are committed to the vigorous prosecution of this action and have retained
competent counsel experienced in the prosecution of complex litigation and consumer class actions.
Plaintiffs and their counsel will fairly and adequately protect the interests of the Class.

13

CLASS ACTION COMPLAINT

56.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Since the amount of each Class member's claim is small relative to the complexity of the litigation, and due to the financial resources of Wells, Class members cannot realistically afford to seek legal redress individually for the claims alleged herein.  Therefore, absent a class action, members of the Class have no realistic likelihood of recovering their damages, and Wells Fargo's wrongful practices alleged herein will continue unabated.

57.     Even if members of the Class could afford to pursue individual litigation, individualized litigation would significantly increase the delay and expense to all parties and to the Court. Individualized litigation would also create the potential for inconsistent or contradictory rulings. In contrast, a class action presents far fewer management difficulties, allows claims to be heard which might otherwise go unheard because of the relative expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale and comprehensive supervision by a single court.  Thus, a class action will allow redress for many persons whose claims would otherwise be too small to litigate individually.  There will be no difficulty in the management of this action as a class action.

## CAUSES OF ACTION

### COUNT I
### BREACH OF CONTRACT, INCLUDING THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

58.     Plaintiffs restate and reallege the preceding paragraphs of this Complaint as though set out here word for word.

59.     The mortgage agreement does not authorize Wells to charge Plaintiffs for kickbacks paid to Wells or an affiliate for force-placed insurance. Paragraph 5 does not contain the word

14

CLASS ACTION COMPLAINT

"commission" or any other explicit or implicit authorization for the payment of any remuneration to Wells or its affiliates for the purchase of force-placed insurance.

60.     The only reference in the mortgage to charges that Wells may assess for purchasing force-placed insurance states that the borrower shall be responsible for the "cost" of force-place insurance and states that "[a]ny amount disbursed by Lender under this Section 5 shall become additional debt of the Borrower...."

61.     No reasonable interpretation of the contract allows the Lender to charge a borrower for portions of insurance payments that are returned to Wells as kickbacks.

62.     Wells Fargo breached the mortgage contract by requiring Plaintiffs to pay charges for force-placed insurance when a part of these charges were returned to Wells or its affiliate. This self-dealing practice is neither authorized by nor disclosed in the contract.

63.     Wells Fargo breached Section 5 of the mortgage contract by assessing "charges" to Plaintiffs' mortgage debt for force-placed insurance that exceeded the "costs" of the insurance policy. Stated another way, Defendant charged for something that was not a cost.

64.     Section 5 of the mortgage authorizes Wells Fargo to force-place insurance coverage to "cover lender." This authorizes Wells Fargo to take only those actions necessary to protect its own interests. It does not authorize Wells Fargo to engage in self-dealing and profiteering for the benefit of Wells and the Wells family of companies. Wells Fargo breached the mortgage contract by doing so, and by requiring Plaintiffs to pay the costs of Wells obtaining the coverage when part of these "costs" was returned to Wells or an affiliate as profit.

65.     The implied covenant of good faith and fair dealing is part of every contract. While the implied covenant cannot override an express contractual term, it attaches to the performance of a

15

specific contractual provision.  The duty to act in good faith limits one party's ability to act in a manner that contravenes the reasonable and justifiable expectations of the other party. When a contract is silent as to the permissibility of certain conduct related to the performance of an express term of a contract, the covenant is used as a "gap-filling" tool.

66.     Section 5 of Plaintiffs' mortgage and class members' mortgages gives Wells and only Wells substantial discretion in the selection of the insurance company and rate for force-placed insurance policies if the borrower allows their insurance to lapse. The servicer, Wells Fargo, is permitted by the contract to force-place insurance with the company of its choice. The "gap" that the covenant of good faith and fair dealing fills is the manner in which Wells may go about implementing this express term.  Specifically, whether Wells Fargo may permissibly set up an exclusive buying arrangement with its chosen insurer where the insurer kicks back a portion of the cost of coverage to Wells Fargo is governed by Wells's obligation of good faith and fair dealing.

67.     Wells Fargo exercised its discretion capriciously, in bad faith, and in contravention of the parties' reasonable expectations, violating the covenant of good faith and fair dealing in at least the following respects:

(a) Charging a "cost" to Plaintiffs and Class members for force-placed insurance that includes a kickback paid to Wells or its affiliates;

(b) Charging Plaintiffs and Class members for commissions when the insurance is prearranged and no commission is due;

(c) Collecting a percentage of whatever premiums are charged to Plaintiffs and the Class and not passing that percentage on to the borrower, thereby creating the incentive to seek the highest-priced premiums possible; and

16

(d) Failing to seek competitive bids on the open market and instead contracting to create "back room" deals whereby the insurance policies are continually purchased through the same companies without seeking a competitive price.

68.     Plaintiffs and the Class have sustained damages as a result of Wells Fargo's breach of contract and breach of the implied covenant of good faith and fair dealing, represented by the amount of the hidden profit or financial benefit earned by Wells or its affiliate on force-placed insurance procured through Assurant and QBE.

## COUNT II
## UNJUST ENRICHMENT

69.     Plaintiffs restate and reallege the preceding paragraphs of this Complaint as though set out here word for word.

70.     Although Section 5 of Plaintiffs' and Class members' standardized residential mortgage authorizes Wells Fargo to procure force-placed insurance to protect its interest, and that the "cost" of such insurance may be more expensive than comparable insurance coverage obtained by Plaintiffs and members of the Class, no contract authorizes Wells or an affiliate to earn a hidden profit or other financial benefit by collecting amounts from residential borrowers for the "cost" of procuring temporary force-placed insurance from Assurant and QBE, where a portion of such "cost" was returned, transferred or paid to Wells or an affiliate.

71.     Wells Fargo and its affiliates were unjustly enriched, in an amount to be proven at trial, by receiving from Plaintiffs and Class members a benefit in the form of overcharges for force-placed insurance policies that are excessive and unreasonable as a result of Defendant's kickback scheme and exclusive arrangement with Assurant and QBE. It would be inequitable to allow Wells and its affiliates to retain these benefits at the expense of Plaintiffs and the Class.

17

72.    Wells Fargo should compensate Plaintiffs and the Class in an amount equal to all payments collected from Plaintiffs and the Class that represent the hidden profits or other financial benefits received by Wells or irs affiliate.

73.    Wells Fargo and its affiliates received and are holding funds belonging to Plaintiffs and the Class, which in equity and good conscience they should not be permitted to keep.

## COUNT III
## CONVERSION

74.    Plaintiffs restate and reallege the preceding paragraphs of this Complaint as though set out here word for word.

75.    Defendant improperly exercises control of the property of the class members by imposing improper kickbacks and charges on class members' escrow accounts and collecting those kickbacks. For example, Defendant required Plaintiffs to increase their mortgage payments to pay for ASIC's insurance premiums and Defendant's kickbacks and retained these readily identifiable funds. This exercise of control is contrary to the rights of Plaintiffs and members of the proposed Class.

76.    The acts of Defendant constitute the tort of conversion.

77.    Plaintiffs and members of the proposed Class are entitled to the immediate possession of fees improperly collected by Defendant, and are entitled to a release of all escrow charges for the improper fees.

78.    Defendant wrongfully converted specific and readily identifiable funds.

79.    As a direct and proximate result of Wells Fargo's acts of conversion, Plaintiffs and members of the proposed Class have suffered and continue to suffer damages.

18

### COUNT VI
### EQUITABLE RELIEF

80.    Plaintiffs ask the Court to enjoin the Defendant from the practice of collecting fees for the force-placement of insurance on the grounds that the fees are neither disclosed nor permitted by Class Members mortgage contracts.

81.    Plaintiffs ask the Court to award restitution to return all charges Defendant or their affiliates received in connection with the purchased of force-placed insurance.

82.    Plaintiffs ask the Court to order Defendant to remove from borrowers' escrow accounts all charges that are attributable to kickbacks paid to Defendant or their affiliates for the purchased of force-placed insurance.

### DAMAGES

83.    Defendant should pay damages to Plaintiffs and the Class in an amount to be determined at trial but, in any event, in excess of five million dollars ($5,000,000). Plaintiffs and members of the proposed Class are entitled to punitive damages or additional damages allowed by statute for Defendant's knowing and intentional violation of laws or actions taken in wanton and reckless disregard for the harm caused to Plaintiffs and members of the proposed Class.

### DEMAND FOR JURY TRIAL

84.    Plaintiffs, on behalf of themselves and all others similarly situated, demand a trial by jury of all matters so triable.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and other members of the Class, demand judgment against Wells as follows:

19

CLASS ACTION COMPLAINT

(1)   Declaring this action to be a proper class action maintainable pursuant to
Rule 23(a) and Rule 23(b) of the Federal Rules of Civil Procedure and
declaring Plaintiffs to be the representatives of the Class;

(2)   Awarding damages sustained by Plaintiffs and the Class as a result of Wells's breach
of contract, including the implied covenant of good faith and fair dealing, together with
prejudgment interest;

(3)   Finding that Wells has been unjustly enriched, and requiring Wells to refund all unjust
benefits to Plaintiffs and the Class, together with prejudgment interest;

(4)   Finding that Wells committed the tort of conversion by withdrawing and retaining
borrowers' funds from borrowers' escrow accounts to pay for insurance premiums that
included wrongful charges for kickbacks paid to Wells or its affiliates, and requiring Plaintiffs
and members of the Class to replenish their escrow accounts after the withdrawal of these
wrongful charges;

(5)   Awarding Plaintiffs and members of the proposed Class the maximum amount of
damages allowable under applicable law along with pre-judgment interest as allowed by
applicable law;

(6)   Granting all relief described above;

(7)   Granting a trial by jury of all issues so triable;

(8)   Awarding Plaintiffs and the Class costs and disbursements and reasonable allowances
for the fees of Plaintiffs' and Class's counsel and experts, and reimbursement of expenses;
and

(9)   Such other and further relief as the Court deems just and equitable.

20

Dated: March 19, 2012

Respectfully submitted,

Sheri L. Kelly, SBN 226993
E-mail: slk@sherikellylaw.com
LAW OFFICE OF SHERI L. KELLY
31 E. Julian St.
San Jose, CA 95112
Telephone: 408/287-7712
Facsimile: 408/583-4249

Brent Walker (AR Bar No. 2002152)
Russell D. Carter (AR Bar No. 2006039)
CARTER WALKER PLLC
2171 West Main, Suite 200
P.O. Box 628
Cabot, AR 72023
(501) 605-1346
(501) 605-1348 (facsimile)
bwalker@carterwalkerlaw.com
dcarter@carterwalkerlaw.com
*pro hac vice application pending*

Steven A. Owings (AR Bar No. 89035)
Alexander P. Owings (AR Bar No. 2011036)
OWINGS LAW FIRM
1400 Brookwood Drive
Little Rock, AR 72202
Telephone: (501) 661-9999
Facsimile: (501) 661-8393
sowings@owingslawfirm.com
apowings@owingslawfirm.com
*pro hac vice application pending*

21

CLASS ACTION COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Jack Wagoner, (AR Bar No. 89096)
WAGONER LAW FIRM, P.A.
1320 Brookwood, Suite E
Little Rock, AR 72202
Telephone: (501) 663-5225
Facsimile: (501) 660-4030
Jack@wagonerlawfirm.com
*pro hac vice application pending*

**Counsel for Plaintiffs**

22

# EXHIBIT A

RECORDED IN OFFICIAL RECORDS
INSTRUMENT # 2005216649 19 PGS
2005 SEP 26 05:56 PM
KAREN E. RUSHING
CLERK OF THE CIRCUIT COURT
SARASOTA COUNTY,FLORIDA
CEAGLETO Receipt#690970

Doc Stamp-Mort: 448.00
Intang. Tax: 256.00

Prepared by or under the supervision of: Greg Hooper
AMERISAVE MORTGAGE CORPORATION
[Name of Natural Person]
3525 PIEDMONT RD. SUITE 6
[Street Address]
ATLANTA, GA 30305
[City, State Zip Code]

After recording please return to:
OHIO SAVINGS BANK ATTN: DOCUMENT CONTROL
[Company Name]

[Name of Natural Person]
1111 CHESTER AVE
[Street Address]
CLEVELAND, OH 44114
[City, State Zip Code]

3216458-DCM

Requested by and Return to:
Recording Department
First American Lenders Advantage
1801 Lakepointe Drive, Suite 111
Lewisville, TX 75057
(469) 322-2500

[Space Above This Line For Recording Data]

# MORTGAGE

MIN: 100162500044824473

4482447

DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated September 9, 2005, together with all Riders to this document.

(B) "Borrower" is STANLEY D. CANNON AND PATRICIA R. CANNON, HUSBAND AND WIFE.

Borrower is the mortgagor under this Security Instrument.

(C) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the mortgagee under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

(D)    "Lender" is AMERISAVE MORTGAGE CORPORATION

Lender is a    corporation                                          organized and existing under the laws of
THE STATE OF GEORGIA                          . Lender's address is    3525 PIEDMONT RD.
SUITE 6, ATLANTA, GA 30305                    .

(E)    "Note" means the promissory note signed by Borrower and dated    September 9, 2005    . The
Note states that Borrower owes Lender        one hundred twenty eight thousand and
NO/100ths                                          Dollars (U.S. $ 128,000.00         )
plus interest.  Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not
later than    October 1, 2025    .

(F)    "Property" means the property that is described below under the heading "Transfer of Rights in the
Property."

(G)    "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due
under the Note, and all sums due under this Security Instrument, plus interest.

(H)    "Riders" means all Riders to this Security Instrument that are executed by Borrower.  The following
Riders are to be executed by Borrower [check box as applicable]:

☐ Adjustable Rate Rider        ☐ Condominium Rider              ☐ Second Home Rider
☐ Balloon Rider                ☐ Planned Unit Development Rider ☐ Biweekly Payment Rider
☒ 1-4 Family Rider             ☐ Revocable Trust Rider
☐ Other(s) [specify]

(I)    "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances
and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable
judicial opinions.

(J)    "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners association or
similar organization.

(K)    "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check,
draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer,
or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account.  Such term
includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by
telephone, wire transfers, and automated clearinghouse transfers.

(L)    "Escrow Items" means those items that are described in Section 3.

(M)    "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by
any third party (other than insurance proceeds paid under the coverages described in Section 5) for:  (i) damage to,
or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance
in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(N)    "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the
Loan.

LOAN NUMBER: 4482447
Florida Mortgage-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT        MERS Modified Form 3010 01/01
—THE COMPLIANCE SOURCE, INC.—                         Page 2 of 14                           14001FL 08/00
www.compliancesource.com                                                             ©2004, The Compliance Source, Inc.



(O) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(P) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(Q) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

County of SARASOTA
*[Type of Recording Jurisdiction]* *[Name of Recording Jurisdiction]*

which has a legal description of:
ATTACH

which currently has the address of 4814 ALMONZA AVENUE
*[Street]*
SARASOTA , Florida 34235
*[City]* *[Zip Code]*
("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2.   Application of Payments or Proceeds. Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3.   Funds for Escrow Items. Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under



RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4.   Charges; Liens.   Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5.   Property Insurance.   Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater

LOAN NUMBER: 4482447
Florida Mortgage-Single Family/Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
---The Compliance Source, Inc.---
www.compliancesource.com
Page 6 of 16
MERS Modified Form 3010 01/01
14301L 06/02
©2004, The Compliance Source, Inc.



or lesser coverage that was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6.  **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7.  **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

LOAN NUMBER: 4402447

Florida Mortgage-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
—THE COMPLIANCE SOURCE, INC.—
www.compliancesource.com

Page 6 of 14

MERS Modified Form 3010 01/01
14001FL 11/04
© 2005, The Compliance Source, Inc.



Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8.   Borrower's Loan Application.  Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan.  Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9.   Protection of Lender's Interest in the Property and Rights Under this Security Instrument.  If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property.  Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding.  Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off.  Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so.  It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument.  These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all of the provisions of the lease.  If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10.  Mortgage Insurance.  If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect.  If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender.  If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect.  Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance.  Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve.  Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance.  If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law.  Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

LOAN NUMBER: 6482447
Florida Mortgage-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
—The Compliance Source, Inc.—
www.compliancesource.com
Page 7 of 14

MERS Modified Form 3010 01/01
14001FL 08/00
©2004, The Compliance Source, Inc.




Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has – if any – with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

LOAN NUMBER: 4462447

Florida Mortgage-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
— The COMPLIANCE SOURCE, INC.—
www.compliancesource.com
Page 8 of 14

MERS Modified Form 3010 01/01
© 2000, The Compliance Source, Inc.



If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. Borrower Not Released; Forbearance By Lender Not a Waiver. Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. Joint and Several Liability; Co-signers; Successors and Assigns Bound. Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14. Loan Charges. Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's

LOAN NUMBER: 4492447

Florida Mortgage-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
—The COMPLIANCE SOURCE, INC.—
www.compliancesource.com

MERS Modified Form 3010 01/01
14341FL 08/00
© 2004, The Compliance Source, Inc.

Page 9 of 14



acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15.  Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16.  Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17.  Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18.  Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19.  Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more

**LOAN NUMBER: 4452447**

Florida Mortgage-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
—THE COMPLIANCE SOURCE, INC.—
www.compliancesource.com

Page 13 of 14

MERS Modified Form 3010 01/01
140591C 10/01
©2001, The Compliance Source, Inc.



of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. Sale of Note; Change of Loan Servicer; Notice of Grievance. The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. Hazardous Substances. As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

LOAN NUMBER: 4492447
Florida Mortgage-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          MERS Modified Form 3010 01/01
—The Compliance Source, Inc.—                                      14301FL 08/00
www.compliancesource.com                  Page 13 of 14          ©2000, The Compliance Source, Inc.



NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

23. Release. Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. Attorneys' Fees. As used in this Security Instrument and the Note, attorneys' fees shall include those awarded by an appellate court and any attorneys' fees incurred in a bankruptcy proceeding.

25. Jury Trial Waiver. The Borrower hereby waives any right to a trial by jury in any action, proceeding, claim, or counterclaim, whether in contract or tort, at law or in equity, arising out of or in any way related to this Security Instrument or the Note.



LOAN NUMBER: 4482447
Florida Mortgage-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
— THE COMPLIANCE SOURCE, INC.—
www.compliancesource.com
Page 13 of 14
MERS Modified Form 3010  01/01
14001Fl  08/00
©2004, The Compliance Source, Inc.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Signed, sealed and delivered in the presence of:

Witness:

*Laurie Seeshotz* _____   *Bradley D Cannon* _____ (Seal)
                                                                    -Borrower
*Laurie Seesholtz* _____   (Printed, Typewritten, or Stamped Name)
(Printed, Typewritten, or Stamped Name)

Post-Office Address:  3430 FESTPER CIR, SARASOTA, FL 34235

*Chris Seesholtz* _____   *Patricia R Cannon* _____ (Seal)
                                                                    -Borrower
*Chris Seesholtz* _____   PATRICIA R CANNON (Printed, Typewritten, or Stamped Name)
(Printed, Typewritten, or Stamped Name)

Post-Office Address:  3430 FESTPER CIR, SARASOTA, FL 34235

_____ (Seal)
                       -Borrower
(Printed, Typewritten, or Stamped Name)

Post-Office Address:

_____ (Seal)
                       -Borrower
(Printed, Typewritten, or Stamped Name)

Post-Office Address:

LOAN NUMBER: 4482447
Florida Mortgage-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
—The COMPLIANCE SOURCE, INC.—
www.compliancesource.com
Page 13 of 14
MERS Modified Form 3010 01/01
14901FL 08/00
©2000, The Compliance Source, Inc.



State of **Florida**

County of **Sarasota**

The foregoing instrument was acknowledged before me this
[date] by STANLEY D CANNON and PATRICIA R CANNON

### Husband and Wife

who is personally known to me or who has produced
[type of identification] as identification.


Fla DIC
[name of person acknowledging]

Raureen Ann Seesholtz
Signature of Person Taking Acknowledgment

Laureen Ann Seesholtz
Name Typed, Printed or Stamped

Notary Public
Title or Rank

DD 206674
Serial Number, if any

LOAN NUMBER: 4492447
Florida Mortgage-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
—The COMPLIANCE SOURCE, INC.—
www.compliancesource.com
Page 14 of 14
MERS Modified Form 3010 01/01
14502L 08/04
©2004, The Compliance Source, Inc.



# 1-4 FAMILY RIDER
## (Assignment of Rents)

THIS 1-4 FAMILY RIDER is made this 9th day of September, 2005 , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Note to AMERISAVE MORTGAGE CORPORATION

(the "Lender")

of the same date and covering the Property described in the Security Instrument and located at:
4814 KIMBERA AVENUE, SARASOTA, FL 34235
*[Property Address]*

1-4 FAMILY COVENANTS. In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

A. ADDITIONAL PROPERTY SUBJECT TO THE SECURITY INSTRUMENT. In addition to the Property described in Security Instrument, the following items now or hereafter attached to the Property to the extent they are fixtures are added to the Property description, and shall also constitute the Property covered by the Security Instrument: building materials, appliances and goods of every nature whatsoever now or hereafter located in, on, or used, or intended to be used in connection with the Property, including, but not limited to, those for the purposes of supplying or distributing heating, cooling, electricity, gas, water, air and light, fire prevention and extinguishing apparatus, security and access control apparatus, plumbing, bath tubs, water heaters, water closets, sinks, ranges, stoves, refrigerators, dishwashers, disposals, washers, dryers, awnings, storm windows, storm doors, screens, blinds, shades, curtains and curtain rods, attached mirrors, cabinets, paneling and attached floor coverings, all of which, including replacements and additions thereto, shall be deemed to be and remain a part of the Property covered by the Security Instrument. All of the foregoing together with the Property described in the Security Instrument (or the leasehold estate if the Security Instrument is on a leasehold) are referred to in this 1-4 Family Rider and the Security Instrument as the "Property."

B. USE OF PROPERTY; COMPLIANCE WITH LAW. Borrower shall not seek, agree to or make a change in the use of the Property or its zoning classification, unless Lender has agreed in writing to the change. Borrower shall comply with all laws, ordinances, regulations and requirements of any governmental body applicable to the Property.

C. SUBORDINATE LIENS. Except as permitted by federal law, Borrower shall not allow any lien inferior to the Security Instrument to be perfected against the Property without Lender's prior written permission.

D. RENT LOSS INSURANCE. Borrower shall maintain insurance against rent loss in addition to the other hazards for which insurance is required by Section 5.

E. "BORROWER'S RIGHT TO REINSTATE" DELETED. Section 19 is deleted.

LOAN NUMBER: 4482447                                      MIN: 100162500044824473
Multistate 1-4 Family Rider—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT        Form 3170 01/01
—The Compliance Source, Inc.—                Page 1 of 3          ©2000 The Compliance Source, Inc.
www.compliancesource.com

**F. BORROWER'S OCCUPANCY.** Unless Lender and Borrower otherwise agree in writing, Section 6 concerning Borrower's occupancy of the Property is deleted.

**G. ASSIGNMENT OF LEASES.** Upon Lender's request after default, Borrower shall assign to Lender all leases of the Property and all security deposits made in connection with leases of the Property. Upon the assignment, Lender shall have the right to modify, extend or terminate the existing leases and to execute new leases, in Lender's sole discretion. As used in this paragraph G, the word "lease" shall mean "sublease" if the Security Instrument is on a leasehold.

**H. ASSIGNMENT OF RENTS; APPOINTMENT OF RECEIVER; LENDER IN POSSESSION.** Borrower absolutely and unconditionally assigns and transfers to Lender all the rents and revenues ("Rents") of the Property, regardless of to whom the Rents of the Property are payable. Borrower authorizes Lender or Lender's agents to collect the Rents, and agrees that each tenant of the Property shall pay the Rents to Lender or Lender's agents. However, Borrower shall receive the Rents until (i) Lender has given Borrower notice of default pursuant to Section 22 of the Security Instrument and (ii) Lender has given notice to the tenant(s) that the Rents are to be paid to Lender or Lender's agent. This assignment of Rents constitutes an absolute assignment and not an assignment for additional security only.

If Lender gives notices of default to Borrower: (i) all Rents received by Borrower shall be held by Borrower as trustee for the benefit of Lender only, to be applied to the sums secured by the Security Instrument; (ii) Lender shall be entitled to collect and receive all of the Rents of the Property; (iii) Borrower agrees that each tenant of the Property shall pay all Rents due and unpaid to Lender or Lender's agents upon Lender's written demand to the tenant; (iv) unless applicable law provides otherwise, all Rents collected by Lender or Lender's agents shall be applied first to the costs of taking control of and managing the Property and collecting the Rents, including, but not limited to, attorneys' fees, receiver's fees, premiums on receiver's bonds, repair and maintenance premiums, taxes, assessments and other charges on the Property, and then to the sums secured by the Security Instrument; (v) Lender, Lender's agents or any judicially appointed receiver shall be liable to account for only those Rents actually received; and (vi) Lender shall be entitled to have a receiver appointed to take possession of and manage the Property and collect the Rents and profits derived from the Property without any showing as to the inadequacy of the Property as security.

If the Rents of the Property are not sufficient to cover the costs of taking control of and managing the Property and of collecting the Rents any funds expended by Lender for such purposes shall become indebtedness of Borrower to Lender secured by the Security Instrument pursuant to Section 9.

Borrower represents and warrants that Borrower has not executed any prior assignment of the Rents and has not performed, and will not perform, any act that would prevent Lender from exercising its rights under this paragraph.

Lender, or Lender's agents or a judicially appointed receiver, shall not be required to enter upon, take control of or maintain the Property before or after giving notice of default to Borrower. However, Lender, or Lender's agents or a judicially appointed receiver, may do so at any time when a default occurs. Any application of Rents shall not cure or waive any default or invalidate any other right or remedy of Lender. This assignment of Rents of the Property shall terminate when all the sums secured by the Security Instrument are paid in full.

LOAN NUMBER: 4482447

Multistate 1-4 Family Rider—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                Form 3170 01/01
—THE COMPLIANCE SOURCE, INC.—                        Page 2 of 3
www.compliancesource.com



STATE OF: Florida
COUNTY: Sarasota

On 9/9/05 before me, Laureen Ann Sarshalte
Personally appeared Stanley D. Cahoon and Patricia R.
Cahoon                                    personally known to me (or provided
to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are
subscribed to the within instrument and acknowledged to me that he/she/they executed the
same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the
instrument the person(s) or the entity upon behalf of which the person(s) acted, executed
the instrument.

Witness my hand and official seal..

Signature Laureen Ann Sarshak

Affix Stamp of Seal Here

| This is/Transfers Deed of Trust/mortgage | |
| --- | --- |
| Date of Document | No. of Pages |
| Other signature not acknowledged | |

I.   CROSS-DEFAULT PROVISION.  Borrower's default or breach under any note or agreement in which Lender has an interest shall be a breach under the Security Instrument and Lender may invoke any of the remedies permitted by the Security Instrument.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this 1-4 Family Rider.

_____ (Seal)          _____ (Seal)
STANLEY D CANNON        -Borrower        PATRICIA R CANNON        -Borrower

_____ (Seal)          _____ (Seal)
                        -Borrower                                 -Borrower

                                         [Sign Original Only]

LOAN NUMBER: 4482447
Multistate 1-4 Family Rider—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                    Form 3170 01/01
—THE COMPLIANCE SOURCE, INC.—                              Page 3 of 3           14503FL 08/00 Rev. 10/04
          www.compliancesource.com                                              ©2004, The Compliance Source, Inc.

Form No. 3301 (6/00)
Short Form Commitment, EAGLE
SUPER EAGLE

ORDER NO: 3216458
FILE NO: 23498080
LENDER REF: 151843

Exhibit "A"

The land referred to in this policy is situated in the STATE OF FLORIDA, COUNTY OF SARASOTA, CITY OF SARASOTA, and described as follows:

BEING LOT NUMBER 418 IN DESOTO LAKES UNIT 7 AS SHOWN IN THE RECORDED PLAT/MAP THEREOF IN BOOK 8 PAGE 121 OF SARASOTA COUNTY RECORDS.

APN # 19140020