1

2

3

4

5                    UNITED STATES DISTRICT COURT

6                    NORTHERN DISTRICT OF CALIFORNIA

7

8    STANLEY D. CANNON, *et al.*,                    No. C-12-1376 EMC

9            Plaintiffs,

10        v.                                         **ORDER GRANTING IN PART AND
                                                     DENYING IN PART DEFENDANTS'**
11   WELLS FARGO BANK. N.A., *et al.*,               **MOTIONS TO DISMISS**

12           Defendants.                             **(Docket Nos. 57, 59-61)**
     _____/

13

14

15        Plaintiffs Stanley D. Cannon and Patricia R. Cannon have filed suit against Wells Fargo

16   Bank, N.A.; Assurant, Inc.; and the Federal National Mortgage Association ("Fannie Mae").  In

17   essence, Plaintiffs challenge certain practices related to Wells Fargo's forced purchase of flood

18   insurance for borrowers whose loans are owned by Fannie Mae and serviced by Wells Fargo.  The

19   insurance is purchased from Assurant's subsidiaries, American Security Insurance Company and

20   Standard Guaranty Insurance Company (collectively, "ASIC").  Currently pending before the Court

21   are various 12(b)(6) motions filed by each of the defendants.

22                    **I.    FACTUAL & PROCEDURAL BACKGROUND**

23        The instant case concerns what Plaintiffs call "force-placed flood insurance" and what

24   Defendants call "lender-placed flood insurance."  Flood insurance is a kind of property insurance.  A

25   person who borrows money to finance the purchase of residential property may be required by the

26   lender to obtain acceptable flood insurance on the real property securing the loan.  When a borrower

27   does not maintain the insurance, then the lender steps in to purchase the insurance for the borrower.

28   The lender typically has the right to do this under the mortgage contract.  In the instant case,

United States District Court

For the Northern District of California

**United States District Court**

For the Northern District of California

Plaintiffs challenge certain force-placed flood insurance practices engaged in by Wells Fargo, acting as a servicer on behalf of the loan owner Fannie Mae.

Plaintiffs allege as follows in their first amended complaint ("FAC").

Plaintiffs are residents of Florida.  *See* FAC ¶ 15.  In September 2005, Plaintiffs obtained a mortgage in the amount of $128,000 from Amerisave Mortgage Corporation.  *See* FAC ¶ 27.  Their mortgage was subsequently purchased by Fannie Mae.  *See* FAC ¶¶ 25, 27.  Fannie Mae is a federally chartered company.  *See* FAC ¶ 18.  It "buys and owns mortgages originated by other lenders."  FAC ¶ 25.  "To service its vast portfolio of loans, Fannie Mae hires servicing agents to service its loans pursuant to the contract terms contained with the loans."  FAC ¶ 25.  For Plaintiffs' loan, Fannie Mae hired Wells Fargo as the servicing agent.  *See* FAC ¶ 26.

Plaintiffs' mortgage was a Fannie Mae form mortgage.  *See* FAC ¶ 29.  One of the terms of the mortgage concerns property insurance.  It provides in relevant part as follows:

> 5.  Property Insurance.  Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire . . . and any other hazards, including, but not limited to, earthquakes and floods, for which Lender requires insurance.  The insurance shall be maintained in the amounts . . . and for the periods that Lender requires.  What Lender requires pursuant to the preceding sentences can change during the term of the Loan. . . .
>
> If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense.  Lender is under no obligation to purchase any particular type or amount of coverage.  Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect.  Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained.  Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument.  These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

FAC, Ex. A (Mortgage § 5).

Because Plaintiffs' home was located in a Special Flood Hazard Area, as defined by federal regulations, they were required to obtain flood insurance.  *See* FAC ¶ 31.  At the time they entered

into the mortgage, Plaintiffs signed a notice regarding a special flood hazard area ("NSFH").  *See*

FAC ¶ 31.  The notice specified that,

> The community in which the property securing the loan is located participates in the National Flood Insurance Program (NFIP).  Federal law will not allow us to make you the loan that you have applied for if you do not purchase flood insurance.  The flood insurance must be maintained for the life of the loan.  If you fail to purchase or renew flood insurance on the property, Federal law authorizes and requires us to purchase the flood insurance for you at your expense.
>
> . . . .
>
> At a minimum, flood insurance purchased must cover the lesser of:
>
> 1.   the outstanding principal balance of the loan; or
> 2.   the maximum amount of coverage allowed for the type of property under the NFIP.

Docket No. 58 (Wells Fargo's RJN, Ex. I) (notice); *see also* FAC ¶ 31; Docket No. 70 (Opp'n at 7)

(stating no objection to request for judicial notice of the NSFH).

Plaintiffs obtained sufficient flood insurance coverage to close their mortgage in 2005.  *See*

FAC ¶ 32.  However, in April 2006 – two months after Wells Fargo became the servicer for

Plaintiffs' mortgage – Wells Fargo increased the amount of flood insurance that Plaintiffs were

required to maintain.  *See* FAC ¶ 34.  In May 2006, Wells Fargo notified Plaintiffs that it had force-

purchased additional flood insurance on behalf of Plaintiffs because there was deficient coverage.

Wells Fargo purchased the insurance from ASIC, *i.e.*, one of Assurant's subsidiaries.  *See* FAC ¶ 38.

Subsequently, Plaintiffs purchased additional flood insurance from a different insurance company to

avoid paying the high premiums charged by ASIC.  *See* FAC ¶ 39.

In April/May 2008, Plaintiffs were again subjected to force-placed flood insurance by Wells

Fargo.  The insurance policy was once again with ASIC.  *See* FAC ¶¶ 39-40.  At this time, Plaintiffs'

private flood insurance policy combined with the force-placed insurance policy provided a total of at

least $238,100 in flood insurance coverage.  *See* FAC ¶ 41.  The amount Plaintiffs owed Fannie Mae

was significantly lower – more than $100,000 lower.  *See* FAC ¶ 41.

According to Plaintiffs, the force-placed insurance to which they were subjected is improper

for at least three reasons.

**United States District Court**
For the Northern District of California

First, Wells Fargo or an affiliated entity receives a kickback from ASIC for the force-placed insurance (*i.e.*, a percentage of the premiums). Although Wells Fargo claims these are commissions earned for finding and placing the insurance, Wells Fargo does not in fact provide any such service because it has a set agreement with Assurant and/or ASIC in which it agrees to buy every force-placed insurance policy from ASIC. *See* FAC ¶¶ 3-5.

Second, Wells Fargo requires all borrowers to maintain flood insurance equal to the "replacement cost value" of the borrower's property, even if that value exceeds the principal balance on the loan. But the purpose of force-placed insurance is only to protect the lender's interest in the property, and therefore a borrower should not be force-placed into insurance exceeding the outstanding principal balance. *See* FAC ¶ 7.

Finally, "Wells [Fargo] force-places retroactive insurance policies covering periods of time in the past where coverage had lapsed. This is done despite the fact that there are no claims during the lapsed period and the homeowner has since secured standard insurance." FAC ¶ 59. In short, Plaintiffs claim that Wells Fargo engages in improper backdating.

Based on, *inter alia*, the above allegations, Plaintiffs assert the following claims, both on their own behalf and on behalf of a nationwide class and a California-wide subclass:

(1)    breach of contract, including the implied covenant of good faith and fair dealing (against Fannie Mae and Wells Fargo only);

(2)    unjust enrichment (against Wells Fargo and Assurant only);

(3)    conversion (against Wells Fargo only);

(4)    breach of fiduciary duty (against Fannie Mae and Wells Fargo only);

(5)    violation of the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 *et seq.* (against Fannie Mae and Wells Fargo only);

(6)    violation of California Business & Professions Code § 17200 (against all Defendants);

(7)    violation of the Real Estate Settlement Procedures Act, 12 U.S.C. § 2601 (against all Defendants); and

(8)    equitable relief (against all Defendants).

United States District Court

For the Northern District of California

1    The eighth claim, however, may be disregarded because, as Plaintiffs concede in their papers,

2    equitable relief is not a claim for relief but rather only a remedy.  *See, e.g.*, Docket No. 70 (Opp'n at

3    22) (stating that Plaintiffs "mistakenly listed 'Equitable Relief' as a cause of action"; agreeing with

4    Defendants that "equitable relief is not a separate cause of action, but is, instead, a remedy").

## II.  DISCUSSION

6    A.    Legal Standard

7        Under Federal Rule of Civil Procedure 12(b)(6), a party may move to dismiss based on the

8    failure to state a claim upon which relief may be granted.  *See* Fed. R. Civ. P. 12(b)(6).  A motion to

9    dismiss based on Rule 12(b)(6) challenges the legal sufficiency of the claims alleged.  *See Parks*

10   *Sch. of Bus. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995).  In considering such a motion, a court

11   must take all allegations of material fact as true and construe them in the light most favorable to the

12   nonmoving party, although "conclusory allegations of law and unwarranted inferences are

13   insufficient to avoid a Rule 12(b)(6) dismissal."  *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir.

14   2009).  While "a complaint need not contain detailed factual allegations . . . it must plead 'enough

15   facts to state a claim to relief that is plausible on its face.'"  *Id.*  "A claim has facial plausibility when

16   the plaintiff pleads factual content that allows the court to draw the reasonable inference that the

17   defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009); *see*

18   *also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007).  "The plausibility standard is not akin to

19   a 'probability requirement,' but it asks for more than sheer possibility that a defendant acted

20   unlawfully."  *Iqbal*, 129 S. Ct. at 1949.

21   B.    Overarching Arguments

22       Before examining whether Plaintiffs have adequately pled allegations in support of each of

23   the claims asserted in the complaint, the Court addresses first some overarching arguments that are

24   made in Defendants' various motions.  More specifically, there are overarching arguments regarding

25   (1) Defendants and (2) the claims.

26   ///

27   ///

28   ///

**United States District Court**
For the Northern District of California

1.     <u>Overarching Arguments Regarding Defendants</u>

As to Defendants, there are two overarching arguments made: (1) that Assurant is not a proper defendant in the litigation and (2) that Fannie Mae cannot be held liable for Wells Fargo's acts.  (There are no overarching arguments made vis-a-vis Wells Fargo as a defendant.)

     a.     <u>Assurant</u>

In its motion, Assurant argues that Plaintiffs lack standing to sue it because it engaged in no alleged wrongdoing itself – rather, its subsidiary (*i.e.*, ASIC) did.  *See* Docket No. 59 (Mot. at 24-25).  In their opposition, Plaintiffs state that they have no evidence to refute Assurant's claims that "it does not write insurance policies, control the business of ASIC, intermingle its affairs with those of ASIC, or participate in any way in ASIC's insurance business."  Docket No. 67 (Opp'n at 7).  Plaintiffs ask, however, that the Court grant them "limited discovery to identify the correct parties and to amend their complaint to name the correct parties."  Docket No. 67 (Opp'n at 7).  In its reply, Assurant appears to object to this proposal but only because Plaintiffs "already know which Assurant subsidiary underwriter as involved," *i.e.*, ASIC.  *See* Docket No. 80 (Reply at 15).

Because Plaintiffs have effectively admitted that they do not have – at least at this point – a good faith basis for suing Assurant, the Court grants the motion to dismiss all claims asserted against Assurant without prejudice.  Moreover, the Court hereby gives Plaintiffs leave to amend to add ASIC to this lawsuit in lieu of Assurant.  Finally, the Court notes that it shall give Plaintiffs some leeway in conducting discovery vis-a-vis ASIC to determine whether Assurant or another affiliated entity may also have been involved.  If discovery reveals a basis for Assurant's liability, Plaintiffs can seek leave to amend.  The Court emphasizes, however, that it is not authorizing Plaintiffs to conduct broad-ranging discovery on this specific issue.  Rather, Plaintiffs shall have leave to conduct reasonable, narrowly tailored discovery on this matter.

     b.     <u>Fannie Mae</u>

As for Fannie Mae, the basic issue is whether it can be held liable for the alleged wrongdoing of Wells Fargo.  In its motion, Fannie Mae makes two arguments:  (1) that Plaintiffs have failed to plead any facts establishing an agency relationship between Wells Fargo and Fannie Mae, *see* Docket No. 61 (Mot. at 9) (arguing that "Plaintiffs allege only the ultimate conclusion . . . without

1  pleading the specific elements [of agency]"); and (2) that, even if Wells Fargo were Fannie Mae's

2  agent, the *Merrill* doctrine protects Fannie Mae from liability for the unauthorized acts of its agents.

3  *See* Docket No. 61 (Mot. at 10-14).

4      For purposes of this opinion, the Court assumes that Plaintiffs have adequately pled facts

5  supporting an agency relationship between Wells Fargo and Fannie Mae given the contractual

6  relationship wherein Wells Fargo services the loan for Fannie Mae.  The question thus is whether the

7  *Merrill* doctrine applies.

8      The *Merrill* doctrine comes from a decades-old Supreme Court decision, *Federal Crop*

9  *Insurance Corp. v. Merrill*, 332 U.S. 380 (1947).  In *Merrill*, the Supreme Court addressed whether

10  a wholly government-owned enterprise – the Federal Crop Insurance Corp. ("FCIC") – could be

11  held liable for a mistake made by one of its agents.  The FCIC was created by statute to insure

12  producers of wheat against crop losses due to unavoidable causes, including drought.  The

13  respondents applied for insurance with a local agent of the FCIC.  They informed the agent that

14      they were planting 460 acres of spring wheat and that on 400 of these

15      acres they were reseeding on winter wheat acreage.  The [agent]
        advised respondents that the entire crop was insurable, and

16      recommended to the [FCIC's] Denver Branch Office acceptance of the
        application.  (The formal application itself did not disclose that any

17      part of the insured crop was reseeded.)  On May 28, 1945, the [FCIC]
        accepted the application.

18  *Id.* at 382.  Subsequently, most of the respondents' crop was destroyed as a result of a drought.

19  After the FCIC discovered that the destroyed acreage had been reseeded, it refused to pay the loss.

20  *See id.*

21      In deciding whether the FCIC could be held liable, the Supreme Court began by noting that

22      [w]hatever the form in which the Government functions, anyone
        entering into an arrangement with the Government takes the risk of

23      having accurately ascertained that *he who purports to act for the*
        *Government stays within the bounds of his authority*.  The scope of

24      this authority may be explicitly defined by Congress or be limited by
        delegated legislation, properly exercised through the rule-making

25      power.  And this is so even though, as here, the agent himself may
        have been unaware of the limitations upon his authority.

26

27  *Id.* at 383 (emphasis added).

28      The Court then noted that,

United States District Court
For the Northern District of California

[i]f the Federal Crop Insurance Act had by explicit language prohibited the insurance of spring wheat which is reseeded on winter wheat acreage, the ignorance of such a restriction, either by the respondents or the [FCIC's] agent, would be immaterial and recovery could not be had against the [FCIC] for loss of such reseeded wheat.

*Id.* at 384.  The same analysis would apply to federal regulations: "[T]he Wheat Crop Insurance Regulations were binding on all who sought to come within the Federal Crop Insurance Act, regardless of actual knowledge of what is in the Regulations or of the hardship resulting from innocent ignorance."  *Id.* at 385.  Because there was in fact a regulation that precluded recovery for the loss of the reseeded wheat, the respondents were essentially out of luck.  *See id.* at 385-86.

In their papers, Plaintiffs essentially argue that *Merrill* should be narrowly construed – *i.e.*, that the FCIC was held not liable only because the respondents had constructive notice through the regulations that they were barred from getting recovery for the loss of the reseeded wheat, in spite of what the FCIC's agent said.  *See* Docket No. 69 (Opp'n at 6).  While Plaintiffs' position is not an unreasonable one given the underlying facts in *Merrill*, courts have not construed *Merrill* so restrictively.  Instead, courts have focused n the broad statement in *Merrill* that "anyone entering into an arrangement with the Government takes the risk of having accurately ascertained that *he who purports to act for the Government stays within the bounds of his authority*."  *Merrill*, 332 U.S. at 383 (emphasis added).  Based on this language, most courts – including the Ninth Circuit – have held that a federal government entity cannot be held responsible for the unauthorized acts of an agent.  Accordingly, an agent must have actual authority to act, as opposed to just apparent or ostensible authority, before a government entity may be held liable as the principal.  *See Phaneuf v. Republic of Indon.*, 106 F.3d 302, 308 (9th Cir. 1997) (stating that, "[w]hen dealing with a purported agent of the United States, the third party bears the risk that the agent is acting outside the scope of the agent's authority"); *Thomas v. INS*, 35 F.3d 1332, 1338 (9th Cir. 1994) (noting that "[e]stoppel and apparent authority normally will not substitute for actual authority to bind the United States government").[1]  Notably, the *Merrill* doctrine has been applied to both contract and tort-based

---

[1]  *See also United States v. Flemmi*, 225 F.3d 78, 85 (1st Cir. 2000) (stating that, "[a]s a general rule, doctrines such as estoppel and apparent authority are not available to bind the federal sovereign" so that the issue in the case was whether the agents had actual authority); *Ferguson v. FDIC*, 164 F.3d 894, 898 (5th Cir. 1999) (noting that "the Government is not bound by the actions

United States District Court

For the Northern District of California

1    claims.  *See, e.g.*, *Paslowski v. Standard Mortg. Corp.*, 129 F. Supp. 2d 793, 804-05 (W.D. Pa. 2000)

2    (applying *Merrill* doctrine to claims for breach of contract and violation of state consumer protection

3    law).

4             None of the authority cited by Plaintiffs detracts from the authority cited above.  *See* Docket

5    No. 69 (Opp'n at 7).  For example, in *United States v. Georgia-Pacific Co.*, 421 F.2d 92 (9th Cir.

6    1970), the Ninth Circuit did note that there was constructive notice in *Merrill*; however, it never held

7    that constructive notice is a requirement under the *Merrill* doctrine.  *See id.* at 100.  Furthermore, the

8    court indicated in its opinion that there should not be liability for the government where the acts of

9    its representatives are unauthorized or outside the scope of their authority.  *See id.* at 100-01.

10   Accordingly, the Court rejects Plaintiffs' narrow reading of *Merrill* and agrees instead with

11   Defendants' interpretation of the doctrine.

12            The question thus becomes whether Fannie Mae authorized the specific force-placed

13   insurance practices employed by Wells Fargo – or rather, in the context of this 12(b)(6) motion,

14   whether Plaintiffs have alleged such authorization.  Plaintiffs have not.  Plaintiffs have simply

15   alleged that Fannie Mae hired Wells Fargo to service their loan, *see* FAC ¶ 26; they have not, *e.g.*,

16   alleged that Fannie Mae authorized Wells Fargo's kickback scheme, the excessive coverage, or the

17   backdating.  To the extent Plaintiffs suggest in their papers that Fannie Mae has not presented any

18   evidence that it precluded Wells Fargo the alleged wrongful conduct, *see* Docket No. 69 (Opp'n at

19

20   _____

21   of agents acting outside the scope of their authority"); *Hachikian v. FDIC*, 96 F.3d 502, 505-06 (1st
     Cir. 1996) (stating that "apparent authority cannot serve as a means of holding the federal sovereign

22   to a contract"; adding that "policy rationales for this rule can be extrapolated from the closely related
     theory that equitable estoppel is generally inapplicable to the federal government when its

23   employees induce reliance by their unauthorized actions"); *Mendrala v. Crown Mortg. Co.*, 955F.2d
     1132, 1140 (7th Cir. 1992) (stating that "[t]he Supreme Court has consistently upheld the principle

24   that federal instrumentalities cannot be estopped by persons acting beyond their authority"); *C.P.
     Squire Contractors, Inc. v. United States*, 716 F.2d 865, 873 (Fed. Cir. 1983) (stating that "[i]t is

25   well settled that if an agent of the government acts outside the scope of the authority delegated to
     him his acts do not create any liability on the government"); *Prater v. United States*, 612 F.2d 157,

26   160 (5th Cir. 1980) (noting that "[i]t is well established that the federal government will not be
     bound by agreement entered into by one of its agents unless the agent acts within his actual

27   authority"); *United States v. Zenith-Godley Co.*, 295 F.2d 634, 635 (2d Cir. 1961) (indicating that,
     under *Merrill*, "the Government is not bound by the unauthorized acts of its agent even if within the

28   scope of the agent's apparent authority").

**United States District Court**
For the Northern District of California

7), that misses the point.  It is Plaintiffs' burden under *Merrill* to make allegations that Fannie Mae authorized Wells Fargo's acts.

Accordingly, the Court dismisses all claims against Fannie Mae based on the *Merrill* doctrine.  At this juncture, the dismissal shall be without prejudice.  Plaintiffs have leave to amend only if they can allege in good faith that Fannie Mae authorized Wells Fargo's conduct.[2]

        c.    Summary

For the foregoing reasons, the Court dismisses the claims against Assurant and Wells Fargo without prejudice.

    2.    Overarching Arguments Regarding Claims

As discussed above, Plaintiffs offer three theories as to why the force-placed insurance to which they were subjected is improper: (1) Wells Fargo or an affiliated entity receives a kickback from ASIC for the force-placed insurance (*i.e.*, a percentage of the premiums); (2) Wells Fargo requires all borrowers to maintain flood insurance equal to the "replacement cost value" of the borrower's property instead of just the outstanding principal balance (which would be sufficient to protect the lender's interest); and (3) "Wells [Fargo] force-places retroactive insurance policies covering periods of time in the past where coverage had lapsed" even where "there are no claims during the lapsed period and the homeowner has since secured standard insurance."  FAC ¶ 59.  In its papers, Wells Fargo makes overarching arguments as to the first two theories, but not the third.[3]

---

    [2]  In their papers, Plaintiffs argue that, if the Court does take judicial notice of a Fannie Mae Servicing Guide, *see* Docket No. 62 (RJN, Ex. A) (Fannie Mae Servicing Guide for 2006 and 2011), then that document establishes Fannie Mae's authorization of Wells Fargo's unlawful conduct.  Plaintiffs point out that the Servicing Guide contains the following statement: "'The contracts with the borrower should include information . . . that the servicer or one of its affiliates may be paid a commission.'"  Docket No. 69 (Opp'n at 8).  This argument has several problems.  First, the Court agrees with Plaintiffs that it is questionable whether the Servicing Guide may be judicially noticed.  Second, even if the document could be judicially noticed, Plaintiffs have not in their FAC objected to the fact of a commission per se; rather, their theory is that there are no *true* commissions (and there are only illegal kickbacks instead) because Wells Fargo gets a percentage of the premiums for providing no services at all – insurance is automatically placed with ASIC.

    [3]  Some of these arguments are echoed in Fannie Mae and Assurant's papers as well.

United States District Court

For the Northern District of California

a.     Kickback Theory

As to the first theory – *i.e.*, the kickback theory – Wells Fargo argues that it is barred by the filed-rate doctrine and/or the primary jurisdiction doctrine.

i.     Filed-Rate Doctrine

"The filed rate doctrine bars suits against regulated utilities grounded on the allegation that the rates charged by the utility are unreasonable.  Simply stated, the doctrine holds that any 'filed rate' – that is, one approved by the governing regulatory agency – is per se reasonable and unassailable in judicial proceedings brought by ratepayers."[4]  *Wegoland Ltd. v. NYNEX Corp.*, 27 F.3d 17, 18 (2d Cir. 1994).  The doctrine "does not preclude recovery of amounts paid in excess of the filed rate, but it completely forecloses any claim that a payment of the filed rate is excessive." *Webb v. Chase Manhattan Mortg. Corp.*, No. 2:05-cv-0548, 2008 U.S. Dist. LEXIS 42559, at *58 (S.D. Ohio May 28, 2008).  Federal courts have recognized that the filed-rate doctrine acts to bar state causes of action and further applies to cases concerning state rates.  *See, e.g.*, *Wegoland*, 27 F.3d at 20; *Taffet v. Southern Co.*, 967 F.2d 1483, 1490 (11th Cir. 1992).  Federal courts have also held that "the filed rate doctrine applies to the insurance industry."  *Schilke v. Wachovia Mortg., FSB*, 820 F. Supp. 2d 825, 835 (N.D. Ill. 2011).

In the instant case, Wells Fargo argues that the kickback theory is barred by the filed-rate doctrine because, at bottom, Plaintiffs are arguing that the cost of the flood insurance is unreasonable or excessive because it includes a kickback (as opposed to a true earned commission). In support of this position, Wells Fargo relies in particular on two district court cases where the courts concluded that the kickback allegations by the plaintiffs did not preclude application of the filed-rate doctrine.  In *Morales v. Attorneys' Title Insurance Fund, Inc.*, 983 F. Supp. 1418 (S.D. Fla. 1995), the plaintiffs sued various title insurance companies for a violation of RESPA based on an alleged kickback.  The court held that the filed-rate doctrine applied because allowing the

---

[4]  The doctrine protects two separate interests, "one concerned with potential 'discrimination' in rates as between ratepayers and the other concerned with the 'justiciability' of determining reasonable rates."  *Wegoland*, 27 F.3d at 19; *see also Arsberry v. Illinois*, 244 F.3d 558, 562 (7th Cir. 2001) (noting that the filed-rate doctrine "is based both on historical antipathy to rate setting by courts, deemed a task they are inherently unsuited to perform competently, and on a policy of forbidding price discrimination by public utilities and common carriers").

**United States District Court**
For the Northern District of California

1   plaintiffs recovery "would result in discrimination against other purchasers of title insurance in

2   Florida who have paid, and will pay, the promulgated rate." *Id.* at 1428.  The court acknowledged

3   that the case was a class action but stated that this fact "'in no way affects the important concerns of

4   agency authority, justiciability, and institutional competence,'" *i.e.*, the other reasons animating the

5   filed-rate doctrine.  *See id.*  In *Schilke v. Wachovia Mortgage, FSB*, 758 F. Supp. 2d 549 (N.D. Ill.

6   2010), the plaintiff sued, *inter alia*, a flood insurance company based on alleged kickbacks, asserting

7   claims for, *e.g.*, fraud and unjust enrichment.  The court took into account the plaintiff's assertion

8   that the kickbacks are illegal under state law.  However, the court noted, "even if [p]laintiff is

9   correct, that does not affect the applicability of the filed rate doctrine" because "[t]he '[a]pplication

10  of the filed rate doctrine in any particular case is not determined by the culpability of the defendant's

11  conduct or the possibility of inequitable results.'"  *Id.* at 562 (quoting *Marcus v. AT&T Corp.*, 138

12  F.3d 46, 58 (2d Cir. 1998)).

13      In addition to the *Morales* and *Schilke* cases, there is other authority that lends support to

14  Defendants' position, including appellate authority.  *See, e.g.*, *McCray v. Fid. Nat'l Title Ins. Co.*,

15  682 F.3d 229, 241 n.11 (3d Cir. 2012) (in case where plaintiffs asserted that title insurance

16  companies violated federal antitrust law, taking note of plaintiffs' claim that title insurers' filings

17  with regulatory agency included "hidden costs based on 'kickbacks and other inducements unrelated

18  to the business of insurance'"; however, still finding the filed-rate doctrine applicable because "it is

19  well established that 'there is no fraud exception to the filed rate doctrine,'" and so "the fact that

20  [a]ppellees allegedly hid expenses and engaged in other fraudulent conduct does not make the

21  doctrine inapplicable"); *In re Title Ins. Antitrust Cases*, 702 F. Supp. 2d 840, 845 (N.D. Ohio 2010)

22  (in case where plaintiffs asserted that title insurers conspired to fix prices for title insurance in

23  violation of, *inter alia*, federal antitrust law, taking note of plaintiffs' allegations that inflated rates

24  included "unlawful kickbacks and other charges unrelated to title insurance or the services provided

25  in connection with title insurance"; however, still finding filed-rate doctrine applicable); *In re*

26  *Pennsylvania Title Ins. Antitrust Litig.*, 648 F. Supp. 2d 663, 679 (E.D. Pa. 2009) (in case where

27  plaintiffs asserted that title insurance companies conspired to fix rates in violation of antitrust law,

28

1   taking note of plaintiffs' allegation that title insurers had inflated title insurance rates by including

2   kickbacks; however, still finding filed-rate doctrine applicable).

3        In spite of the above authority, the Court is not convinced that the filed-rate doctrine is

4   applicable.  As Plaintiffs note, there are two cases where a court specifically rejected application of

5   the filed-rate doctrine – in particular, to a bank.  First, in *Abels v. JPMorgan Chase Bank, N.A.*, 678

6   F. Supp. 2d 1273 (S.D. Fla. 2009), the court held that it would not apply the filed-rate doctrine, in

7   part because the plaintiff had sued a bank and not an insurance company.  The court noted:

> Plaintiffs argue that Defendant is a bank, not an insurance company, and therefore the filed rate doctrine does not apply to it.  Indeed, the purpose of the filed rate doctrine is to "'(1) preserve the regulating agency's authority to determine the reasonableness of rates; and (2) insure that the regulated entities charge only those rates that the agency has approved.'"  Therefore, Plaintiffs argue, because the bank is not subject to the extensive administrative oversight that insurance companies are, applying the filed rate doctrine in this instance would not serve either purpose.
>
> The Court finds that Plaintiffs have the better argument.  Plaintiffs are not complaining that they were charged an excessive insurance rate, they are complaining that the defendant bank acted unlawfully when it chose this particular insurance company and this particular rate. Indeed, the Supreme Court "has emphasized the limited scope of the filed rate doctrine to preclude damage claims only where there are validly filed rates."  Accordingly, the filed rate doctrine does not bar Plaintiffs' case.

*Abels*, 678 F. Supp. 2d at 1277.  Second, in *Kunzelmann v. Wells Fargo Bank, N.A.*, No. 9:11-cv-81373-DMM, 2012 WL 2003337 (S.D. Fla. June 4, 2012), the court took note of the *Abels* decision and then stated that it, too, was not applying the filed-rate doctrine because the plaintiff was "not challenging the rates filed by Defendants' insurers.  Rather, Plaintiff challenges the manner in which Defendants select insurers, the manipulation of the force-placed insurance process, and the impermissible kickbacks that were included in the premiums."  *Kunzelmann*, 2012 WL 2003337, at *3.  The Court finds the reasoning of these cases – *Kunzelmann* in particular – persuasive.

        Wells Fargo protests that *Abels* and *Kunzelmann* should be disregarded because the filed-rate doctrine "cannot turn on [the] distinction [between bank and insurer]" – if a rate is reasonable, then it is

> reasonable for the buyer as well as the seller.  Rate approval would

United States District Court

For the Northern District of California

serve no purpose if insurers could not sell insurance at the approved rates because no buyer could lawfully purchase the insurance at that rate. Thus, a claim that a bank acted unlawfully in buying insurance at the approved rate is just as direct an assault on Florida's regulation of insurance rates as a claim that the insurer acted wrongfully in charging that rate.

Docket No. 60 (Mot. at 16-17). But while the court in *Abels* did focus in part on the distinction between a bank and an insurance company, the court in *Kunzelmann* did not. The point made by the *Kunzelmann* court was that, where a plaintiff is not challenging a rate as excessive, but rather the manipulation of the rate, the filed-rate doctrine does not apply. This reasoning is persuasive. For example, if insurance were available from a number of carriers at different rates – all subject to filed-rates – the filed-rate doctrine would not protect a loan servicer who chooses a carrier and a policy with a rate higher than others simply to receive a kickback not available from other carriers. A claim of manipulation could lie irrespective of the fact that the rate charged by the carrier is protected under the filed-rate doctrine.

Accordingly, the Court rejects Wells Fargo's argument that the filed-rate doctrine is a bar to the kickback claims asserted against it.[5]

ii.     Primary Jurisdiction Doctrine

Wells Fargo argues that, even if the Court is not inclined to apply the filed-rate doctrine, then the primary jurisdiction doctrine should still be applied. More specifically, Wells Fargo argues that the Court should invoke the doctrine to – at the very least – stay the case so that Plaintiffs can first

---

[5]  The Court also notes that several courts have expressly rejected the filed-rate doctrine where the plaintiffs have articulated a kickback claim predicated on RESPA. The rationale is typically that used by Judge Alsup in *Kay v. Wells Fargo & Co.*, 247 F.R.D. 572 (N.D. Cal. 2007):

> Statutes like RESPA are enacted to protect consumers from unfair business practices by giving consumers a private right of action against service providers. Plaintiffs may not sue under the veil of RESPA if they simply think that the price they paid for their settlement services was unfair. Alternatively, plaintiffs bringing a suit under RESPA may allege a violation of fair business practices through the use of illegal kickback payments. The filed-rate doctrine bars suit from the former class of plaintiffs and not the latter.

*Id.* at 576; *see also Alston v. Countrywide Fin. Corp.*, 585 F.3d 753, 764-65 (3d Cir. 2009); *Reed v. Washington Mut., Inc.*, No. 07-4426, 2008 U.S. Dist. LEXIS 50523, at *9-10 (E.D. Pa. June 30, 2008).

United States District Court

For the Northern District of California

1    present their kickback-based claims to the Florida Office of Insurance Regulation ("OIR").  *See*

2    Docket No. 77 (Reply at 4).  Plaintiffs have not specifically addressed the primary jurisdiction

3    doctrine in their papers.

4         The primary jurisdiction doctrine is one recognized by both federal courts and state courts,

5    including those in Florida and California.  Under federal law, "[t]he primary jurisdiction doctrine

6    allows courts to stay proceedings or to dismiss a complaint without prejudice pending the resolution

7    of an issue within the special competence of an administrative agency."  *Clark v. Time Warner*

8    *Cable*, 523 F.3d 1110, 1114 (9th Cir. 2008).  The same is basically true under Florida and California

9    law.  *See Flo-Sun, Inc. v. Kirk*, 783 So. 2d 1029, 1036-37 (Fla. 2001) (stating that "[t]he doctrine of

10   primary jurisdiction dictates that when a party seeks to invoke the original jurisdiction of a trial

11   court by asserting an issue which is beyond the ordinary experience of judges and juries, but within

12   an administrative agency's special competence, the court should refrain from exercising its

13   jurisdiction over that issue until such time as the issue has been ruled upon by the agency");

14   *Jonathan Neil & Assoc., Inc. v. Jones*, 33 Cal. 4th 917, 931-32 (2004) (noting that primary

15   jurisdiction "applies where a claim is originally cognizable in the courts, and comes into play

16   whenever enforcement of the claim requires the resolution of issues which, under a regulatory

17   scheme, have been placed within the special competence of an administrative body; in such a case

18   the judicial process is  suspended pending referral of such issues to the administrative body for its

19   views") (internal quotation marks omitted).

20        Under federal law, however, the primary jurisdiction doctrine focuses on referral of a *federal*

21   claim to an administrative agency.  *See Clark*, 523 F.3d at 1115 (noting that the primary jurisdiction

22   doctrine generally focuses on whether there is "'(1) [a] need to resolve an issue that (2) has been

23   placed *by Congress* within the jurisdiction of an administrative body having regulatory authority (3)

24   pursuant to a statute that subjects an industry or activity to a comprehensive regulatory authority that

25   (4) requires expertise or uniformity in administration'") (emphasis added).  Furthermore, under

26   federal law, "[p]rimary jurisdiction usually involves referral to a federal agency," although there

27   appear to be some exceptions – *e.g.*, a federal court may refer a case to a state agency where the state

28   agency "is exercising in effect delegated federal power."  *Illinois Bell Tel. Co. v. Global Naps Ill.,*

United States District Court
For the Northern District of California

*Inc.*, 551 F.3d 587, 595 (7th Cir. 2008); *see also Western Radio Servs. Co. v. Qwest Corp.*, 530 F.3d 1186, 1200 (9th Cir. 2008) (stating that, "while we might under other circumstances be hesitant to require that a party bring its claim to a state agency before raising a federal private right of action in district court, [47 U.S.C.] §§ 251 and 252 give the PUC a uniquely prominent role").

The federal primary jurisdiction doctrine does not apply to the instant case.  While Plaintiffs have alleged two federal claims – a violation of TILA and a violation of RESPA – Wells Fargo is not asking for a referral of those claims to a federal agency.  And there is nothing to indicate that the Florida OIR has been delegated any federal power.

Nor does the primary jurisdiction doctrine as a bar for the state law claims.  For much of the same reasons why the Court declines to apply the filed-rate doctrine to Wells Fargo, the Court refuses to apply the primary jurisdiction doctrine.  Notably, in *Abels*, the district court rejected the bank's assertion of the primary jurisdiction doctrine because

> [t]he [Florida] OIR only regulates insurance companies, and Florida Statute [§] 627.371 [which creates a detailed process for challenging an insurance rate] only applies when a person challenges a rate issued by an insurer.  [In contrast], Defendant, a financial institution, is regulated by the Florida Office of Financial Regulation (OFR).  Indeed, section 655.946 specifically allows a bank to purchase "force-placed" insurance.  However, unlike the chapter 627, chapter 655 does not provide any type of administrative remedy.  Furthermore, as noted above, Plaintiffs are not complaining of an excessive insurance rate, they are complaining that the defendant bank acted unlawfully when it chose this particular insurance company and this particular rate.  For these reasons, the doctrine of primary agency jurisdiction does not bar this action.

*Abels*, 678 F. Supp. 2d at 1277-78.

The Court thus rejects the primary jurisdiction doctrine as a bar to Plaintiffs' kickback claims.

b.   Excessive Coverage Theory

Wells Fargo challenges not only Plaintiffs' kickback claims but also their excessive coverage claims – *i.e.*, their claims that Wells Fargo engaged in wrongful conduct by requiring flood insurance coverage in an amount greater than the outstanding principal balance on the loan (*i.e.*, the replacement cost value of the property).

**United States District Court**
For the Northern District of California

Under the National Flood Insurance Act ("NFIA"), *see* 42 U.S.C. § 4001, a loan secured by improved real property in a flood zone must be "covered for the term of the loan by flood insurance in an amount *at least* equal to the outstanding principal balance of the loan or the maximum limit of coverage made available under the Act with respect to the particular type of property, whichever is less." *Id.* § 4012a(b)(1) (emphasis added); *see also* 24 C.F.R. § 203.16a(c) (providing that "[t]he flood insurance must be maintained during such time as the mortgage is insured in an amount *at least* equal to either the outstanding balance of the mortgage, less estimated land costs, or the maximum amount of the NFIP [National Flood Insurance Program] insurance available with respect to the property improvements, whichever is less") (emphasis).  In its papers, Wells Fargo notes that, as made clear by the language of § 4012a(b)(1), a lender may require flood insurance in an amount that exceeds the principal balance.  "The words 'at least equal to' set a minimum requirement or floor, not a maximum amount or ceiling."  Docket No. 60 (Mot. at 6).

Wells Fargo asserts that, because the mortgage gives it discretion as to the amount of flood insurance required, Plaintiffs' excessive coverage theory (*i.e.*, that Wells Fargo should not have required coverage in excess of the principal balance) cannot be maintained.  The relevant provision in the mortgage (§ 5) is as follows:

> 5.  Property Insurance.  Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire . . . and any other hazards, including, but not limited to, earthquakes and floods, for which Lender requires insurance.  The insurance shall be maintained in the amounts . . . and for the periods that Lender requires.  What Lender requires pursuant to the preceding sentences can change during the term of the Loan. . . .
>
> If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense.  Lender is under no obligation to purchase any particular type or amount of coverage.  Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect.  Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained.  Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument.  These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

17

1  FAC, Ex. A (Mortgage § 5).

2      Plaintiffs basically make two arguments in response.  First, they argue that § 5 of the

3  mortgage expressly provides that the coverage "shall cover Lender" – *i.e.*, if the point is to protect

4  the lender's interest, then all that is necessary is coverage in the amount of the principal balance and

5  nothing more (not, *e.g.*, the replacement cost value).  Second, Plaintiffs suggest that, at the very

6  least, when the mortgage is considered *in conjunction* with the notice of special flood hazard area

7  ("NSFH"), *see* Docket No. 58 (Wells Fargo's RJN, Ex. I) (notice); *see also* FAC ¶ 31; Docket No.

8  70 (Opp'n at 7) (stating no objection to request for judicial notice of the NSFH), there is an

9  ambiguity as to whether the lender had discretion to set coverage in an amount in excess of the

10  principal balance.  The notice at issue specified that,

11          The community in which the property securing the loan is located
          participates in the National Flood Insurance Program (NFIP).  Federal
12          law will not allow us to make you the loan that you have applied for if
          you do not purchase flood insurance.  The flood insurance must be
13          maintained for the life of the loan.  If you fail to purchase or renew
          flood insurance on the property, Federal law authorizes and requires us
14          to purchase the flood insurance for you at your expense.

15          . . . .

16          •   At a minimum, flood insurance purchased must cover the
              lesser of:
17
              1.      the outstanding principal balance of the loan; or
18              2.      the maximum amount of coverage allowed for the type
              of property under the NFIP.
19

20  Docket No. 58 (Wells Fargo's RJN, Ex. I) (notice).

21      Plaintiffs' first argument has been rejected by at least one court – more specifically, by Judge

22  Spero of this District.  In *McKenzie*, Judge Spero agreed with Wells Fargo that a lender has an

23  interest beyond the principal balance.

24          As Defendants point out, if a flood destroys a home and insurance
          benefits are sufficient to repay only the loan, the lender is left without
25          a performing loan, one that may have been gaining interest at a higher
          rate than possible under current market conditions.  Lenders also incur
26          loan origination costs arising from the premature payment of the loan.

27  *McKenzie*, 2012 U.S. Dist. LEXIS 155480, at *58.  The same rationale was endorsed by the

28  dissenting judge in a recent First Circuit opinion.  *See Lass v. Bank of Am.*, 695 F.3d 129, 143 (1st

United States District Court
For the Northern District of California

1   Cir. 2012) (Boudin, J., dissenting) (stating that, "[b]y virtue of its provision of the loan and the risks

2   of nonpayment, the lender has an interest both in the loan amount and in the stream of interest

3   payments; both give it ample reason to insist on insurance that goes beyond the balance of the loan

4   and up to the replacement cost").  The Court agrees with Judge Spero and Judge Boudin that a

5   lender's interest is not limited to the outstanding principal.

6        As for Plaintiffs' second argument, however, they do have authority in support – in

7   particular, *Arnett v. Bank of America, N.A.*, No. 3:11-cv-01372-SI, 2012 U.S. Dist. LEXIS 95848 (D.

8   Or. July 11, 2012).  In *Arnett*, the plaintiffs argued – as Plaintiffs do here – that the defendants

9   breached the mortgage contract by requiring payment for additional and excessive flood insurance

10  not required by the contract.  *See id.* at *17.  In evaluating this argument, the *Arnett* court appears to

11  have considered the same § 5 and NSFH.  Bank of America argued that § 5 gave it the right to

12  choose the amount of flood insurance on the property.  As for the notice, Bank of America argued

13  that it did not alter or conflict with the mortgage because "it 'merely specif[ies] the "minimum"

14  flood insurance required by the Lender[.]'  Thus, even when construing the [notice] as part of the

15  [mortgage] contract, [Bank of America] 'had the discretion to set their flood insurance coverage

16  amount' under the contract."  *Id.* at *20.

17       The *Arnett* court found that Bank of America's interpretation of the mortgage and notice was

18  plausible.  However, it also endorsed a different interpretation as plausible.  "Under this

19  interpretation, Section five of the trust deed does not permit BOA discretion to set the amount of

20  flood insurance that the borrower must maintain because the NSFH 'fills in' the trust deed's open-

21  ended discretionary terms."  *Id.* at *21.  The court explained as follows:

22          First, [NSFH] provides that the [plaintiffs] must maintain flood
            insurance.  Second, it fixes the amount of flood insurance that the
23          [plaintiffs] must maintain: "At a minimum, flood insurance purchased
            must cover the lesser of" the outstanding loan balance or the
24          maximum amount of coverage provided by the NFIP.  Finally, the
            NSFH provides that "[t]he flood insurance must be maintained for the
25          life of the loan."  In this provision, the definite article "the," which
            precedes "flood insurance," signals that the flood insurance that must
26          be "maintained for the life of the loan" is the same "flood insurance"
            described in the provision fixing the amount of insurance that the
27          plaintiffs must maintain.  In other words, the NSFH sets, or "fills in,"
            the amount of flood insurance that the lender requires for the life of

28

1    the loan and that amount is not subject to change, except as expressly
2    provided for in the NSFH.

3    *Id.* at *22.

4          In response to the bank's contention that this alternative interpretation failed to account for

5    the phrase, "[a]t a minimum," the court reasoned:

6          According to BOA, the phrase "[a]t a minimum" means the NSFH
           merely identifies the minimum amount of coverage that the lender
7          may require. As noted above, this is a plausible interpretation. It is
           also plausible, however, that the phrase "[a]t a minimum" does not
8          mean that the amount of coverage specified in the NSFH is the
           minimum that *the lender may require*. Instead, "at a minimum" could
9          mean that the amount of coverage specified in the NSFH is not the
           maximum that *the borrower may purchase*. In other words, it is also a
10         plausible interpretation that the NSFH firmly fixes the amount of
           coverage that the lender requires but does not prohibit the borrower
11         from obtaining additional coverage if that is what the borrower wants
           to do. This alternative interpretation also makes financial sense: the
12         lender's financial interest in the property is equal to the amount of the
           outstanding loan, but the borrower's interest may be the entire
13         replacement value of the property.

14   *Id.* at *23-24 (emphasis in original).

15         The Court is not persuaded by the reasoning of *Arnett*. First, as Judge Spero noted in

16   *McKenzie*, a lender plausibly has a financial interest beyond the amount of the principal balance.

17         Second, as noted above, the *Arnett* court emphasized the fact that the NSFH included the

18   statement "[t]he flood insurance must be maintained for the life of the loan." According to the

19   *Arnett* court, "the definite article 'the,' which precedes 'flood insurance,' signals that the flood

20   insurance that must be 'maintained for the life of the loan' is the same 'flood insurance' described in

21   the provision fixing the amount of insurance that the plaintiffs must maintain." *Id.* at *22. But this

22   grammatical interpretation is problematic. When the notice is considered as a whole, "[t]he flood

23   insurance [that] must be maintained for the life of the loan" (emphasis added) seems to refer back to

24   "flood insurance" as used in the immediately *preceding* sentence: "Federal law will not allow us to

25   make you the loan that you have applied for if you do not purchase flood insurance." The *Arnett*

26   court, however, linked "*[t]he* flood insurance [that] must be maintained for the life of the loan"

27

28

20

United States District Court

For the Northern District of California

(emphasis added) to a statement found *later* in the notice – *i.e.*, "[a]t a minimum, flood insurance

purchased must cover the lesser of . . . ."[6]

In any event, there is a more fundamental problem. As Judge Spero aptly noted:

> Contrary to the *Arnett* court's conclusion, nothing in the [notice] restricts the lender's ability to require more than the minimum coverage. Read in isolation, it may be plausible to interpret the phrase "[a]t a minimum" to not mean that the amount of coverage specified in the [notice] is the minimum the lender may require. But the existence of Paragraph 5 precludes such an interpretation. That provision clearly provides that the amount of flood insurance the lender requires "can change during the term of the Loan." The [notice] should not be interpreted so as to cancel out a clear provision elsewhere in the contract. The only reasonable interpretation of the contract is that it gives the borrower the ability to purchase, *and* the lender the ability to require, flood insurance above the minimum amount.
>
> Additionally, the [notice] speaks to what the NFIP requires, not necessarily what the lender requires. As such, it notifies the borrower of the minimum amount of coverage that is required to be purchased by the borrower – *or* the lender if the borrower fails to make such a purchase. Accordingly, the phrase "[a]t a minimum, flood insurance purchased must cover" is equally applicable to the borrower and the lender.

*Id.* at *55-56.

In their papers, Plaintiffs protest that *Arnett* is not the only authority in their favor; they cite

in particular the recent First Circuit decision *Lass*. But, as Wells Fargo argued at the hearing, the

NSFH in *Lass* is materially different. The notice in *Lass* provided in relevant part: "'[A]t the closing

the property you are financing must be covered by flood insurance in the amount of the principle

[sic] amount financed, or the maximum amount available, whichever is less. This insurance will be

mandatory until the loan is paid in full.'" *Lass*, 2012 U.S. App. LEXIS 19937, at *3-4. Because of

this provision, the First Circuit concluded that the notice "reasonably may be read to state that the

mandatory amount of flood insurance imposed at that time would remain unchanged for the duration

of the mortgage. Given the ambiguity as to the lender's authority to increase the coverage

requirement, [plaintiff] is entitled to proceed with her breach of contract and related claims." *Id.* at

*1-2. The First Circuit's conclusion makes sense. As Judge Spero stated in *McKenzie*, the notice of

---

[6] In patent law, the definite article "the" is used to refer to an *antecedent*, not to a "subsequent."

United States District Court

For the Northern District of California

1   special flood hazard in *Lass* is materially different because it did "'not identify the level of coverage

2   required at closing to be a mandatory minimum.' Here, . . . the NSFH *does* identify the level of

3   coverage required at closing to be a mandatory minimum." *McKenzie*, 2012 U.S. Dist. LEXIS

4   155480, at *56 n.11 (emphasis in original). In short, the notice in *Lass* does not contain the "at a

5   minimum" qualification contained in the notice in this case. As Judge Spero noted, "the notification

6   does not qualify the unequivocal obligation in Paragraph 5 nor does it in any way conflict with or

7   contradict that obligation." *McKenzie*, 2012 U.S. Dist. LEXIS 155480, at *56 n.11.

8         Accordingly, the Court agrees with Wells Fargo that Plaintiffs' excessive coverage claims

9   are barred. The Court notes, however, that, only "pure" excessive coverage claims are barred. To

10   the extent Plaintiffs claim that Wells Fargo increased coverage to replacement cost value in order to

11   obtain kickbacks or that Wells Fargo force-placed retroactive insurance policies at replacement

12   value coverage in order to obtain a benefit for itself, those claims are not barred because they are, in

13   reality, kickback claims and backdating claims rather than excessive coverage claims.

14           c.    <u>Summary</u>

15         As discussed above, the Court rejects Wells Fargo's contention that the kickback claims are

16   barred by the filed-rate or primary jurisdiction doctrine but agrees with Wells Fargo that dismissal is

17   warranted with respect to the excessive coverage claims. The backdating theory, however, has not

18   been challenged on any overarching basis.

19   C.   <u>Federal Claims</u>

20         Because at least some of Plaintiffs' theories survive the above challenges by Wells Fargo

21   (*i.e.*, the kickback and backdating theories), the Court may now evaluate the specific arguments

22   made as to each of the causes of action pled by Plaintiffs.

23           1.   <u>TILA</u>

24         Plaintiffs have brought a TILA claim against Fannie Mae and Wells Fargo only. However,

25   because Fannie Mae is being dismissed, the Court addresses the claim as against Wells Fargo only.

26         In their complaint, Plaintiffs assert that, when Wells Fargo "added the force-placed premium

27   charge to the outstanding principal amount of [their] loan, a new debt obligation was created,

28   requiring a new set of disclosures . . . . However, neither Fannie Mae nor Wells Fargo provided

United States District Court

For the Northern District of California

Plaintiffs with a new set of disclosures." FAC ¶ 32. In their opposition papers, Plaintiffs suggest that Wells Fargo should have provided new disclosures that (1) the force-placed insurance included a kickback to Wells Fargo and that (2) the insurance could cover as much as the replacement cost value (*i.e.*, more than the principal balance). *See, e.g.*, Docket No. 69 (Opp'n at 15-16). From the Court's perspective, it is not clear how either alleged failure to disclose could constitute a violation of TILA. Nothing about TILA or its implementing regulations seems to require such disclosures. At best, there is a requirement, under 12 C.F.R. § 226.18(d), that a creditor disclose a finance charge,[7] which (by definition) can include a premium for property insurance. *See id.* § 226.4(b)(8) (providing that one example of a finance charge is "[p]remiums or other charges for insurance against loss of or damage to property, or against liability arising out of the ownership or use of property, written in connection with a credit transaction"). Therefore, the Court limits its consideration of the TILA claim to whether there has been a violation of § 226.18(d).[8]

As Plaintiffs point out, several courts have held that, when a defendant force places insurance and adds that amount to the principal owed, then the defendant has an obligation to provide new disclosures under TILA. *See, e.g.*, *Arnett*, 2012 U.S. Dist. LEXIS 95848, at *44 (indicating that a new credit transaction – which requires new TILA disclosures – takes place where a creditor increases the amount of the plaintiff's debt; concluding that the plaintiffs in the case under

---

[7] Section 226.18 provides in relevant part as follows:

For each transaction, the creditor shall disclose the following information as applicable:

(a)     Creditor. . . .

(b)     Amount financed. . . .

(c)     Itemization of amount financed. . . .

(d)     Finance charge. . . .

[etc.]

12 C.F.R. § 226.18.

[8] The Court also limits its consideration of the TILA claim in terms of time because Plaintiffs have abandoned their assertion of equitable tolling. Although equitable tolling allegations were made in the complaint, Plaintiffs failed to raise equitable tolling in its opposition papers, even though the statute of limitations was expressly raised by at least some of the defendants.

consideration "may be able to state a TILA claim" if they could allege that the bank added the cost of flood insurance premiums to their outstanding principal on their mortgage loan); *Travis v. Boulevard Bank, N.A.*, 880 F. Supp. 1226, 1229-39 (N.D. Ill. 1995) (concluding that "the Defendant's purchase of the allegedly unauthorized insurance and the subsequent addition of the resulting premiums to Plaintiffs' existing indebtedness constituted a new credit transaction[;] Defendant's action involved augmenting Plaintiffs' existing finance charge with an additional finance charge for the resulting premiums"). This position has support from the language of § 226.18(d), which provides that, "[f]or *each* [credit] transaction, the creditor shall disclose the following information as applicable: . . . (d) Finance charge." 12 C.F.R. § 226.18(d) (emphasis added).

In *McKenzie*, however, Judge Spero held that these cases were limited to situations where the purchase of insurance was unauthorized. Judge Spero rejected the TILA claim at issue in his case because

> Plaintiffs base their TILA claim on the theory that the letters sent to Plaintiffs notifying them that their coverage was insufficient altered the terms of their loans and Defendants failed to disclose this alteration. However, as discussed previously, the contracts already provided Defendants the authority to require coverage beyond the principal loan balance. The letters sent to Plaintiffs, therefore, did not alter the terms of the loans and no disclosure under TILA was required. *See Travis v. Boulevard Bank, N.A.*, 880 F. Supp. 1226, 1229-30 (N.D. Ill. 1995) (requiring post-consummation TILA disclosures under 12 C.F.R. 226.18 only where the defendant force-placed insurance *without proper authorization*); *Wulf v. Bank of Am., N.A.*, 798 F. Supp. 2d 586, 588-89 (E.D. Pa. 2011) (same). Accordingly, Plaintiffs' TILA claim is dismissed with prejudice.

*McKenzie*, 2012 U.S. Dist. LEXIS 155480, at *75-76.

Here, as discussed above, the excessive insurance coverage was authorized. Arguably, however, the kickback and backdating was not.

Wells Fargo, however, presents one additional argument – *i.e.*, that "[n]o new TILA disclosures are required when a creditor adds charges to a loan balance *as a result of the borrower's default*."[9] Docket No. 60 (Mot. at 22) (emphasis added). Although, in its motion, Wells Fargo cites

---

[9] Wells Fargo does not make any argument for dismissal based on 12 C.F.R. § 226.4(d)(2), which provides that a creditor may exclude a property insurance premium from the finance charge if certain conditions are met.

United States District Court

For the Northern District of California

1    cases which refer to 12 C.F.R. §§ 226.4(c)(2) and 226.17(e), the critical regulation is actually §

2    226.4(b)(8), as Wells Fargo notes in its reply.  *See* Reply at 9 n.11.  As noted above, under §

3    226.4(b)(8), a finance charge (by definition) can include a premium for property insurance.  *See* 12

4    C.F.R. § 226.4(b)(8) (providing that one example of a finance charge is "[p]remiums or other

5    charges for insurance against loss of or damage to property, or against liability arising out of the

6    ownership or use of property, written in connection with a credit transaction").  However, the

7    Official Staff Commentary for § 226.4(b)(8) makes clear that, where property insurance is purchased

8    by the creditor *based on a failure by the borrower to maintain the insurance*, the force-placed

9    insurance cannot be deemed a finance charge in the first place:

> 2. Insurance written after consummation.  In closed-end credit
> transactions, insurance sold after consummation is not "written in
> connection with" the credit transaction if the insurance is written
> because of the consumer's default (*for example, by failing to obtain or
> maintain required property insurance*) or because the consumer
> requests insurance after consummation (although credit sale
> disclosures may be required for the insurance if it is financed).

14   46 F.R. 50288 (1981) (emphasis added).[10]  The Court adheres to the general directive contained in

15   the Commentary:  no TILA disclosure is required if the added charges are the result of the

16   borrower's default in failing to obtain the requisite insurance.

17        That being said, Plaintiffs legitimately point out that they would not have been required to

18   provide the additional flood insurance but for Wells Fargo's unauthorized efforts to obtain a

19   kickback or to otherwise receive a benefit through the backdating.  Thus, the TILA claim remains

20   viable so long as the kickback and backdating theories are viable (although some specific claims are

21   dismissed as discussed below).  The Court therefore denies the motion to dismiss the TILA claim, to

22   the extent it is based on a kickback or backdating theory.  As discussed above, "pure" excessive

23   coverage claims are dismissed.

---

[10]  Notably, in an earlier opinion, the *Travis* court took note of this very Commentary.  The court only found the Commentary inapplicable because at issue in *Travis* was the forced purchase of *default* insurance, not the forced purchase of *property* insurance.  *See Travis v. Boulevard Bank, N.A.*, No. 93 C 6847, 1994 U.S. Dist. LEXIS 14615, at *28 (N.D. Ill. Oct. 13, 1994) (noting that "[s]ection 225.4(b)(8) applies only to insurance for loss or damage to property[;] [t]hus, the phrase 'written in connection with a credit transaction' does not pertain to default insurance, making Plaintiffs' failure to obtain [such] insurance completely irrelevant").

United States District Court

For the Northern District of California

2.      RESPA

Unlike the TILA claim, the RESPA claim is pled against all Defendants – at least in the complaint. However, at the hearing, Plaintiffs represented to the Court (upon the Court's inquiry) that the claim is being asserted against Wells Fargo only. The Court takes Plaintiffs at their word and, accordingly, addresses the RESPA claim against Wells Fargo only.

In its papers, Wells Fargo argues that (1) the RESPA claim is barred by the statute of limitations and (2) the RESPA claim is not viable because Plaintiffs did not allege that any Defendant engaged in improper conduct at the time of closing or escrow – only well after the loan was consummated.

a.      Statute of Limitations

In the instant case, Plaintiffs have alleged that Defendants violated RESPA based on the alleged kickbacks that Wells Fargo received from Assurant/ASIC. *See* 12 U.S.C. § 2607. Under 12 U.S.C. § 2614, there is a one-year statute of limitations for a claim brought pursuant to §§ 2607. The clock starts from "the date of the occurrence of the violation." *Id.* § 2614.

In the instant case, Plaintiffs assert that there is no time bar because

> the "date of the occurrence of the violation" is each date when Plaintiffs paid for force-placed insurance and the date that Wells Fargo finally added the balance of force-placed insurance charges that Plaintiffs did not pay to the loan balance it sought to collect through foreclosure. This final act occurred on November 23, 2011, within the one year statute of limitations.

Docket No. 67 (Opp'n at 17). Plaintiffs do not make any argument of equitable tolling, even though they pled such in the complaint. *See, e.g.*, FAC ¶¶ 65-72. As stated in note 8, *supra*, the Court deems the equitable tolling argument abandoned and finds that there is no limitations bar to the extent Plaintiffs have restricted their claim to the alleged wrongdoing within the limitations period.

b.      Settlement Service

Although there may be no time bar, the RESPA claim shall still be dismissed for an independent reason. As noted above, Plaintiffs claim a violation of § 2607.[11] Section 2607(a)

---

[11] At the hearing, Plaintiffs expressly disavowed that they were bringing any claim pursuant to 12 U.S.C. § 2605.

United States District Court

For the Northern District of California

1   provides that "[n]o person shall give and no person shall accept any fee, kickback, or thing of value

2   pursuant to any agreement or understanding, oral or otherwise, that business incident to or a part of a

3   real estate *settlement service* involving a federally related mortgage shall be referred to any person."

4   12 U.S.C. § 2607(a) (emphasis added).  Section 2607(b) provides that "[n]o person shall give and no

5   person shall accept any portion, split, or percentage of any charge made or received for the rendering

6   of a real estate *settlement service* in connection with a transaction involving a federally related

7   mortgage loan other than for services actually performed."  *Id.* § 2607(b) (emphasis added).

8        For purposes of RESPA, "the term 'settlement services' includes any service provided in

9   connection with a real estate settlement."  *Id.* § 2602(3).  An implementing regulation similarly

10   defines "settlement service" as "any service provided in connection with a prospective or actual

11   settlement" – including the "[p]rovision of services involving hazard, flood, or other casualty

12   insurance or homeowner's warranties."  24 C.F.R. § 3500.2.  Significantly, however, the term

13   "settlement" itself is defined by the regulation to mean "the process of executing legally binding

14   documents regarding a lien on property that is subject to a federally related mortgage loan.  *This*

15   *process may also be called 'closing' or 'escrow' in different jurisdictions.*"  *Id.* (emphasis added).

16        Because settlement is, in essence, the closing of the loan, a number of courts have found that

17   no RESPA claim is viable based on an allegation that the defendant force placed insurance *after* the

18   closing of the loan.  For example, in *McNeary-Calloway v. JP Morgan Chase Bank, N.A.*, 863 F.

19   Supp. 2d 928 (N.D. Cal. 2012), Judge Spero held as follows:

20           It is undisputed here that Defendants did not provide, nor were any
        way involved in, the hazard insurance purchased in connection with

21           the closing of the loans.  Rather, Plaintiffs, without any involvement of
        the Defendants, first purchased the hazard insurance policies on the

22           open market and only some two to eight years after the closing of their
        respective loans did Defendants "provide" hazard insurance.

23           Moreover, the policies first purchased by Plaintiffs are not at issue in
        this case.  The fact that hazard insurance was required in order to close

24           the loan is irrelevant here in deciding whether the hazard insurance at
        issue is a "settlement service."

25

26   *Id.* at 953.  The *Arnett* decision (which Plaintiffs relied on in a different context) also arrives at the

27   same conclusion.  *See Arnett*, 2012 U.S. Dist. LEXIS 95848, at *46-47 (noting that settlement means

28   closing and "BOA's placement of flood insurance was performed years after the [plaintiffs] closed

United States District Court

For the Northern District of California

1   on their home loan[;] RESPA 'does not focus on post-settlement fees paid by mortgagors after they

2   have purchased their houses'"). The Court agrees with the reasoning of these cases.

3          In one of their opposition briefs, Plaintiffs acknowledge that "no Court has ruled that RESPA

4   applies to kickbacks for post-origination force-placed insurance." Docket No. 67 (Opp'n at 15).

5   Plaintiffs argue, however, that, "in light of the purpose of RESPA and the fact that Congress recently

6   amended other provisions of RESPA to specifically govern force-placed insurance for the life of

7   every mortgage (*see* 12 U.S.C. § 2605(l)-(m)), Plaintiffs request that this Court allow the RESPA

8   claim to proceed." Docket No. 67 (Opp'n at 15). This argument is not persuasive. Section 2605 is

9   a completely different provision in RESPA from the one at issue here (*i.e.*, § 2607(a) and (b)).

10  Section 2605 addresses the servicing of mortgage loans generally. It says nothing about post-closing

11  force-placed insurance being a settlement service.

12  D.     State Claims

13         1.     National Bank Act Preemption

14         With respect to the state law claims (*i.e.*, breach of contract, including the implied covenant

15  of good faith and fair dealing, unjust enrichment, conversion, breach of fiduciary duty, and violation

16  of § 17200), Wells Fargo raises an overarching preemption argument. According to Wells Fargo,

17  the state law claims are preempted by the National Bank Act ("NBA").

18         "National banks are chartered by the federal government pursuant to the NBA, and are

19  regulated by the Office of the Comptroller of the Currency ('OCC')." *Williams v. Wells Fargo Bank*

20  *N.A.*, No. 11-21233-CIV-ALTONAGA/Simonton, 2011 U.S. Dist. LEXIS 119136, at *21 (S.D. Fla.

21  Oct. 14, 2011). The parties do not dispute that Wells Fargo is a national bank.

22         As a general matter, national banks "are subject to state laws of general application in their

23  daily business" but only "to the extent such laws do not conflict with the letter or the general

24  purposes of the NBA." *Rose v. Chase Bank USA, N.A.*, 513 F.3d 1032, 1037 (9th Cir. 2008)

25  (internal quotation marks omitted). More specifically, "[s]tates are permitted to regulate the

26  activities of national banks where doing so does not prevent or significantly interfere with the

27  national bank's or the national bank regulator's exercise of its powers. But when state prescriptions

28  significantly impair the exercise of authority, enumerated or incidental under the NBA, the State's

United States District Court

For the Northern District of California

regulations must give way." *Id.* (internal quotation marks omitted).  This preemption standard was essentially established by the Supreme Court in *Barnett Bank, N.A. v. Nelson*, 517 U.S. 25, 33 (1996) (noting that states are not deprived of the power to regulate national banks "where . . . doing so does not prevent or significantly interfere with the national bank's exercise of its powers").[12]

In the instant case, Wells Fargo argues that the NBA preempts all of Plaintiffs' state law claims based on two implementing regulations, 12 C.F.R. §§ 34.4 and 7.4002.  Section 34.4 provides in relevant part as follows:

> (a) A national bank may make real estate loans under 12 U.S.C. 371 and § 34.3, without regard to state law limitations concerning:
>
> . . . .
>
> (2) The ability of a creditor to require or obtain private mortgage insurance, insurance for other collateral, or other credit enhancements or risk mitigants, in furtherance of safe and sound banking practices;
>
> . . . .
>
> (10) Processing, origination, servicing, sale or purchase of, or investment or participation in, mortgages;
>
> . . . .
>
> (b) State laws on the following subjects are not inconsistent with the real estate lending powers of national banks and apply to national banks to the extent consistent with the decision of the Supreme Court in *Barnett Bank of Marion County, N.A. v. Nelson, Florida Insurance Commissioner, et al.*, 517 U.S. 25 (1996):
>
> (1) Contracts;
>
> (2) Torts; . . . .

*Id.* § 34.4.  In turn, § 7.4002 provides in relevant part that "[a] national bank may charge its customers non-interest charges and fees, including deposit account service charges."  *Id.* § 7.4002(a).

---

[12]   The *Barnett* standard was basically codified by Congress in 12 U.S.C. § 25b, a statute that took effect on July 21, 2011.  *See* 12 U.S.C. § 25b(b) (providing that a state consumer financial law is preempted if, *e.g.*, in accordance with the legal standard for preemption in *Barnett*, "the State consumer financial law prevents or significantly interferes with the exercise by the national bank of its powers").

United States District Court
For the Northern District of California

1    It is difficult to see how there can be preemption pursuant to § 34.4.  Section 34.4(a)

2  expressly provides that a national bank has powers with respect to "mak[ing] real estate loans"

3  without regard to state law limitations.  *Id.* § 34.4(a).  But here, Wells Fargo did not extend a real

4  estate loan to Plaintiffs; rather, it was simply the servicer of Plaintiffs' loan which was owned by

5  Fannie Mae.  *See* Docket No. 70 (Opp'n at 26).

6    That being said, § 7.4002 has potential applicability because, arguably, an insurance

7  premium is a charge or a fee.  Still, even if § 7.4002 were applicable (or for that matter § 34.4), there

8  would be preemption only if the state law prevents or significantly restricts the national bank's

9  powers.  Here, Wells Fargo has failed to make an adequate showing on this point.  Contrary to what

10 Wells Fargo suggests, Plaintiffs are not challenging Wells Fargo's authority to force place

11 insurance; rather, their challenge is to the manipulation of the force-placed insurance process.  This

12 was the very point made by the court in *Williams*:

13         [N]otwithstanding Wells Fargo Bank's contentions to the contrary,
           none of Plaintiffs' claims question Wells Fargo Bank's  ability to
14         charge fees or premiums related to force-placed insurance or to collect
           commissions from the force-placing of insurance.  Plaintiffs only
15         challenge the *manner* in which Wells Fargo Bank  manipulated those
           charges and the force-placed insurance process in general.  "A desire
16         to limit a bank's authority to charge a fee is not synonymous with a
           desire to hold a bank liable for the bad-faith manner in which" it
17         exercises that authority.  The former is not permitted in light of the
           NBA's preemptive reach, but the latter is.  In the present action,
18         Plaintiffs are not challenging the bank's right to impose force-placed
           insurance policies. Instead, the issue is whether Wells Fargo has been
19         unjustly enriched by manipulating the force-placed insurance process
           so as to obtain kickbacks, and whether by doing so, it has violated its
20         duty of good faith and fair dealing under the contracts.

21 *Williams*, 2011 U.S. Dist. LEXIS 119136, at *32-33 (emphasis added); *see also Martinez v. Wells*

22 *Fargo Mortg., Inc.*, 598 F.3d 549, 555-56 (9th Cir. 2010) (indicating that the NBA "does not

23 preempt a claim of express deception asserted under state law"; citing approvingly a Georgia district

24 court decision "holding that a claim under the Georgia Fair Business Practices Act that a bank

25 engaged in unfair or deceptive business practices by manipulating the posting of transactions to an

26 account in order to impose overdraft fees was not preempted"); *Gutierrez v. Wells Fargo & Co.*, No.

27 C 07-05923 WHA, 2010 U.S. Dist. LEXIS 29082, at *5 (N.D. Cal. Mar. 26, 2010) (finding no

28 preemption where state law claim "target[ed] whether Wells Fargo's manipulation of customer

United States District Court

For the Northern District of California

1   transactions 'behind the scenes' to maximize the *occurrence* of overdraft fees during the posting

2   process was a breach of the bank's duty to act in good faith[;] in other words, it is the bank's

3   allegedly 'unfair' practice of assessing and imposing as many overdraft penalties as mathematically

4   possible that is at issue in this action") (emphasis in original).

5          Wells Fargo's comparison to HOLA preemption is unavailing.  As the *Williams* court noted,

6   HOLA preemption is much broader, "'occup[ying] the entire field of lending regulation for federal

7   savings associations.'"  *Williams*, 2011 U.S. Dist. LEXIS 119136, at *26 (quoting 12 C.F.R. §

8   560.2(a)).

9          Accordingly, the Court rejects Wells Fargo's NBA preemption argument.

10         2.      Applicable Law

11         Because the Court does not find NBA preemption applicable, it must now address each state

12  law claim asserted by Plaintiffs on the merits.  As a preliminary matter, however, the Court must

13  decide what substantive law applies to each claim.

14         The starting point for the choice-of-law dispute is the mortgage.  Section 16 of the mortgage

15  provides that "[t]his Security Instrument shall be governed by federal law and the law of the

16  jurisdiction in which the Property is located."  FAC, Ex. A (Mortgage § 16).  In light of this

17  provision, clearly, Plaintiffs' claim for breach of contract (including breach of the implied covenant

18  of good faith and fair dealing) is governed by Florida law, where the real property at issue is located.

19  The parties do not dispute this.  The harder question is what law controls the tort law claims – *i.e.*,

20  Florida (as Defendants advocate) or California (as Plaintiffs advocate).[13]

21         "In a federal question action that involves supplemental jurisdiction over state law claims, [a

22  court] appl[ies] the choice of law rules of the forum state – here, California."  *Paulsen v. CNF Inc.*,

23  559 F.3d 1061, 1080 (9th Cir. 2009).  California's choice-of-law rules dictate that whether a

24  contractual choice-of-law provision is ambiguous as to its scope – *e.g.*, whether it encompasses tort

25  claims related to the contract – "is a question of contract interpretation that in the normal course

26  _____

27         [13]  For the one state statutory claim – *i.e.*, the violation of § 17200 – clearly, California law
     governs.  Here, the parties have a dispute as to whether a California law claim is viable.  Defendants
28   take the position that the § 17200 claim is not viable because, in essence, there is an insufficient
     connection to California.

**United States District Court**
For the Northern District of California

1   should be determined pursuant to [the law specified in the contractual choice-of-law provision]."

2   *Nedlloyd Lines B.V. v. Superior Court*, 3 Cal. 4th 459, 469 n.7 (1992); *see also JMP Sec. LLP v.*

3   *Altair Nanotech. Inc.*, No. 11-4498 SC, 2012 U.S. Dist. LEXIS 102264, at *12-13 (N.D. Cal. July

4   23, 2012) (applying *Nedlloyd*).  Thus, here, the Court should look at Florida law (the law specified

5   in the mortgage) to determine whether a contractual choice-of-law provision such as the one here

6   covers related tort claims.

7          As Plaintiffs indicate, the Eleventh Circuit (as well as Florida district courts) seem to view

8   contractual choice-of-law provisions as inapplicable to tort claims.  *See, e.g.*, *Cooper v. Meridian*

9   *Yachts, Ltd.*, 575 F.3d 1151, 1162 (11th Cir. 2009) (stating that "[a] choice of law provision that

10  relates only to the agreement will not encompass related tort claims"); *see also Green Leaf Nursery*

11  *v. E.I. Dupont de Nemours & Co.*, 341 F.3d 1292, 1301 (11th Cir. 2003) (stating that, "[b]ecause the

12  choice-of-law provision is narrow and governs only the scope and effect of the release, we turn to

13  the choice-of-law rules of the forum state, Florida, to determine the applicable law governing the

14  Plaintiffs' tort claims").  But Wells Fargo criticizes these cases as they do not clearly apply Florida

15  state law in reaching this conclusion.

16         The Court agrees with Wells Fargo.  Moreover, the Court agrees with Wells Fargo that there

17  does not appear to be any authority as to what Florida state law would say about a contractual

18  choice-of-law provision such as the one here and whether it applies to tort actions.  *See* Docket No.

19  78 (Reply at 2 n.1).)  The Court was not able to locate any case based on its independent research.

20  Wells Fargo contends that, in the absence of any authority, the Court should do what the California

21  Supreme Court did in *Nedlloyd – i.e.*, in the absence of any authority about Hong Kong law, the

22  California Supreme Court defaulted to California law in determining whether a contractual choice-

23  of-law provision covers tort claims.  *See Nedlloyd*, 3 Cal. 4th at 469 n.7.  As Plaintiffs have not

24  suggested any other viable alternative, the Court adopts the *Nedlloyd* approach advocated by Wells

25  Fargo.

26         Under California law, "[a] valid choice-of-law clause, which provides that a specified body

27  of law 'governs' the 'agreement' between the parties encompasses *all causes of action arising from*

28  *or related to that agreement*, regardless of how they are characterized, including tortious breaches of

United States District Court

For the Northern District of California

duties emanating from the agreement or the legal relationship it creates." *Nedlloyd*, 3 Cal. 4th at 470
(emphasis added).  Thus, as Wells Fargo argues, under California law, Plaintiffs' tort claims would
also be subject to the choice-of-law provision – *i.e.*, the tort claims should also be governed by
Florida substantive law.

>   3.   Breach of Contract

Plaintiffs have asserted a claim for breach of contract, including the implied covenant of
good faith and fair dealing, against Fannie Mae and Wells Fargo only.  As discussed above, Fannie
Mae is being dismissed without prejudice based on the *Merrill* doctrine.  Therefore, the only
question is whether a breach of contract claim is viable against Wells Fargo.  Notably, here, the
parties agree that Florida substantive law governs pursuant to the terms of the mortgage agreement.
*See* FAC, Ex. A (Mortgage § 16) (providing that "[t]his Security Instrument shall be governed by
federal law and the law of the jurisdiction in which the Property is located").

In its papers, Wells Fargo argues that the breach-of-contract claim should be dismissed based
on the overarching arguments it made that the kickback theory is not viable (pursuant to the filed-
rate and primary jurisdiction doctrines) and that the excessive coverage theory is not viable.  While,
as discussed above, the Court agrees that the excessive coverage theory is not viable, the kickback
theory is.  Moreover, Wells Fargo has failed to address the backdating theory.

However, there is a question as to whether Wells Fargo can be held liable for a breach of
contract in the first place given that it was not a party to the mortgage agreement.  *See McKenzie*,
2012 U.S. Dist. LEXIS 155480, at *62 n.12 (noting that, "[i]f Wells was acting as servicer, and not
as Lender or Lender's agent, when it required increased insurance coverage, it could not be sued for
breach of contract since it is not a party to the contract"); *cf. Johnson v. Elizabeth Wellborn, P.A.*,
418 Fed. App. 809, 816 n.8 (11th Cir. 2011) (noting that, "[u]nder Florida law, an agent is not liable
for a disclosed principal's obligations under a contract that the agent negotiated or executed on
behalf of the principal").  Plaintiffs recognize such in their papers.  *See* Docket No. 70 (Opp'n at 11)
(admitting that "Plaintiffs are unsure whether they even have a contractual relationship with Wells
Fargo" and thus arguing that they have pled alternative theories for Wells Fargo's liability – *i.e.*,
breach of contract or unjust enrichment); FAC ¶ 101 (alleging that, "[i]f Plaintiffs have no contract

United States District Court
For the Northern District of California

1    with Wells Fargo, their causes of action against Wells Fargo must sound in equity and tort").

2    Admittedly, Wells Fargo has not made any motion to dismiss on this basis.  In fact, Wells Fargo has

3    argued that the unjust enrichment claim pled against it should not survive because there is a

4    mortgage agreement that covers the relationship between the parties.  *See* Docket No. 60 (Mot. at

5    19).  Nevertheless, the Court concludes that a breach-of-contract claim cannot be maintained against

6    Wells Fargo as it was not a contracting party.  But, as discussed below, an unjust enrichment claim

7    against Wells Fargo is plausible.

8              4.       Unjust Enrichment

9         Plaintiffs have asserted a claim for unjust enrichment against Wells Fargo and Assurant both.

10   At this juncture, Assurant is dismissed without prejudice.  Thus, the Court addresses only the claim

11   against Wells Fargo.  As to the claim against Wells Fargo, because the excessive coverage theory is

12   out, the claim rests on the kickback and backdating theories only.

13        Under Florida law,

14              [t]o state a claim for unjust enrichment, a plaintiff must plead the
                following elements: 1) the plaintiff has conferred a benefit on the
15              defendant; 2) the defendant has knowledge of the benefit; 3) the
                defendant has accepted or retained the benefit conferred; and 4) the
16              circumstances are such that it would be inequitable for the defendant
                to retain the benefit without paying fair value for it.  Courts have held
17              that under Florida law, a claim for unjust enrichment, a form of
                equitable relief, cannot stand if an express contract exists.
18

19   *Degirmenci v. Sapphire-Fort Lauderdale, LLLP*, 693 F. Supp. 2d 1325, 1347 (S.D. Fla. 2010).

20        Wells Fargo presents two arguments as to why the unjust enrichment claim should be

21   dismissed: (1) because there is an express contract that governs and (2) because any enrichment

22   cannot be considered unjust when Plaintiffs were the ones who failed to pay for insurance, thus

23   leading to the force placement.

24        Both arguments are without merit.  First, Wells Fargo is not a party to the mortgage

25   agreement and it has not otherwise shown that it should be considered a contracting party.  The

26   unjust enrichment claim, therefore, is not barred by an express contract.  Notably, the cases cited by

27   Wells Fargo do not hold that a party is entitled to dismissal of an unjust enrichment claim where it is

28   not a contracting party.  For example, in *Reese v. JPMorgan Chase & Co.*, 686 F. Supp. 2d 1291

United States District Court

For the Northern District of California

1   (S.D. Fla. 2009), the court dismissed the unjust enrichment claim against *Chase* because of a

2   contract that the plaintiff had with *Chase*.  *See id.* at 1309.  In *Degirmenci*, it is not clear whether the

3   plaintiff had a contract with only one of the defendants (Sapphire and its general partner) or with

4   both.  *See Degirmenci*, 693 F. Supp. 2d at 1333 (referring to an agreement with "Developer" which

5   was used to collectively refer to both).  Even if the contract was with Sapphire only, *see id.* at 1348

6   (taking note of "an express contract with Sapphire"), the court did not explain why dismissal of the

7   unjust enrichment claim was also warranted as to the general partner if not a contracting party.

8   Finally, the Court takes note that, in *Lass*, the First Circuit rejected an argument by the defendant

9   bank that the unjust enrichment claim (Massachusetts law) should be dismissed because there was

10  an existing contract governing the same subject matter.  The court noted that the contract "does not

11  explicitly address either commissions or, more generally, the Bank's entitlement to profit from its

12  forced placement of insurance."  *Lass*, 2012 U.S. App. LEXIS 19937, at *30.  "[T]he district court

13  will be in a better position once the record is more developed to determine whether the unjust

14  enrichment claim should survive."  *Id.*

15      Second, even if the force-placed insurance was procured because Plaintiffs failed to pay for

16  their flood insurance, that does not mean that Defendants could do whatever they wanted with

17  respect to the force-placed insurance.  *Cf. McNeary-Calloway*, 863 F. Supp. 2d at 964 (finding that

18  "Plaintiffs' FAC states a valid claim for restitution [under California law]" because "Plaintiffs allege

19  that Defendants unjustly charged Plaintiffs for backdated policies and that Defendants wrongfully

20  earned commissions and kickbacks at Plaintiffs' expense").  That the force-placed insurance was

21  triggered by Plaintiff's conduct does not negate allegedly inequitable conduct by Defendants.

22      The Court therefore denies the motion to dismiss the unjust enrichment claim.

23      5.   Conversion

24      Plaintiffs have asserted the conversion claim against Wells Fargo only.  In its motion, Wells

25  Fargo argues that the claim should be dismissed because (1) it is pled in the alternative if Wells

26  Fargo is not bound by the mortgage but Wells Fargo agrees that the mortgage is controlling and (2)

27  as the mortgage is controlling, the conversion claim runs up against the economic loss rule.  *See Eye*

28  *Care Int'l, Inc. v. Underhill*, 92 F. Supp. 2d 1310, 1314 (M.D. Fla. 2000) (noting that, under Florida

United States District Court
For the Northern District of California

1    law, "'contract principles are more appropriate than tort principles to resolve purely economic

2    claims'"; adding that "Florida courts apply the economic loss rule to prevent tort recovery 'when

3    damages flow from a breach of contract unless the tort is independent of the breach of contract'").

4         As discussed in conjunction with the claim for breach of contract, the mortgage does not

5    bind Wells Fargo as it is not a contracting party.  Furthermore, the tort by Wells Fargo is

6    independent of the breach of contract as the contract does not on its face address kickbacks or

7    backdating.  Therefore, the motion to dismiss this claim is denied.

8         6.    Breach of Fiduciary Duty

9         Plaintiffs have asserted a claim for breach of fiduciary duty against Fannie Mae and Wells

10   Fargo only.  Because Fannie Mae is being dismissed without prejudice, the Court addresses only the

11   claim against Wells Fargo.  Wells Fargo argues for dismissal of the claim because Plaintiffs have

12   alleged no special circumstances establishing a fiduciary relationship between the parties.  Wells

13   Fargo also invokes the economic loss rule once again.

14        The economic loss rule argument is rejected for the reasons already stated above.  *See also*

15   *City of St. Petersburg v. Wachovia Bank, N.A.*, No. 8:10-cv-693-T-26TBM, 2010 U.S. Dist. LEXIS

16   75199, at *8-9 (M.D. Fla. July 27, 2010) (indicating that claim for breach of fiduciary duty was not

17   barred by the economic loss rule because there was a relationship that "exist[ed] apart from the

18   contract" at issue).

19        The special circumstances argument is also problematic.  As a preliminary matter, the Court

20   notes that, although Plaintiffs have argued for application of California as opposed to Florida law,

21   they seem to agree with Defendants that, in any event, a fiduciary relationship exists only where

22   there are special circumstances including where a defendant (1) takes on extra services for a

23   customer, (2) receives a greater economic benefit than from a typical transaction, or (3) exercises

24   extensive control.  *See* Docket No. 70 (Opp'n at 14-15 & n.13) (citing *Capital Bank v. Mvb*, 644 So.

25   2d 515, 519 (Fla. Ct. App. 1994)); *see also Building Educ. Corp. v. Ocean Bank*, 982 So. 2d 37, 41

26   (Fla. Ct. App. 2008) (stating that a fiduciary relationship may arise where the defendant bank knows

27   or has reason to know that the customer is placing trust and confidence in it and is relying on it to

28   counsel and inform him).

United States District Court

For the Northern District of California

Plaintiffs argue that there are special circumstances here because (1) Wells Fargo took on extra services by providing force-placed insurance and because (2) Wells Fargo earned a greater economic benefit by getting kickbacks. The first argument is not persuasive. While the case law does not make precisely clear what is meant by "extra services," here, Wells Fargo was simply providing force-placed insurance within the existing, arms-length servicer-borrower relationship.

As for the second argument, Wells Fargo contends that "[t]he alleged kickbacks cannot serve both as the basis for imposing a fiduciary duty (under the 'greater economic benefit' rationale) and as the breach of the duty thus imposed." Docket No. 60 (Mot. at 21). In support, it cites *Nehrer v. Bank of America, N.A.*, No. 6:11-cv-50-Orl-31DAB, 2011 U.S. Dist. LEXIS 99324 (M.D. Fla. Sept. 2, 2011), where the court dismissed the claim for breach of fiduciary duty (without any real explanation) even though the plaintiffs had alleged that the defendant "'performed additional services for the Plaintiffs by referring them to its appraisers, received a greater economic benefit through its referral and kickback program with CCEC BRIAR ROSE, and exercised considerably more control over the transaction than would be typical of a mortgage lender.'" *Id.* at *8.

But Plaintiffs point to cases where courts have held that a fiduciary duty may exist where there is forced placement of insurance. Most notably, in *Gordon v. Chase Home Fin., LLC*, No. 8:11-cv-2001-T-33EAJ, 2012 U.S. Dist. LEXIS 30326 (M.D. Fla. Mar. 7, 2012), the court held that the plaintiffs had adequately stated a claim for breach of fiduciary duty because they had "allege[d] that Chase received a greater economic benefit from the typical mortgage transactions in the form of 'kickbacks.'" *Id.* at *13.

In the case at bar, the Court follows the *Gordon* case and not *Nehrer*, particularly because *Nehrer* did not provide any reasoning for its conclusion. Thus, because Plaintiffs allege that Wells Fargo received a great economic benefit than normal given the alleged kickback and backdating, the Court denies the motion to dismiss the claim for breach of fiduciary duty.

7.      Section 17200

Finally, Plaintiffs have pled a claim for violation of § 17200, a California statute, against all Defendants. Because Fannie Mae and Assurant are being dismissed, the Court addresses only the claim against Wells Fargo.

United States District Court
For the Northern District of California

As a preliminary matter, the Court notes that, as discussed above, Florida law governs, not California law, and therefore the § 17200 is dismissed on that basis alone. However, even if California law could apply, the § 17200 claim is still without merit because, as Wells Fargo argues, this case has an insufficient connection with California, and so § 17200 should not have extraterritorial application here.

Plaintiffs argue that there is no extraterritoriality problem because Wells Fargo has its principal place of business in California and "'[a] California court may properly apply California laws to non-California members of a nationwide class where the defendant is a California corporation and some or all of the challenged conduct emanates from California.'" Docket No. 70 (Opp'n at 3-4) (quoting *Wershba v. Apple Comp., Inc.*, 91 Cal. App. 4th 224, 243 (2001); also citing *Parkinson v. Hyundai Motor Am.*, 258 F.R.D. 580, 598 (C.D. Cal. 2008) (noting that "defendant's relevant operations, including its headquarters . . . are located in California" and that "many of the alleged wrongful acts emanated from the defendant's . . . offices in . . . California")). Plaintiffs also emphasize that they are bringing a class action so that some of the class members will undoubtedly reside in California (*i.e.*, an injury would have taken place in the state).

Even assuming this is the case, the question is whether Wells Fargo's connection to California is enough to give rise to Plaintiffs' § 17200 claim. "In determining whether the UCL . . . appl[ies] to non-California residents, courts consider where the defendant does business, whether the defendant's principal offices are located in California, where class members are located, and the location from which [the relevant] decisions were made." *In re Toyota Motor Corp.*, 785 F. Supp. 2d 883, 917 (C.D. Cal. 2011). In the case at bar, there does not appear to be any dispute that Wells Fargo has its principal place of business in California. Accordingly, it is possible that the decision to do the kickbacks and the backdating emanated from California.[14] The question, however, is whether it is *plausible* that Wells Fargo did so; without additional facts suggesting that Wells Fargo

---

[14] *Compare Norwest Mortgage, Inc. v. Superior Court*, 72 Cal. App. 4th 214, 227 (1999) (noting that the only contact was defendant's state of incorporation – "[b]ecause Norwest Mortgage's headquarters and principal place of business, the place Category III members were injured, and the place the injury-producing conduct occurred are outside California, we conclude application of the UCL to the claims of Class III members would be arbitrary and unfair and transgress due process limitations").

United States District Court

For the Northern District of California

1   did make the decision from California (*i.e.*, the tortious conduct occurred at least in part in

2   California), the Court concludes it is not.  *See id.* (stating that "Plaintiffs have not alleged with

3   sufficient detail that the point of dissemination from which advertising and promotional literature

4   that they saw or could have seen is California"); *Gustafson v. BAC Home Loans Serv'g, LP*, No.

5   SACV 11-915-JST (ANx), 2012 U.S. Dist. LEXIS 117493, at *15 (C.D. Cal. Apr. 12, 2012)

6   (concluding that plaintiff's allegation that defendants' scheme was devised, implemented, and

7   directed from their offices in California was too conclusory; noting that the "mere possibility that

8   certain decisions related to [defendants'] policies and practices regarding force-placed insurance

9   may have been made in California does not, standing alone, justify application of the UCL to

10  Plaintiff's claims"); *Gross v. Symantec Corp.*, No. C 12-00154 CRB, 2012 U.S. Dist. LEXIS

11  107356, at *26, 28 (N.D. Cal. July 31, 2012) (noting that, while plaintiff had alleged that defendant

12  was headquartered in California, "several courts have found that this allegation is not enough to

13  create a plausible inference that the unlawful conduct emanated from that location"; ultimately

14  finding complaint insufficient because it did not contain allegations about the state in which

15  defendant's fraudulent conduct occurred – "[s]pecifically, because the fraudulent scheme

16  materialized 'during the marketing and sale of [defendant's] computer software products,' [p]laintiff

17  should allege that [defendant's] sales and marketing departments operate out of it[s] California

18  offices").

19        The Court therefore dismisses the § 17200 claim.

20  E.   <u>Summary</u>

21        For the foregoing reasons, the Court grants in part and denies in part Defendants' motions to

22  dismiss.  The Court's specific rulings are as follows.

23  (1)   Fannie Mae is dismissed without prejudice.  Plaintiffs have leave to amend but only if

24         they can allege in good faith that Fannie Mae authorized Wells Fargo's conduct.  If

25         Plaintiffs do amend, they should plead only claims consistent with the rulings in this

26         order.

27  (2)   Assurant is dismissed without prejudice.  Plaintiffs have leave to amend to add in ASIC

28         as a defendant.  Any claims pled against ASIC should be consistent with the rulings

**United States District Court**
For the Northern District of California

in this order.  Plaintiffs shall have some leeway in discovery to explore whether

Assurant or another affiliated entity was also involved in the alleged wrongdoing.

(3)  All claims against Wells Fargo, whether based on federal or state law, are dismissed to

the extent they are based on a "pure" excessive coverage theory.

(4)  As to the kickback and backdating theories asserted against Wells Fargo:

    (a)  The motion to dismiss the TILA claim is denied.  The Court notes that Plaintiffs have

        abandoned their claim of equitable tolling.

    (b)  The motion to dismiss the RESPA claim is granted.  Dismissal is with prejudice.

    (c)  The motion to dismiss the claim for breach of contract (including the implied

        covenant) is granted.  Dismissal is with prejudice.

    (d)  The motion to dismiss the unjust enrichment claim is denied.

    (e)  The motion to dismiss the conversion claim is denied.

    (f)  The motion to dismiss the claim for breach of fiduciary duty is denied.

    (g)  The motion to dismiss the § 17200 claim is granted.

The amended complaint shall be filed within thirty days of the date of this order.

F.  <u>Waiver of Jury Trial</u>

Finally, the Court addresses Wells Fargo's contention that Plaintiffs' demand for a jury trial

should be dismissed or stricken.  In support of this contention, Wells Fargo points to the mortgage

that Plaintiffs signed, which contains the following provision: "25. Jury Trial Waiver.  The

Borrower hereby waives any right to a trial by jury in any action, proceeding, claim, or

counterclaim, whether in contract or tort, at law or in equity, arising out of or in any way related to

this Security Instrument or the Note."[15]  FAC, Ex. A (Mortgage § 25).

Plaintiffs do not dispute that a party may waive a right to a jury trial in a contract.  Plaintiffs

emphasize, however, that for such a waiver to be enforceable it must have been knowingly and

---

[15] Arguably, Wells Fargo cannot invoke the jury waiver provision in the mortgage because it is not a party to the mortgage contract.  *See Williams v. Wells Fargo Bank N.A.*, No. 11-21233-CIV-ALTONAGA/Simonton, 2011 U.S. Dist. LEXIS 119136, at *40-41 (S.D. Fla. Oct. 14, 2011) (concluding that Wells Fargo could not invoke the jury waiver in the mortgage contract because it was not a party to the contract and was instead only a servicer of the mortgage).  For purposes of this opinion, the Court assumes that Wells Fargo has standing to raise the argument.

United States District Court

For the Northern District of California

voluntarily made.  Plaintiffs argue that the waiver here was not knowing and voluntary because

> [t]he jury waiver provision is located at the end of the mortgage and it is not set apart from the other sections of the contract.  Most importantly, Plaintiffs had no opportunity to negotiate the terms of their form mortgage contract.  Plaintiffs' mortgage is a standard national Fannie Mae/Freddie Mac mortgage, and the contract terms were presented on a take-it-or-leave-it basis.

Docket No. 70 (Opp'n at 26).  Plaintiffs also argue that, even if the Court deems the jury waiver valid, that does not mean all of the claims are subject to a bench trial – *i.e.*, "claims that do not arise out of the mortgage contract" are still subject to a jury trial.  Docket No. 70 (Opp'n at 27).

This issue is a close call.  The right to a jury trial is a fundamental one, and therefore there is a presumption against its waiver.  *See, e.g.*, *Merrill Lynch & Co. v. Allegheny Energy, Inc.*, 500 F.3d 171, 188 (2d Cir. 2007) (noting that the right to a jury trial "is fundamental and a presumption exists against its waiver").  However, "a contractual waiver is enforceable if it is made knowingly, intentionally, and voluntarily." *Id.*  Courts are divided as to who has the burden of proving that a waiver was knowing and voluntary.  *See* 8-38 Moore's Fed. Prac. – Civ. § 38.52[3][b]; *see also Century 21 Real Estate LLC v. All Professional Realty, Inc.*, No. CIV. 2:10-2751 WBS GGH, 2012 U.S. Dist. LEXIS 93895, at *11 (E.D. Cal. July 6, 2012).  This Court concludes the burden should be on the party attempting to enforce the waiver because there is a presumption against waiver.  *See also id.* (noting that "the cases from [the district courts in] this circuit that the court has been able to locate have uniformly placed the burden on the party seeking to enforce the waiver").

In evaluating whether a waiver is enforceable, courts commonly consider the following factors: "'1) the negotiability of contract terms and negotiations between the parties concerning the waiver provision; 2) the conspicuousness of the waiver provision in the contract; 3) the relative bargaining power of the parties; and 4) the business acumen of the party opposing the waiver.'" *Price v. Cushman & Wakefield, Inc.*, 808 F. Supp. 2d 670, 705 (S.D.N.Y. 2011); *see also Century 21*, 2012 U.S. Dist. LEXIS 93895, at *10 (taking into consideration the same); *Correa v. BAC Home Loans Serv'g LP*, No. 6:11-cv-1197-Orl-22DAB, 2012 U.S. Dist. LEXIS 159089, at *47-48 (M.D. Fla. Apr. 9, 2012) (taking into consideration the same, plus "'whether the waiver party was

United States District Court

For the Northern District of California

1   represented by counsel'"). Ultimately, the question is "whether the waiver was 'unconscionable,

2   contrary to public policy, or simply unfair.'"  *Id.* at *48.

3          1.      Negotiability of Contract Terms

4          There does not appear to be a dispute that the mortgage signed by Plaintiffs was a form

5   contract. While this does not necessarily mean that there was no room to negotiate, Wells Fargo and

6   Fannie Mae have not offered any evidence that Plaintiffs could have negotiated contract terms, or at

7   least the jury waiver provision. This factor is thus essentially neutral.

8          2.      Conspicuousness of Jury Waiver Provision

9          As for the conspicuousness of the jury waiver provision, this is not a situation where the

10  provision was especially hidden or buried deep in the contract. The mortgage contract itself is

11  fourteen pages; the jury waiver provision is on the thirteenth page and is actually the last provision

12  in the mortgage; on the very next page, Plaintiffs provided their signatures. However, there is

13  nothing that makes the jury waiver provision stand out either. For example, the font size is the same

14  as the font size throughout the document. The waiver provision does not appear to have been

15  bolded[16] nor were all capital letters used in the provision. The provision did not include a space for

16  Plaintiffs to put their initials, nor did the page containing the provision have a space for Plaintiffs to

17  put their initials. At the end of the day, this factor weighs slightly in favor of Plaintiffs.

18         3.      Relative Bargaining Power of the Parties

19         This factor does not require that "the parties stand on precisely equal footing." *Century 21*,

20  2012 U.S. Dist. LEXIS 93895, at *21. In fact, courts typically consider whether there is a "gross

21  disparity" in bargaining power. *Id.*; *see also First Union Nat'l Bank v. United States*, 164 F. Supp.

22  2d 660, 663 (E.D. Pa. 2001) (stating the same); *Westside-Marrero Jeep Eagle, Inc. v. Chrysler

23  Corp., Inc.*, 56 F. Supp. 2d 694, 709 (E.D. La. 1999) (stating that, "[t]o invalidate a waiver

24  provision, however, the bargaining differential must be the kind of 'extreme bargaining

25  disadvantage' or 'gross disparity in bargaining position' that occurs only in certain exceptional

26  situations").

27  ───────────────

28         [16] It is not clear from the copy of the mortgage that was submitted to the Court whether the
title of the provision "Jury Trial Waiver" was in bold.

42

United States District Court

For the Northern District of California

1    Here, Plaintiffs were arguably in a weaker bargaining position given that they were

2    individuals.  On the other hand, Plaintiffs could have walked away from the deal, and they have not

3    explained why they could not have walked away (*e.g.*, because this was the only lender who was

4    willing to extend them credit).  *See Acciard v. Whitney*, No. 2:07-CV-00476-FtM-36DNF, 2011 U.S.

5    Dist. LEXIS 118477, at *11 (M.D. Fla. Oct. 13, 2011) (noting that "the Borrowers do not explain

6    why they could not have walked away from the deal if they found the Waiver Provision

7    unreasonable[;] [i]t does not appear that the Borrowers signed the notes and mortgages under

8    extreme pressure"); *Correa*, 2012 U.S. Dist. LEXIS 159089, at *50-51 (indicating that there was

9    nothing to explain why "'Plaintiffs could not have simply walked away from the deal – a strong

10   bargaining chip – if they found it to be unacceptable'").  Thus, this factor is either neutral or at best

11   weighs only marginally in favor of Plaintiffs.

12           4.    Business Acumen of Plaintiffs

13   Neither side has offered any evidence regarding the business acumen of Plaintiffs.  This

14   factor militates against Wells Fargo as it is Wells Fargo's burden to prove the waiver was knowing

15   and voluntary.

16           5.    Summary

17   At the end of the day, this issue turns on the burden of proof.  Wells Fargo has not

18   adequately carried its burden of demonstrating that the waiver was knowing and voluntary.

19   Although Wells Fargo has pointed to cases in which a jury waiver provision was upheld in a

20   mortgage contract, those cases are largely distinguishable based on the conspicuousness of the jury

21   waiver provision.  For example:

22   •     *Madura v. BAC Home Loans Serv'g L.P.*, 851 F. Supp. 2d 1291 (M.D. Fla. 2012).  The jury

23   waiver provision in *Madura* was more conspicuous than the jury waiver provision at issue here

24   because, in *Madura*, the plaintiffs "initialed the page containing the waiver."  *Id.* at 1294.  Plaintiffs

25   did not do so in the instant case because there was no space – either next to the jury waiver provision

26   or anywhere else on the same page – requiring their initials.

27

28

43

1    •    *Collins v. Countrywide Home Loans, Inc.*, 680 F. Supp. 2d 1287 (M.D. Fla. 2010).  In

2    *Collins*, the jury waiver appeared "directly above Plaintiffs' signatures." *Id.* at 1295.  In contrast,

3    here, Plaintiffs' signatures were on the following page.

4    •    *Allyn v. Western United Life Assur. Co.*, 347 F. Supp. 2d 1246 (M.D. Fla. 2004).  In *Allyn*,

5    the jury waiver provision was "in boldface, uppercase font (unlike the remainder of the text)." *Id.* at

6    1252.  Furthermore, the plaintiff "inserted his signature just inches below this provision." *Id.*

7    •    *Correa*, 2012 U.S. Dist. LEXIS 159089.  In *Correa*, the plaintiff "initialed the page just

8    below the jury trial waiver provision." *Id.* at *48.

9    •    *Oglesbee v. IndyMac Fin. Servs.*, 657 F. Supp. 2d 1155 (S.D. Fla. 2009).  In *Oglesbee*, the

10   plaintiff "initialed the page which contains the waiver." *Id.* at 1158.

11   *But see Acciard*, 2011 U.S. Dist. LEXIS 118477, at *10 (upholding jury waiver provision based on

12   largely the same facts as the instant case – *i.e.*, "[t]his Waiver Provision is identified with a bold-

13   face heading, set forth in a separately numbered paragraph contained in the last paragraph of the

14   page immediately preceding the Borrowers' signature page[;] [i]t is in the same font as the

15   remainder of the document and consists of unambiguous plain English").

16        Accordingly, the Court denies Wells Fargo's request to dismiss or strike the jury demand.

17                              **III.    CONCLUSION**

18        For the foregoing reasons, the Court grants Fannie Mae's motion to dismiss, grants

19   Assurant's motion to dismiss, and grants in part and denies in part Wells Fargo's motion to dismiss.

20        This order disposes of Docket Nos. 57, 59, 60, and 61.

21

22        IT IS SO ORDERED.

23

24   Dated:  January 9, 2013

25                              _____

26                              EDWARD M. CHEN
                                United States District Judge

27

28