Sheri L. Kelly, SBN 226993
E-mail: slk@sherikellylaw.com
LAW OFFICE OF SHERI L. KELLY
31 E. Julian St.
San Jose, CA  95112
Telephone:  408/287-7712
Facsimile:  408/583-4249

**Attorney for Plaintiffs**
*Additional Counsel Listed on Signature Page*

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| STANLEY D. CANNON, PATRICIA R. CANNON, and CHERYL BULLOCK, individually, and for other persons similarly situated,<br><br>　　　　　Plaintiffs,<br>vs.<br><br>WELLS FARGO BANK, N.A.<br><br>　　　　　Defendant. | Case No. CV-12-01376  EMC<br><br>**SECOND AMENDED COMPLAINT**<br>**CLASS ACTION**<br><br>**JURY TRIAL DEMANDED**<br><br>Judge: Hon. Edward M. Chen<br><br>Action Filed: March 19, 2012<br>Trial Date: None Set |

Plaintiffs Stanley D. Cannon, Patricia R. Cannon, and Cheryl Bullock, acting individually and on behalf of all others similarly situated, for their Second Amended Complaint and demand for jury trial, state and allege as follows:

## NATURE OF THE ACTION

1.     This is an action seeking damages and other relief against Wells Fargo Bank, N.A. ("Wells Fargo" or "Wells") for wrongful and collusive business practices relating to force-placed flood insurance.

2.     Wells Fargo is one of the nation's largest mortgage servicers and lenders. The mortgages Wells Fargo services require the borrowers to maintain acceptable flood and hazard insurance on the residential property securing their loans. When borrowers do not obtain insurance coverage in the amounts Wells Fargo requires, it purchases insurance for the borrower. This is called "force-placed" or "lender-placed insurance." This is standard and appropriate.

3.     What is not standard and appropriate is Wells Fargo's exploitative and self-dealing arrangements with force-placed insurers.

4.     Wells Fargo entered into an exclusive purchasing arrangement with American Security Insurance Company (ASIC).

5.     Under this agreement, ASIC agreed to pay a kickback of 10%-20% of every force-placed insurance premium to Wells Fargo or its affiliate, Wells Fargo Insurance, Inc.

6.     In return, Wells Fargo agreed to purchase all force-placed insurance from ASIC.

7.     ASIC charges at least twice as much, and sometimes up to 10 times as much, for flood insurance as other companies participating in the flood insurance marketplace. They are able to charge these rates because Wells Fargo provides them with a captive market—all of Wells Fargo's borrowers.

8. Wells Fargo outsources its insurance-related servicing responsibilities—such as tracking insurance coverage on borrower's properties, sending notices related to insurance coverage issues to borrowers, and force-placing insurance on borrowers' properties—to ASIC. In effect, the company receiving force-placed insurance premiums is responsible for determining who has to pay them. Wells Fargo pays ASIC a below-cost fee for these services, but gets the cost of these services returned when ASIC kicks back a portion of every premium it receives to Wells Fargo. Borrowers are forced to foot the bill for Wells Fargo's outsourcing arrangement. The purpose of force-placed insurance is to protect the lender's interest in the property securing a mortgage. The purpose is not to gouge the borrower solely to profit the mortgage servicer. The purpose is not to shift the cost of the mortgage servicer's operations—such as keeping up with the status of borrowers' insurance coverage, sending notices about deficient coverage, and the like—to the borrower by outsourcing these operations to an insurance company that forces borrowers to pay two to ten times the going rate for insurance.

9. Wells Fargo uses its sister corporation, Wells Fargo Insurance, Inc., as the "insurance agent" that gets paid for "finding" and placing the force-placed insurance policies. It thus characterizes the kickbacks as insurance agent "commissions." But there is no "finding" involved. Wells Fargo Insurance, Inc. performs no services whatsoever for individual borrowers and performs none of the services insurance agents typically perform to earn commissions. Wells Fargo already has written contracts with ASIC that agree to purchase all force-placed insurance for Wells Fargo borrowers from ASIC. These payments are not "commissions." They are kickbacks.[1]

10. Wells Fargo charges borrowers' mortgage escrow accounts for force-placed insurance premiums and Wells Fargo Insurance, Inc.'s kickbacks. It increases borrowers' monthly mortgage

---

[1] "**Kickback**, *n.* (1920) A return of a portion of a monetary sum received, esp. as a result of coercion or a secret agreement." Black's Law Dictionary (9th Ed. 2009).

1    payments to recoup the escrow deficiency created when Wells Fargo withdraws these premiums and

2    kickbacks. If the borrower refuses or fails to pay, Wells Fargo adds the premiums to the borrower's

3    mortgage balance and charges the borrower interest on these charges, creating a new loan.

4         11.    Wells Fargo increased its flood insurance requirements to increase the number and

5    amount of kickbacks it receives. Traditionally, mortgage lenders have required borrowers to maintain

6    insurance equal to the outstanding balance on the mortgage, which is the amount necessary to protect

7    the lender's financial interest in the property. Wells Fargo increased this minimum requirement to

8    replacement cost value, which is the amount of insurance necessary to rebuild the property in the

9    event that a disaster completely destroys it. If the borrower does not maintain this amount of flood

10   insurance, Wells Fargo force-places insurance up to the lesser of the replacement cost value of the

11   property or $250,000 (which is the federal maximum for flood insurance).

12        12.    Plaintiffs allege that (1) Wells Fargo entered into a hidden arrangement with ASIC to

13   receive a kickback of a portion of every force-placed insurance policy it bought for its borrowers, (2)

14   Wells Fargo purchased the most expensive insurance policies available for its borrowers to increase

15   the amount of each kickback, (3) Wells Fargo increased its flood insurance requirements to increase

16   the number and amount of kickbacks, and (4) Wells Fargo required backdated insurance to increase

17   the number of kickbacks.

18        13.    Wells Fargo's practices alleged in this Amended Complaint violate the fiduciary duty

19   Wells Fargo has with respect to the management and use of borrowers' escrow funds, violate the

20   Truth in Lending Act ("TILA") and anti-tying provisions of the Bank Holding Company Act

21   (BHCA), violate California Bus. & Prof. Code § 17200, unjustly enriched the defendant, and

22   constitute conversion.

23

24

---

3

14.     Plaintiffs seek to recover damages equal to (1) Wells Fargo's kickbacks, (2) the excess cost of force-placed insurance, (3) the excess cost of Wells Fargo's excessive insurance requirements and practice of backdating force-placed insurance policies, and (4) three times the amount of Wells Fargo's kickbacks pursuant to the BHCA, as well as injunctive relief.

## JURISDICTION AND VENUE

15.     This Court has jurisdiction over this action under the Class Action Fairness Act of 2005, 28 U.S.C. §§ 1332(d)(2) and (6), because the aggregate claims of the putative Class members exceed $5 million, exclusive of interest and costs, and because at least one Plaintiff is a citizen of a different state than Wells Fargo.

16.     This Court also has original jurisdiction over Plaintiffs' federal claims pursuant to 28 U.S.C. § 1331. Plaintiffs' state law claims arose out of the same transaction and occurrence as their TILA and BHCA claims—specifically, all claims arose out of Wells Fargo's kickback scheme, its efforts to increase kickbacks by raising its flood insurance requirements, and requiring backdated insurance—and are so related to Plaintiffs' TILA and BHCA claims that they form part of the same case or controversy.

17.     Venue is proper in this district pursuant to 28 U.S.C. § 139, because Wells Fargo is subject to personal jurisdiction, because its principal place of business is 420 Montgomery Street, San Francisco, California 94163, and because a substantial part of the acts or omissions giving rise to the claims herein occurred and continue to occur in this district.

## PARTIES

18.     Stanley D. Cannon and Patricia R. Cannon are, and at all times relevant to this complaint have been, residents of Sarasota County, Florida.

4

*SECOND AMENDED COMPLAINT, CASE NO. CV-12-01376 EMC*

19.     Cheryl A. Bullock is, and at all times relevant to this Complaint was, a resident of California City, California.

20.     Defendant Wells Fargo Bank N.A. is a national bank registered to do business in the State of California with its principal address in San Francisco, California. As a result of a 2004 merger, Wells Fargo Bank is the successor to Wells Fargo Home Mortgage, Inc., which no longer exists. However, Wells Fargo Bank, N.A. sometimes does business under the name Wells Fargo Home Mortgage.

## FACTUAL ALLEGATIONS

### A.      Wells Fargo's Role as Servicer or Lender for Different Mortgagors

21.     Wells Fargo provides services including, but not limited to, banking, insurance, investments, mortgage lending, mortgage servicing, and consumer and commercial finance across North America. It services approximately 9 million mortgages, and has assets of $1.2 trillion.

22.     Wells Fargo's mortgage business includes mortgage servicing, mortgage lending, and purchasing mortgages on the secondary market.

23.     A mortgage servicer is an entity that provides certain functions on behalf of the lender or owner of the mortgage. The heart of the mortgage servicer's job is to collect payments on behalf of the third party that is entitled to receive payments under the mortgage. For example, Stanley and Patricia Cannon's mortgage is owned by Federal National Mortgage Association ("Fannie Mae"), and Wells Fargo simply services their mortgage on Fannie Mae's behalf. Wells Fargo is not in privity of contract with mortgagors whose loans Wells Fargo services but does not own.

24.     Wells Fargo also owns many mortgages and makes mortgage loans of its own. Wells Fargo services many of these mortgages through its servicing department (formerly Wells Fargo Home Mortgage prior to its 2004 merger with Wells Fargo Bank, N.A.).

25.     Due to the complex and opaque nature of the modern secondary mortgage market, in which mortgage loans are sold, resold, and assigned to trusts to convert into mortgage-backed securities without notice to borrowers, whether Wells Fargo owns and services or only services Cheryl Bullock's mortgage is unknown at this time.

26.     As servicer, Wells Fargo's responsibilities included sending monthly mortgage statements, collecting monthly mortgage payments, collecting and maintaining escrow accounts for the payment of insurance on properties used to collateralize loans, paying for such insurance on those properties from borrower's escrow accounts, monitoring and ensuring that all required forms of insurance are in full force and effect, notifying borrowers of insurance lapses and other required actions, procuring and paying for force-placed insurance, and accounting for and remitting borrowers' payments to the owner of each borrower's mortgage.

27.     Numerous lenders, or note holders, hire Wells Fargo to take on these responsibilities for millions of mortgages. The note holder pays Wells Fargo to provide these services, and Wells Fargo is not permitted to charge the borrowers for these services.  Wells Fargo, in turn, outsources some of its responsibilities to third parties. Wells Fargo delegates many of its insurance-related responsibilities to ASIC, which performs these services under the trade name Assurant Specialty Property. This outsourcing arrangement is the same whether Wells Fargo owns or simply services a particular borrower's mortgage.

**B.      ASIC's Role as an Outsourcer and Insurance Company**

28.     Wells Fargo outsources many of its servicing responsibilities described above to ASIC, or one of Assurant, Inc.'s other subsidiaries. Under this outsourcing arrangement, Assurant's subsidiaries monitor borrowers' flood insurance coverage, send letters on Wells Fargo letterhead stating when borrowers need to increase their flood insurance coverage, and force-place coverage on

borrowers' property if the borrowers do not obtain sufficient coverage to meet Wells Fargo's requirements.

29.    As part of this "bundle" of services, Wells Fargo also authorizes Assurant, Inc.'s subsidiaries to purchase every force-placed policy for Wells Fargo's borrowers from ASIC. In return for this lucrative business, every time ASIC force-places an insurance policy on one of Wells Fargo's borrowers' property, it pays a portion of the premium to Wells Fargo, or its affiliate Wells Fargo Insurance, Inc.

**C.    Facts as to Stanley D. Cannon and Patricia R. Cannon**

30.    On September 9, 2005, the Cannons obtained their mortgage loan from Amerisave Mortgage Corporation. The principal balance of their mortgage at closing was $128,000. After the closing of the loan, the note and mortgage were ultimately purchased by Fannie Mae. A true and correct copy of the mortgage is attached as **Exhibit A**.

31.    Pursuant to the mortgage, Plaintiffs are required to insure the improvements on the real property:

> 5.    Property Insurance. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included with the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires…The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably…
>
> If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrowers expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by lender under this Section 5 shall become additional debt of

7

Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

32.     Plaintiffs' mortgage was a Fannie Mae form mortgage. Most of the mortgages Wells Fargo serviced during the Class period were, likewise, Fannie Mae mortgages written on forms that contained provisions regarding property insurance that were substantially similar to those in Section 5 of the Cannons' mortgage.

33.     While this standardized provision states that the "cost of the [force-placed] insurance so obtained might significantly exceed the cost of insurance that Borrower could have obtained," it does not authorize or contemplate that Wells Fargo or an affiliate will derive a hidden profit or financial benefit by procuring force-placed insurance from ASIC. Nor does it authorize Wells Fargo to add these hidden kickbacks as additional debt of the borrower.

34.     The Cannons' home was located in a Special Flood Hazard Area, as defined by federal regulations, at the time they entered into their mortgage. Plaintiffs signed a "Notice of Special Flood Hazards and Availability of Federal Disaster Relief Assistance" at the time they entered into their mortgage. This notice stated that the Cannons were required to maintain flood insurance that "must cover **the lesser of**: (1) the outstanding principal balance of the loan; or (2) the maximum amount of coverage allowed for the type of property under the NFIP. Flood insurance coverage under the NFIP is limited to the overall value of the property securing the loan minus the value of the land on which the property is located."

35.     Plaintiffs obtained sufficient flood insurance coverage to close on their mortgage in 2005. Neither their mortgage lender nor initial servicer (Ohio Savings Bank) advised them to increase their flood insurance coverage.

8

36.     Wells Fargo Home Mortgage began servicing the Cannons' mortgage on or about February 1, 2006 and continued to do so until Wells Fargo Home Mortgage and Wells Fargo merged. Since the merger, Wells Fargo has serviced the Cannons' mortgage for Fannie Mae.

37.     Beginning in April of 2006—two months after Wells Fargo began servicing their mortgage—and continuing until the present, Wells Fargo incrementally increased the amount of flood insurance Plaintiffs were required to maintain.

38.     Wells Fargo increased the Cannons' minimum flood insurance requirement pursuant to a standard practice of requiring all borrowers to maintain replacement cost value insurance. Wells Fargo implemented this policy in order to increase the probability that the Cannons and similarly situated borrowers would require force-placed insurance, which would guarantee Wells Fargo a kickback equal to a portion of the premium for the force-placed insurance policy.

39.     For example, in 2006, Wells Fargo demanded that Plaintiffs increase their flood insurance coverage by $79,200. Plaintiffs did so and maintained $227,900 of flood insurance coverage beginning in August of 2006. Despite this, Wells Fargo force-placed them into $10,200 of additional flood insurance on May 29, 2008.

40.     On April 6, 2006, Wells Fargo sent Plaintiffs a form letter stating "Our records indicate that the amount of coverage provided by your current flood insurance is less than the coverage required by Wells Fargo Home Mortgage." The letter went on to say that "your flood insurance coverage should provide replacement cost coverage for your structure/improvements…"

41.     On May 30, 2006, Wells sent Plaintiffs a form letter titled "NOTICE OF TEMPORARY FLOOD INSURANCE PLACED BY LENDER DUE TO DEFICIENT COVERAGE" stating that it had purchased a flood insurance binder from ASIC to obtain $79,200 in additional flood insurance coverage for them at an annual cost of $772.18. The policy was placed

with ASIC. Plaintiffs subsequently purchased $227,900 in flood insurance from Fidelity National Property & Casualty Insurance Company, which cost dramatically less than ASIC's premiums. Plaintiffs maintained this amount of insurance to avoid further force-placement in the future.

42.     Again on April 21, 2008, ASIC sent Plaintiffs another "INSURANCE BINDER" force-placing an additional $10,200 in flood insurance for which Plaintiffs were charged $94.95.

43.     On May 29, 2008, Wells Fargo sent Plaintiffs a form letter titled "NOTICE OF PLACEMENT OF FLOOD INSURANCE," which informed them that Wells Fargo had purchased a flood insurance policy that would cost $94.95 in annual premiums, which would be withdrawn from their escrow account. This policy was placed with ASIC. Wells Fargo withdrew $94.95 from Plaintiffs' escrow account to pay ASIC. On information and belief, ASIC returned at least $9.50 of this amount to Wells Fargo or Wells Fargo Insurance, Inc.

44.     At this time, Plaintiffs' private flood insurance policy combined with ASIC's force-placed flood insurance policy provided a total of at least $238,100 in flood insurance coverage. Their mortgage balance was significantly below this amount. Although documents in Defendant's possession—such as mortgage statements—will be necessary to verify the amount of excess coverage, Plaintiffs' original principal balance at the time of closing on their mortgage was $128,000 and the total principal balance on the mortgage on November 23, 2011, when Wells Fargo filed a complaint to foreclose on Plaintiffs' mortgage, was $104,828.11.

45.     At ASIC's premium rate of $772.18 for $79,200 of coverage (or about $0.0097 of premium for $1.00 of coverage), Wells Fargo's excess requirement of $238,100 gave Wells Fargo a potential kickback of $230.96 (10% of .0097 multiplied by $238,100) as compared with a potential kickback of $101.68 for mortgage balance coverage. In addition, Wells Fargo's ever increasing

1   requirements made it impossible for the Cannons to keep their insurance sufficient in Wells Fargo's

2   eyes, guaranteeing that they would eventually be force-placed and pay a kickback to Wells Fargo.

3       46.    Plaintiffs lack administrative remedies to address the wrongful conduct alleged herein.

4       47.    All conditions precedent to the relief sought herein have been performed, occurred or

5   been waived. Plaintiffs' contract requires pre-suit notice, but such notice would be futile. First, Wells

6   has already filed a complaint to foreclose on Plaintiffs' property due to a default on the mortgage that

7   arose from Defendant's wrongful practices. Second, Defendant's practices that are the subject of this

8   complaint—force-placing excessive insurance on borrowers in order to receive a kickback—are

9   mandated by Wells Fargo's contracts with ASIC, such that Wells Fargo cannot correct its practices to

10  conform with the law absent intervention of the Court.

11      **D.**    **Facts as to Cheryl Bullock**

12      48.    Cheryl Bullock owns her home in California City, California.

13      49.    Ms. Bullock is retired. She lives on a fixed income and is unable to adjust her income

14  to meet new financial needs, such as increases in Wells Fargo's insurance requirements.

15      50.    On information and belief, Ms. Bullock's mortgage is a Fannie Mae uniform security

16  instrument whose terms are materially identical to those contained in Stanley and Patricia Cannon's

17  mortgage. Ms. Bullock is uncertain whether Wells Fargo owns or only services her mortgage.

18      51.    As of January 4, 2013, Ms. Bullock's mortgage balance was $30,306.22. As of August

19  6, 2012, her mortgage balance was $31,054.46. As of July 7, 2010, her mortgage balance was

20  $40,041.45.

21      52.    Beginning in January, 2011, Wells Fargo began sending Ms. Bullock letters indicating

22  that she was required to increase her flood insurance coverage. On January 31, 2011, Wells Fargo

23

24

*SECOND AMENDED COMPLAINT, CASE NO. CV-12-01376 EMC*

1    sent Ms. Bullock a letter indicating that it had purchased an insurance binder from ASIC on her

2    behalf. The letter indicated that Ms. Bullock was required to maintain $243,000 in flood insurance.

3          53.    Ms. Bullock sent Wells Fargo proof of her existing flood insurance coverage.

4          54.    Wells Fargo cancelled the original insurance binder, but purchased an additional

5    binder with $7,000 in coverage at an annual premium of $63 on March 23, 2011.

6          55.    This process repeated itself in 2012, though Plaintiffs are uncertain of the specific

7    details because she was not able to locate copies of Wells Fargo's letters in 2012.

8          56.    Wells Fargo force-placed Ms. Bullock into flood insurance in 2011 and 2012 and

9    charged the cost of the force-placed insurance to Ms. Bullock's escrow account. Wells Fargo, or its

10   affiliate, received a portion of the premium for each force-placed insurance policy. Each year, in

11   response, Ms. Bullock purchased additional flood insurance in order to avoid paying Wells Fargo's

12   exorbitant force-placed insurance charges and may have received a partial refund of the force-placed

13   insurance premiums.

14         57.    The force-placed insurance premiums increased Ms. Bullock's monthly mortgage

15   payments and resulted in her becoming delinquent on her mortgage payments in 2012. Wells Fargo

16   began depositing her regular monthly mortgage payments into a suspense account rather than

17   applying it to her mortgage. Wells Fargo threatened Ms. Bullock with foreclosure in several letters in

18   December 2012 and January 2013. As of December 5, 2012, Wells Fargo determined Ms. Bullock

19   was $74.50 delinquent on her mortgage payments.

20         58.    Wells Fargo's ever increasing requirements made it impossible for Ms. Bullock to

21   keep her insurance sufficient in Wells Fargo's eyes, guaranteeing that she would eventually be force-

22   placed and pay a kickback to Wells Fargo.

23

24

*SECOND AMENDED COMPLAINT, CASE NO. CV-12-01376 EMC*

59.     Ms. Bullock lacks administrative remedies to address the wrongful conduct alleged herein.

60.     All conditions precedent to the relief sought herein have been performed, occurred or been waived. If Ms. Bullock's contract requires pre-suit notice, such notice would be futile. First, Wells has already threatened to foreclose on Plaintiffs' property because of a delinquency arising from Defendant's wrongful practices. Second, Defendant's practices that are the subject of this complaint—force-placing excessive insurance on borrowers in order to receive a kickback—are mandated by Wells Fargo's contracts with ASIC, such that Wells Fargo cannot correct its practices to conform with the law absent intervention of the Court.

**E.     Facts Common to the Classes**

61.     Each and every mortgage at issue in this litigation, whether owned and serviced or only serviced by Wells Fargo, requires borrowers, including Plaintiffs, to maintain insurance on their real property. If the borrower fails to maintain the requisite insurance, the mortgage servicer may force-place insurance on the property.

62.     The mortgages at issue in this litigation are Fannie Mae form mortgages written on standardized residential mortgage instruments that contain substantially identical provisions regarding flood insurance and fees that may be imposed in connection with force-placed insurance to those cited above (section 5 of **Exhibit A**).

63.     Pursuant to the mortgage contracts at issue, once an insurance policy has lapsed, the mortgage servicer can force-place (purchase) insurance for the home, and then charge the borrower the full cost of the premium. However, these premiums are not the actual amount that Wells Fargo pays, because a substantial portion of the premiums are refunded to Wells Fargo through kickbacks or unearned "commissions."

64.     In accomplishing this force-placement, Wells Fargo, in bad faith, entered into secret agreements with ASIC to guarantee that ASIC would be the exclusive force-placed insurance provider for all force-placed policies on the vast majority of mortgages Wells Fargo services. Under this arrangement Wells Fargo charges exorbitant rates to Plaintiffs and the Classes who have no way of refusing the force-placed charges. These premium rates or charges were not arrived at on a competitive basis and were well in excess of those which could have been obtained in the open market by Wells Fargo, Plaintiffs or the Classes. No good faith, arms-length transactions take place between Wells Fargo and ASIC. Rather, the pricing is the result of collusion between Wells Fargo and ASIC.

65.     The premiums on force-placed insurance policies generally cost at least two times, and up to ten times, more than what the borrower was either originally paying or what the borrower could obtain if he or she purchased the insurance on a competitive basis on the open market. For example, the Cannons' force-placed flood insurance policy cost $94.95 for $10,200 in insurance coverage, or about $0.0093 for each dollar in insurance coverage. The Cannons' private flood insurance policy cost $1092 in premiums for $227,900 in coverage, or about $0.0048 in premium for each dollar in coverage.

66.     Force-placed insurance policies are extremely lucrative for ASIC and generate extremely high profit margins. Assurant, Inc., ASIC's parent company, collected $2.7 billion of premiums in 2010 through its force-placed insurance division alone. Assurant, Inc.'s family of companies paid out claims equaling only 36% of this take. With Assurant's other lines of business, the norm is a 70% claims-to-premiums ratio. 40% of the $2.7 billion in revenue is consumed by "general expenses," largely kickbacks to banks and their affiliates described as "commissions." In

*SECOND AMENDED COMPLAINT, CASE NO. CV-12-01376 EMC*

1    other lines of insurance, overhead and general expenses are usually only a fraction of policyholder

2    claims.

3         67.    Wells Fargo and ASIC have reaped excessive profits relating to force-placed

4    insurance.

5         68.    Wells Fargo receives commissions or kickbacks from ASIC when the high-priced,

6    force-placed, insurance policies are purchased. These kickbacks are directly tied to the cost of the

7    force-placed insurance and are usually a percentage of the premium for the policy.

8         69.    This kickback arrangement provides the mortgage servicer with an incentive to

9    purchase the highest priced force-placed insurance policy on a non-competitive basis that it can—the

10   higher the cost of the insurance policy, the higher their kickback. The consumer pays the bill for this

11   anti-competitive scheme. Wells maximizes the amount of its commissions or kickbacks by force-

12   placing borrowers into insurance policies in excess of the amounts required by federal law, and

13   exceeding the amount of the note holder's interest in the borrower's home.

14        70.    The commission or kickback is paid by ASIC to Wells Fargo in order to maintain their

15   pre-existing uncompetitive and exclusive relationship, to induce Wells Fargo to purchase

16   excessively-priced force-placed insurance policies from ASIC, and to cause Wells Fargo to not seek

17   competitive bids in the market.

18        71.    Wells Fargo and ASIC have entered into an arrangement such that a competitively

19   priced insurance policy is not actually "found" for any given property. Therefore, the notion that any

20   "commission" is due to Wells Fargo or its affiliates is false. Rather, Wells has a pre-set arrangement

21   by which ASIC has access to and searches Wells Fargo's database to find lapsed insurance policies.

22   Then ASIC writes to the homeowners to notify them of the force-placed coverage. Assuming there is

23   a lapse in coverage, insurance is automatically placed—the provider of the insurance and the cost of

24

the insurance are pre-determined under this relationship. Further, the cost of the insurance for each home bears no relation to each homeowner's individual home. Rather it is pre-determined based upon Well Fargo's entire portfolio of mortgages.

72.    ASIC's services—monitoring Wells Fargo's portfolio for insurance lapses, notifying borrowers of the amount of insurance they are required to maintain, and purchasing force-placed insurance—are part of Wells Fargo's job as a mortgage servicer. Wells Fargo is paid to perform these services by Fannie Mae. Wells Fargo, in turn, outsources these services to ASIC. Plaintiffs do not challenge this outsourcing arrangement in principle, but Wells Fargo pays ASIC a below-cost fee for performing these services. ASIC, in turn recoups its losses on services provided to Wells Fargo along with additional profits by charging higher premiums for force-placed insurance. Wells Fargo recoups the cost of paying ASIC for performing these services by receiving a kickback from the force-placed insurance premiums.

73.    Therefore, the borrower paying ASIC's premium rates is not just paying ASIC for force-placed insurance. The borrower is also paying ASIC for a bundle of services, including performing Well Fargo's job of administering and servicing the mortgages. This bundle of administrative services includes Wells Fargo's cost of monitoring and servicing its entire portfolio of loans to identify insurance lapses and is not chargeable to Plaintiffs under the mortgages. The lender, on whose behalf Wells Fargo services the mortgages, already pays Wells Fargo for these services, so Wells Fargo's kickback arrangement ensures that it gets paid twice—once by the lender, and again by the borrower.

74.    Under this arrangement, the "premiums" for insurance that are charged to the Plaintiffs are exorbitant and illegal because they not only include the excessive cost of insurance, but

1    they also include illegal kickbacks and the cost of the bundle of administrative services that ASIC is

2    providing to Wells Fargo that Wells Fargo has already been paid to perform.

3         75.    This anticompetitive arrangement insures that ASIC and its affiliates are the only

4    entities providing force-placed insurance for Wells Fargo borrowers, and the price of the premium far

5    exceeds the market value of the insurance coverage.

6         76.    If the consumer cannot afford to pay the exorbitant premiums for force-placed

7    insurance, the premiums are added to the mortgage's principal balance, and Wells Fargo can force

8    payment of the premiums through the threat of negative credit reporting and foreclosure.

9         77.    Wells also force-places retroactive insurance policies covering periods of time in the

10   past where coverage had lapsed. This is done despite the fact that there are no claims during the

11   lapsed period and the homeowner has since secured standard insurance. For example, if a borrower's

12   flood insurance coverage lapses, and the borrower renews or secures a new insurance policy one

13   month later, Wells Fargo will cancel most of the force-placed insurance charge, but charge the

14   borrower for one month of force-placed insurance. Retroactive force-placing of insurance is an

15   especially egregious practice given that the National Association of Insurance Commissioners has

16   stated that insurance is "prospective in nature" and that policies should not be backdated.

17        78.    The actions and practices described herein represent bad faith and unconscionable

18   practices that are an abusive and unlawful exercise of the lender's authority under the contract. Force-

19   placing these excessively priced insurance policies on Plaintiffs' and Class Members' mortgages

20   without regard for the market price of similar policies is merely price-rigging the premiums for the

21   sole purpose of maximizing Wells Fargo's profits through kickbacks paid from the premiums for the

22   force-placed policies. This conduct is prohibited by state and Federal law.

23

24

79.     As a mortgage servicer, Wells Fargo has the right to purchase force-placed insurance, but Wells Fargo must discharge this duty in good faith. Plaintiffs challenge Wells Fargo's practice and business arrangements that negate the market forces that regulate the price of insurance policies, and result in the highest possible insurance premium charges to homeowners, all for the sole purpose of generating large kickbacks to Wells Fargo from those premiums.

80.     Wells Fargo was not, and is not, authorized by any federal, state, or local governing body, contract, or agreement to manipulate the price of the force-placed insurance policies, and acted in bad faith as alleged above.

81.     These fraudulent practices have recently come under fire by all fifty State Attorneys General as part of a nationwide investigation.

## CLASS ALLEGATIONS

82.     Plaintiffs bring this action on behalf of themselves and all others similarly situated pursuant to Fed. R. Civ. P. 23. This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of Rule 23(a)(1)-(4) and (b)(3).

83.     The proposed Classes are defined as follows:

1.      **Bank Holding Company Act Class:** Class representatives Stanley Cannon, Patricia Cannon, and Cheryl Bullock bring their Bank Holding Company Act claims on behalf of a class of all persons with properties in the United States who were charged for force-placed insurance by Wells Fargo Bank, N.A. or any of its affiliates within the applicable statute of limitations through the present where such charges included funds used to pay a fee, commission, or other financial remuneration to Wells Fargo Insurance, Inc. or any of Wells Fargo Bank, N.A.'s affiliates.

2.      **Truth in Lending Act Class:** Class representatives Stanley Cannon, Patricia Cannon, and Cheryl Bullock bring their Truth in Lending Act claims on behalf of a class of all persons with properties in the United States who

        (a)     were charged for force-placed insurance by Wells Fargo Bank, N.A. or any of its affiliates within the applicable statute of limitations through the present where such charges included funds used to pay a fee, commission, or other financial remuneration to Wells Fargo Insurance, Inc. or any of Wells Fargo Bank, N.A.'s affiliates;

18

*SECOND AMENDED COMPLAINT, CASE NO. CV-12-01376 EMC*

(b)      were charged for force-placed insurance by Wells Fargo Bank, N.A. or any of its affiliates within the applicable statute of limitations through the present where the effective date of the insurance policy temporally preceded the date on which the policy was purchased; or

(c)      were charged for force-placed insurance coverage by Wells Fargo Bank, N.A. or any of its affiliates within the applicable statute of limitations through the present where the amount of force-placed insurance coverage exceeded the outstanding principle balance of the Class member's mortgage as of the time of force-placement.

3.      **California Unjust Enrichment (Restitution), Fiduciary Duty, and Conversion Class:** Class representative Cheryl Bullock brings her unjust enrichment, breach of fiduciary duty, and conversion claims on behalf of a class of all persons with properties in the state of California who were charged for force-placed insurance by Wells Fargo Bank, N.A. or any of its affiliates within the applicable statute of limitations through the present where such charges included funds used to pay a fee, commission, or other financial remuneration to Wells Fargo Insurance, Inc. or any of Wells Fargo Bank, N.A.'s affiliates.

4.      **Florida Unjust Enrichment, Fiduciary Duty, and Conversion Class:** Class representatives Stanley and Patricia Cannon bring their unjust enrichment, breach of fiduciary duty, and conversion claims on behalf of a class of all persons with properties in the state of Florida who were charged for force-placed insurance by Wells Fargo Bank, N.A. or any of its affiliates within the applicable statute of limitations through the present where such charges included funds used to pay a fee, commission, or other financial remuneration to Wells Fargo Insurance, Inc. or any of Wells Fargo Bank, N.A.'s affiliates.

5.      **California Business & Professions Code § 17200 Class:** Class representative Cheryl Bullock brings her Cal. Business & Professions Code § 17200 claim on behalf of a class of all persons with properties in the state of California who

(a)      were charged for force-placed insurance by Wells Fargo Bank, N.A. or any of its affiliates within the applicable statute of limitations through the present where such charges included funds used to pay a fee, commission, or other financial remuneration to Wells Fargo Insurance, Inc. or any of Wells Fargo Bank, N.A.'s affiliates;

(b)      were charged for force-placed insurance by Wells Fargo Bank, N.A. or any of its affiliates within the applicable statute of limitations through the present where the effective date of the insurance policy temporally preceded the date on which the policy was purchased; or

(c)      were charged for force-placed insurance coverage by Wells Fargo Bank, N.A. or any of its affiliates within the applicable statute of limitations through the present where the amount of force-placed insurance coverage exceeded the outstanding principle balance of the Class member's mortgage as of the time of force-placement.

84.      Excluded from the Classes are Wells Fargo, its respective parents, subsidiaries, affiliates, officers, employees and directors, as well as any entity in which they have controlling interests, and counsel for Plaintiffs.

19

85.     Plaintiffs reserve the right to modify or amend the definition of the proposed Classes before the Court determines whether certification is appropriate.

86.     The members of the Classes are so numerous that joinder is impractical. The Classes are believed to consist of thousands of members, whose identities are within the exclusive knowledge of and can only be ascertained by resort to the records of Wells Fargo.

87.     There are questions of law and fact common to Plaintiffs and the Classes that predominate over questions affecting individual Class members. These common questions include:

a.     Whether Defendant was unjustly enriched by charging their residential borrowers amounts for force-placed insurance procured from ASIC, a portion of which was returned, transferred or paid to Wells or an affiliate;

b.     Whether Defendant converted funds owned by borrowers by withdrawing such funds from borrowers' escrow accounts and requiring borrowers to pay to replenish their escrow accounts in order to pay the premiums for force-placed insurance procured from ASIC, a portion of which was returned, transferred or paid to Wells or an affiliate;

c.     Whether Defendant acted unfairly by entering into an exclusive buying arrangement with ASIC in order to receive kickbacks of a portion of insurance premiums paid to ASIC for force-placed insurance policies;

d.     Whether Wells Fargo's practices are unusual within the meaning of the BHCA;

e.     Whether Wells Fargo tied the services of its affiliate to its provision of force-placed flood insurance;

20

f.     Whether Wells Fargo should be enjoined from continuing to receive kickbacks from ASIC and withdrawing the amounts of these kickbacks from borrowers' escrow accounts.

88.     Plaintiffs' claims are typical of the claims of other members of the Classes. Plaintiffs, like all Class members, were charged for backdated force-placed insurance procured without seeking competitive bids on the open market by Wells Fargo from ASIC to insure property secured by a residential mortgage originated, owned or serviced by Wells. Wells Fargo forced all Plaintiffs to maintain insurance exceeding their loan balances in order to increase the number and amount of kickbacks ASIC paid to Wells Fargo. Plaintiffs, like all Class members, sustained damages based on the same actions of Wells and have no interest antagonistic to the interests of any members of the Classes.

89.     Plaintiffs are committed to the vigorous prosecution of this action and have retained competent counsel experienced in the prosecution of complex litigation and consumer class actions. Plaintiffs and their counsel will fairly and adequately protect the interests of the Classes.

90.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Since the amount of each Class member's claim is small relative to the complexity of the litigation, and due to the financial resources of Defendant, Class members cannot realistically afford to seek legal redress individually for the claims alleged herein. Therefore, absent a class action, members of the Classes have no realistic likelihood of recovering their damages, and Wells Fargo's wrongful practices alleged herein will continue unabated.

91.     Even if members of the Classes could afford to pursue individual litigation, individualized litigation would significantly increase the delay and expense to all parties and to the Court. Individualized litigation would also create the potential for inconsistent or contradictory

1  rulings. In contrast, a class action presents far fewer management difficulties, allows claims to be

2  heard which might otherwise go unheard because of the relative expense of bringing individual

3  lawsuits, and provides the benefits of adjudication, economies of scale and comprehensive

4  supervision by a single court. Thus, a class action will allow redress for many persons whose claims

5  would otherwise be too small to litigate individually. There will be no difficulty in the management

6  of this action as a class action.

7        92.    Wells Fargo has acted or failed to act in a manner generally applicable to the Classes,

8  thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to

9  the Classes as a whole.

10                          **CAUSES OF ACTION**

11                            **COUNT I**
                  **UNJUST ENRICHMENT (RESTITUTION)**
12              *On Behalf of All Plaintiffs and Classes 3 and 4*

13        93.    Plaintiffs restate and reallege the preceding paragraphs of this Complaint as though set

14  out here word for word.

15        94.    Plaintiffs Stanley and Patricia Cannon, and Cheryl Bullock bring their unjust

16  enrichment (restitution) claim on behalf of all persons with homes in the United States, California, or

17  Florida with loans owned and serviced or only serviced by Wells Fargo who were charged for force-

18  placed insurance premiums that included Wells Fargo's kickbacks.

19        95.    Plaintiffs Stanley and Patricia Cannon never borrowed money from Wells Fargo.

20  Therefore, they have no contract with Wells Fargo. Their causes of action against Wells Fargo must

21  sound in equity and tort. Further, Wells Fargo's kickback scheme is not referenced directly or

22  indirectly in any Plaintiffs' mortgage and, therefore, is not governed by any of the Plaintiffs'

23  mortgages.

24

*SECOND AMENDED COMPLAINT, CASE NO. CV-12-01376 EMC*

96.     Plaintiffs' unjust enrichment claims against Wells Fargo arise from Wells Fargo's illegal practice of earning a hidden profit or other financial benefit by collecting money from residential borrowers for the exorbitant insurance premiums for force-placed flood insurance policies procured through ASIC where a portion of the above-market rate premiums were returned to Wells and its affiliates. This secret kickback arrangement between Wells Fargo and ASIC monetarily benefited Wells and its affiliates at the direct expense of the Plaintiffs.

97.     Wells Fargo enjoyed and accepted monetary or other financial benefits from ASIC by accepting kickbacks paid to Wells Fargo or its affiliates out of the exorbitant above-market rates being charged to the Plaintiffs under this secret kickback arrangement.

98.     Wells Fargo and its affiliates were unjustly enriched, in an amount to be proven at trial, by receiving a portion of each force-placed flood insurance premium paid by Plaintiffs and Class members. It would be inequitable to allow Wells and its affiliates to retain these benefits at the expense of Plaintiffs and the Classes.

99.     Wells Fargo should compensate Plaintiffs and the Classes in an amount equal to all payments collected from Plaintiffs and the Classes that represent the hidden profits or other financial benefits received by Wells or its affiliates.

100.    Wells Fargo and its affiliates received and are holding funds belonging to Plaintiffs and the Classes, which in equity and good conscience they should not be permitted to keep.

**COUNT II**
**CONVERSION**
*On Behalf of All Plaintiffs and Classes 3 and 4*

101.    Plaintiffs restate and reallege the preceding paragraphs of this Complaint as though set out here word for word.

23

102.    Plaintiffs Stanley and Patricia Cannon, and Cheryl Bullock bring their conversion claim on behalf of themselves and all persons with property located in the United States, California, or Florida with loans owned and serviced or only serviced by Wells Fargo who were charged for force-placed insurance premiums that included kickbacks to Wells Fargo.

103.    Plaintiffs Stanley and Patricia Cannon never borrowed money from Wells Fargo. Therefore, they have no contract with Wells Fargo. Their causes of action against Wells Fargo must sound in equity and tort. Further, Wells Fargo's kickback scheme is not referenced directly or indirectly in any Plaintiffs' mortgage and, therefore, is not governed by any of the Plaintiffs' mortgages.

104.    Plaintiffs bring their conversion claims against Wells Fargo for taking a portion of Plaintiffs' force-placed flood insurance premiums.

105.    Wells Fargo improperly exercises control of the property of Plaintiffs and Class members by imposing improper kickbacks and charges on Plaintiffs' and Class members' escrow accounts and collecting those kickbacks. For example, Wells Fargo required Plaintiffs to increase their mortgage payments to pay for ASIC's insurance premiums and Wells Fargo's kickbacks and retained these readily identifiable funds. This exercise of control is contrary to the rights of Plaintiffs and members of the proposed Classes.

106.    The acts of Wells Fargo constitute the tort of conversion.

107.    Plaintiffs and members of the proposed Classes are entitled to the immediate possession of fees improperly collected by Wells Fargo, and are entitled to a release of all escrow charges for the improper fees.

108.    Wells Fargo wrongfully converted specific and readily identifiable funds.

24

*SECOND AMENDED COMPLAINT, CASE NO. CV-12-01376 EMC*

109.   As a direct and proximate result of Wells Fargo's acts of conversion, Plaintiffs and members of the proposed Classes have suffered and continue to suffer damages.

## COUNT III
## BREACH OF FIDUCIARY DUTY
*On Behalf of All Plaintiffs and Classes 3 and 4*

110.   Plaintiffs restate and reallege the preceding paragraphs of this Complaint as though set out here word for word.

111.   Plaintiffs Stanley and Patricia Cannon, and Cheryl Bullock bring their fiduciary duty claim on behalf of themselves and all persons with property located in the United States, Florida, or California with loans owned and serviced or only serviced by Wells Fargo who were charged for force-placed insurance premiums that included kickbacks to Wells Fargo.

112.   Wells Fargo holds funds in escrow on behalf of borrowers whose mortgages it services. These funds are to be used for the purpose of paying insurance premiums when due, and any excess funds are to be returned to Plaintiffs and members of the Classes under the terms of the mortgage agreements.

113.   Wells Fargo has managed borrowers' monies for insurance premiums on a monthly basis and held them in escrow.

114.   A fiduciary relationship exists between Plaintiffs and Wells Fargo because Wells Fargo received a greater economic benefit than from a typical escrow transaction. *See Capital Bank v. MVB, Inc.*, 644 So. 515, 519 (Fla. 3d DCA 1994). Specifically, the debtor-creditor relationship transformed into a fiduciary relationship when Wells Fargo took it upon itself to manage borrowers' escrow accounts and withdraw money from borrowers' escrow accounts to pay force-placed flood insurance premiums. Wells Fargo violated its fiduciary duty when it began receiving unlawful

25

*SECOND AMENDED COMPLAINT, CASE NO. CV-12-01376 EMC*

kickbacks or fees under the kickback scheme described above, which is clearly a greater economic benefit than what was contemplated under the mortgage.

115.   Wells Fargo breached its fiduciary duty to Plaintiffs and other members of the Proposed Classes by (1) not acting in their best interest when it profiting from force-placed flood insurance policies that were purchased using escrow funds it held for the benefit of Plaintiffs and Class members at the expense of Plaintiffs and Class members, and (2) not disclosing the kickback scheme to Plaintiffs and Class Members.

116.   These actions were undertaken by Wells Fargo in bad faith for its own benefit and were not intended to benefit Plaintiffs or other Proposed Class members.

117.   As a direct result of Wells Fargo's actions, and its subversion of Plaintiffs' interest to Wells Fargo's own interests in reaping extravagant and outrageous fees, Plaintiffs and the Proposed Classes have suffered injury in the form of unnecessary and excessive escrow charges and a loss of funds from their escrow accounts.

118.   Plaintiffs and the Proposed Classes are entitled to damages for Wells Fargo's breach of its fiduciary obligations and misappropriation of escrow funds. In addition, Plaintiffs and the Classes are entitled to punitive damages because Wells Fargo acted in bad faith in deliberate or reckless disregard of their rights and its obligation to hold their escrow funds in trust.

## COUNT IV
## VIOLATIONS OF THE TRUTH IN LENDING ACT (15 U.S.C. § 1601 *et seq.*)
*On Behalf of All Plaintiffs and Class 2*

119.   Plaintiffs restate and reallege the preceding paragraphs of this Complaint as though set out here word for word.

120.   Plaintiffs Stanley and Patricia Cannon, and Cheryl Bullock bring their Truth in Lending Act claim on behalf of themselves and all persons with loans owned or serviced by Wells

*SECOND AMENDED COMPLAINT, CASE NO. CV-12-01376 EMC*

Fargo who were (1) charged for force-placed flood insurance premiums that included kickbacks to Wells Fargo, (2) force-placed into flood insurance exceeding their mortgage balance and were charged force-placed insurance charges that included the payment of a kickback to Wells Fargo or one of its affiliates, or (3) force-placed into backdated flood insurance.

121. Plaintiffs' mortgages were consumer credit plans secured by their principal dwellings, and were subject to the disclosure requirements of the Truth in Lending Act, 15 U.S.C. § 1601, *et seq.*, and all related regulations, commentary, and interpretive guidance promulgated by the Federal Reserve Board.

122. Wells Fargo is a "creditor" as defined by the Truth in Lending Act (TILA) because it owned Plaintiffs' note and mortgage and changed the terms of that mortgage so as to create a new mortgage obligation, of which Wells Fargo was the creditor. When Wells Fargo added force-placed insurance charges to Plaintiffs' mortgage balance and charged them interest on these charges, it created a new loan subject to the requirements of TILA. Alternatively, Wells Fargo is the "assignee" of Plaintiffs' note and mortgage as defined by 15 U.S.C. § 1641.

123. The inaccuracy on the face of Plaintiffs' TILA disclosures are apparent on the face of the disclosures because:

a. the inaccuracy arose out of Wells Fargo unilaterally changing the terms of Plaintiffs' loan;

b. anti-coercion disclosures included with Stanley and Patricia Cannon's mortgage explicitly stated that the lender was prohibited from conditioning its extension of credit on the borrowers purchasing any insurance product from the lender or its affiliates;

c.   the force-placed insurance disclosure included with the Cannons' mortgage specifically stated that force-placed insurance would only be obtained in the amount "required" by the lender "to protect its interest in the property[,]";

d.   Plaintiffs' mortgages do not authorize kickbacks or other compensation to Wells Fargo or its affiliates for the purchase of force-placed insurance; and

e.   Plaintiffs' mortgages do not authorize backdated force-placed flood insurance.

124.   Wells Fargo was required to accurately and fully disclose the terms of the legal obligations between the parties. 12 C.F.R. § 226.17(c).

125.   Wells Fargo violated 12 C.F.R. § 226.17(c) by (i) failing to clearly, fully, and accurately disclose its flood insurance requirements in its mortgages; and (ii) failing at all times to disclose the amount and nature of the "commission" Wells Fargo's affiliates would receive for the purchase of flood insurance.

126.   Specifically, when Wells Fargo added the force-placed premium charge to the outstanding principal amount of Plaintiffs' loans, a new debt obligation was created. When Wells Fargo created this new debt obligation, it was required to provide new disclosures.

127.   12 C.F.R. § 226.18(d) requires disclosures of finance charges, which includes force-placed insurance premiums, including kickbacks under 12 C.F.R. § 226.4(b)(8). Wells Fargo failed to disclose the nature and amount of all finance charges associated with the force-placed insurance premiums it withdrew from Plaintiffs' escrow accounts and added to their principal balance. This failure violated TILA.

128.   The Cannons' TILA claim is timely because Wells Fargo added force-placed insurance charges to Plaintiffs' mortgage balance repeatedly through 2011. The last time this occurred was on November 13, 2011, when Wells Fargo filed a complaint to foreclose on the

28

1  Cannons' mortgage. The foreclosure complaint included force-placed insurance charges as part of the

2  debt to be recovered through foreclosure.

3      129.   Cheryl Bullock's TILA claim is timely because she was force-placed into flood

4  insurance and had charges for backdated force-placed insurance that included kickbacks paid to

5  Wells Fargo or its affiliate added to her mortgage balance in 2011 and 2012.

6      130.   Plaintiffs and members of the Class have been injured and have suffered a monetary

7  loss arising from Wells Fargo's violations of the TILA.

8      131.   As a result of Wells Fargo's TILA violations, Plaintiffs and members of the Class are

9  entitled to recover actual damages and a penalty of $500,000.00 or 1% of Wells Fargo's net worth, as

10  provided by 15 U.S.C. § 1640(a)(1)-(2).

11      132.   Plaintiffs and members of the Class are also entitled to recovery of attorneys' fees and

12  costs to be paid by Wells Fargo, as provided by 15 U.S.C. § 1640(a)(3).

13
## COUNT V
## VIOLATION OF CALIFORNIA BUSINESS & PROFESSIONS CODE, § 17200, *et seq.*
14  *ON BEHALF OF CHERYL BULLOCK AND CLASS 5*

15      133.   Plaintiffs restate and reallege the preceding paragraphs of this Complaint as though set

16  out here word for word.

17      134.   Plaintiff Cheryl Bullock brings her § 17200 claims on behalf of herself and on behalf

18  of all California residents who were (1) charged for force-placed flood insurance premiums that

19  included kickbacks to Wells Fargo, (2) force-placed into flood insurance exceeding their mortgage

20  balance and were charged force-placed insurance charges that included the payment of a kickback to

21  Wells Fargo or one of its affiliates, or (3) force-placed into backdated force-placed flood insurance.

22

23

24

*SECOND AMENDED COMPLAINT, CASE NO. CV-12-01376 EMC*

135.   Wells Fargo was required to adhere to the requirements of California's Unfair Competition Law (UCL), Cal. Bus. & Prof. Code §17200 *et seq.* ("UCL"), when conducting business with Plaintiff Cheryl Bullock, and other members of the Proposed Class.

136.   The UCL prohibits any "unlawful" business act or practice. Wells Fargo has violated the UCL's prohibition against engaging in unlawful acts or practices by violating statutes and common law rules prohibiting Defendant's conduct as described herein, including:

        a.      Wells Fargo's Unjust Enrichment;

        b.      Wells Fargo's Conversion;

        c.      Wells Fargo's Breach of Fiduciary Duty;

        d.      Wells Fargo's violations of the Truth in Lending Act, 15 U.S.C. § 1601, *et seq.*; and

        e.      Wells Fargo's violations of the anti-tying provisions of the Bank Holding Company Act, 12 U.S.C. § 1972, *et seq.*

Plaintiff reserves the right to allege other violations of law that constitute other unlawful business acts or practices.

137.   The UCL also prohibits any "unfair" business act or practice. As detailed in the preceding paragraphs, Wells Fargo engaged in unfair business acts or practices by, among other things, (1) charging California residents for force-placed flood insurance premiums that included kickbacks paid to Wells Fargo, (2) force-placing flood insurance in amounts exceeding borrowers' principal mortgage balance in order to receive larger kickbacks and a greater volume of kickbacks, and (3) force-placing California residents into backdated flood insurance.

138.   Wells Fargo systematically engaged in these unfair and/or unlawful business practices to the detriment of Ms. Bullock and other members of the Proposed Class.

139.    These business practices are also unfair because they are contrary to the principle that (i) "lenders should avoid creating situations where a building is over-insured," 74 Fed. Reg. 35,914, 35918 (July 21, 2009); (ii) consumers should receive "meaningful disclosure of credit terms," 15 U.S.C. § 1601(a); and other clearly articulated principles of law.

140.    The harm caused by these business practices vastly outweighs any legitimate business utility they possibly could have.

141.    Ms. Bullock and other members of the Proposed Class have been injured and have suffered a monetary loss as a result of Defendant's violations of the UCL. They are entitled to restitution in an amount to be determined at trial. Plaintiffs also seek an injunction prohibiting the unlawful and unfair business practices alleged herein.

142.    As a result of Defendant's violations of the UCL, Ms. Bullock and members of the Proposed Class are also entitled to recover attorneys' fees and costs to be paid by Defendant, as provided by Code of Civil Procedure § 1021.5 and other applicable law.

### COUNT VI
### VIOLATIONS OF THE ANTI-TYING PROVISIONS OF THE BANK HOLDING COMPANY ACT (12 U.S.C. § 1972, *et seq.*)
*On Behalf of All Plaintiffs and Class 1*

143.    Plaintiffs restate and reallege the preceding paragraphs of this Complaint as though set forth here word for word.

144.    Plaintiffs Stanley and Patricia Cannon, and Cheryl Bullock bring their Bank Holding Company Act claim on behalf of themselves and all persons in the United States who were charged for force-placed insurance premiums that included a "commission" or kickback to Wells Fargo Insurance, Inc., Wells Fargo, or any other affiliate of Wells Fargo.

145.    Wells Fargo's kickback scheme violates the anti-tying provisions of the Bank Holding Company Act, 12 U.S.C. § 1972, *et seq.*

*SECOND AMENDED COMPLAINT, CASE NO. CV-12-01376 EMC*

146.    12 U.S.C. § 1972(b) of the Bank Holding Company Act (BHCA) states "a bank shall not in any manner extend credit, lease, or sell property of any kind, or furnish any service, or fix or vary the consideration for any of the foregoing, on the condition or requirement . . . (B) that the customer shall obtain some additional credit, property, or service from a bank holding company of such bank, or from any other subsidiary of such bank holding company."

147.    Wells Fargo's holding company is Wells Fargo & Company.

148.    Wells Fargo Insurance, Inc. (WFI) is a wholly owned subsidiary of Wells Fargo & Company.

149.    Wells Fargo's purchase of insurance on borrowers' behalf is a service that Wells Fargo offers to its borrowers. To accept this service, borrowers must agree to pay commissions to WFI for unidentified services.

150.    Wells Fargo, WFI, and ASIC entered into contractual arrangements under which WFI would act as the "broker" or "agent" for 100% of force-placed insurance policies purchased on behalf of Wells Fargo's borrowers. Under these agreements WFI received a guaranteed commission for every force-placed insurance policy procured on behalf of Wells Fargo's borrowers equal to 10% to 20% of the premium for each policy.

151.    WFI does not engage in any insurance broker or agent services. For example, it does not seek out competitive insurance policies from different insurance providers, but refers all force-placed insurance business to ASIC. WFI provides no services whatsoever for borrowers.

152.    This is an "unusual" banking practice. Under the BHCA, an "unusual" banking practice is one that is not traditional within the banking industry. What is "unusual" about Wells Fargo's force-placed insurance practices is that Wells Fargo's exclusive purchase agreement with ASIC obviates any opportunity for WFI to earn a commission from borrowers. Wells Fargo requires

*SECOND AMENDED COMPLAINT, CASE NO. CV-12-01376 EMC*

borrowers to pay for services that WFI provides to Wells Fargo and ASIC. WFI provides no services for borrowers themselves. In a "traditional" or "usual" setting, WFI would search for the best available or lowest cost insurance policy available for each borrower requiring force-placed insurance, instead of always purchasing the highest price, lowest coverage policies from ASIC.

153.    Fannie Mae recently amended its policies regarding force-placed insurance to explicitly prohibit mortgage servicers servicing loans owned by Fannie Mae from charging borrowers for any lender-placed insurance commission earned on a force-placed insurance policy by the servicer or any related entity, or costs associated with insurance tracking or administration. Fannie Mae directed its servicers to exclude charges for commissions to servicer-affiliated insurance agents from force-placed insurance commissions. This is further evidence that Wells Fargo's practices are "unusual."

154.    Wells Fargo's practices are anti-competitive.

a.    Wells Fargo and ASIC refer all force-placed insurance agency business to WFI and guarantee WFI's commissions. The commissions paid to WFI are based on contracts between Wells Fargo and ASIC, not on any services actually provided by WFI. WFI has no competitive incentive to provide any services on behalf of borrowers.

b.    Wells Fargo unilaterally sets the commission amount that WFI will receive. The substantial revenues ASIC receives in premiums from Wells Fargo's borrowers give it an incentive to agree to any commission rate that Wells Fargo demands for WFI.

c.    Wells Fargo's tying arrangement results in unreasonably high commissions to WFI. The commissions are a percentage of ASIC's premiums. ASIC provides more limited insurance policies than borrowers can obtain on the market but cost more than twice as much as other policies the borrowers would obtain on the open market. Wells Fargo's agreements allow WFI to receive more than twice the commission any other insurance agent would receive for procuring more limited insurance than any other insurance agent would procure.

d.    Unlike regular insurance agency arrangements, Wells Fargo utilizes its power as borrowers' mortgage lender or servicer to guarantee payment of WFI's commissions. Wells Fargo withdraws insurance premiums and commissions directly from borrowers' escrow accounts to pay commissions to its holding company's subsidiary, WFI. If borrowers refuse to make increased payments to their escrow account, Wells

33

Fargo coerces them into doing so with negative credit reporting and, potentially (as happened to Plaintiffs Stanley and Patricia Cannon), foreclosing on their homes. Wells Fargo uses its power as borrowers' bank to steer commissions to WFI.

e.    In some cases, the borrower immediately obtains insurance as Wells Fargo demands in order to avoid being force-placed into insurance at abnormally high premiums. However, Wells Fargo further guarantees commission payments to WFI by reserving sole discretion to define any portion of the commission as "earned." For example, when a borrower obtains flood insurance to meet Wells Fargo's requirements, Wells Fargo can determine that a portion of the force-placed insurance premium was "earned" and simply refuse to return this portion of the premium to the borrower. WFI would keep a portion of this "earned" premium. Wells Fargo uses its control of funds in borrowers' escrow account—its power as a bank—to steer commissions to WFI.

f.    Wells Fargo's force-placed insurance arrangement usurps market share from other insurance agencies in favor of WFI. Force-placed insurance may be a more costly option than purchasing insurance on the open market, but it is a significantly easier and less demanding option. Hundreds of thousands of homeowners in the United States have allowed Wells Fargo to purchase force-placed flood insurance on their property, resulting in tens of millions of dollars in commissions being paid to WFI.

g.    Wells Fargo's exclusive purchase arrangement and kickback scheme artificially inflate the price of force-placed insurance and artificially increase commissions paid to Wells Fargo's captive insurance agent, WFI. The artificially inflated price of ASIC's force-placed insurance is only possible because Wells Fargo refers 100% of its force-placed insurance business to ASIC. As one of the nation's largest mortgagees and mortgage servicers, Wells Fargo's exclusive force-placed insurance referrals can and do substantially affect competitive incentives to reduce prices. This guarantees distorted commissions to WFI, whose commissions are a percentage of ASIC's inflated premiums.

155.    The "tied product" in this arrangement is WFI's "service" of acting as an insurance agent for force-placed insurance.

156.    The "tying product" is Wells Fargo's service of purchasing insurance on borrowers' behalf. The tie is also effectuated through language in the mortgage that allows Wells Fargo to foreclose on borrowers who refuse to pay WFI's "commissions." This conditions Wells Fargo's continued extension of credit on borrowers agreeing to accept WFI's "services."

157.    Wells Fargo ties the procurement of insurance on borrowers' behalf to WFI's "services" as insurance agent as alleged above.

34

*SECOND AMENDED COMPLAINT, CASE NO. CV-12-01376 EMC*

158.   Section 22 of Plaintiffs' mortgages allows Wells Fargo to rescind its extension of credit and foreclose on Plaintiffs' property if Plaintiffs fail to pay commissions to WFI that Wells Fargo determines WFI earns. The continuing extension of credit is conditioned on Plaintiffs agreeing to accept WFI as the insurance agent for force-placed insurance and pay any commissions Wells Fargo determines are owed.

159.   Wells Fargo benefits directly and indirectly from this tying arrangement. The vast majority of commissions paid to WFI are remitted directly to Wells Fargo in the form of "soft dollar" transactions, whereby WFI's compensation for other services provided to Wells Fargo is reduced by the amount of commissions received by WFI (reducing Wells Fargo's debts to WFI). Moreover, Wells Fargo receives an indirect benefit when WFI's profits are remitted to Wells Fargo & Company, which provides increased capital investments and other monetary benefits to Wells Fargo.

160.   Plaintiffs and members of the Class have been damaged by Wells Fargo's anti-competitive tying arrangement in that they have paid excessive commissions to Wells Fargo & Company's subsidiary, WFI.

161.   12 U.S.C. § 1975 states "[a]ny person who is injured in his business or property by reason of anything forbidden in section 1972 of this title may sue therefore in any district court of the United States in which the defendant resides or is found or has an agent." Section (e) of the BHCA allows any person injured by an unlawful tying arrangement to file an action for actual damages, entitles such a person to three times the actual damages sustained, and allows for the cost of the suit and attorneys' fees. Section (f) authorizes injunctive relief.

162.   Plaintiffs request that this Court find Wells Fargo in violation of 12 U.S.C. § 1972, *et seq.*

163.   Plaintiffs and members of the proposed Class are entitled to three times the amount of damages sustained by them, and the cost of suit, including a reasonable attorney's fee pursuant to 12 U.S.C. § 1975. Plaintiffs are further entitled to an injunction barring Wells Fargo from continuing their unlawful conduct, including their exclusive purchasing arrangement with ASIC and kickback scheme with WFI. Plaintiffs seek an injunction requiring Wells Fargo to exclude the amount of any commissions paid to WFI from charges withdrawn from class members' escrow accounts to pay for force-placed insurance.

## RELIEF SOUGHT

### *EQUITABLE REMEDIES*

164.   Plaintiffs restate and reallege the preceding paragraphs of this Complaint as though set out here word for word and request equitable relief from the Court.

165.   Plaintiffs have no adequate remedy at law to address the wrongful conduct engaged in by Defendant. Thus Plaintiffs ask the Court to enjoin the Defendant from the practice of collecting fees for the force-placement of insurance on the grounds that the fees are neither disclosed nor permitted by Class Members' mortgage contracts. Plaintiffs ask that the Court order Wells Fargo to disgorge all "commissions," kickbacks, or other fees associated with force-placed insurance to Plaintiffs and members of the Classes. Plaintiffs further ask the Court to enjoin the Defendant from force-placing insurance in excess of their and Class Members' mortgage balances until such time as Wells Fargo discontinues its exclusive purchase arrangement and "commission" agreement with ASIC and disgorge premiums paid for insurance in excess of loan balance coverage force-placed while these agreements were in effect.

166.   Plaintiffs ask the Court to award restitution to return all charges Defendant or their affiliates received in connection with the purchase of force-placed insurance.

*SECOND AMENDED COMPLAINT, CASE NO. CV-12-01376 EMC*

1    167.    Plaintiffs ask the Court to order Defendant to remove from Class Members' escrow

2    accounts all charges that are attributable to kickbacks paid to Defendant or their affiliates for the

3    purchased of force-placed insurance.

4                                       *DAMAGES*

5    168.    Defendant should pay damages to Plaintiffs and the Classes in an amount to be

6    determined at trial according to law, in any event, in excess of five million dollars ($5,000,000).

7    Plaintiffs and members of the proposed Classes are entitled to treble damages under the BHCA, and

8    punitive damages or additional damages allowed by statute for Defendant's knowing and intentional

9    violation of laws or actions taken in wanton and reckless disregard for the harm caused to Plaintiffs

10   and members of the proposed Classes.

11           Dated: March 28, 2013                Respectfully submitted,

12                                                 /s/ Sheri Kelly_____
                                                  Sheri L. Kelly, SBN 226993
13                                                E-mail: slk@sherikellylaw.com
                                                  LAW OFFICE OF SHERI L. KELLY
14                                                31 E. Julian St.
                                                  San Jose, CA 95112
15                                                Telephone: 408/287-7712
                                                  Facsimile: 408/583-4249
16
                                                  Steven A. Owings (*Pro Hac Vice*)
17                                                Alexander P. Owings (*Pro Hac Vice*)
                                                  OWINGS LAW FIRM
18                                                1400 Brookwood Drive
                                                  Little Rock, AR 72202
19                                                Telephone: (501) 661-9999
                                                  Facsimile: (501) 661-8393
20                                                sowings@owingslawfirm.com
                                                  apowings@owingslawfirm.com
21
                                                  Brent Walker (*Pro Hac Vice*)
22                                                WALKER LAW PLLC
                                                  P.O. Box 287
23                                                Cabot, AR 72023
                                                  (501) 605-8595

24                                            37

*SECOND AMENDED COMPLAINT, CASE NO. CV-12-01376 EMC*

(888) 571-0319 (facsimile)
bwalker@walkerlawplc.com

Jack Wagoner, (*Pro Hac Vice*)
Angela Mann (*Pro Hac Vice*)
WAGONER LAW FIRM, P.A.
1320 Brookwood, Suite E
Little Rock, AR 72202
Telephone: (501) 663-5225
Facsimile: (501) 660-4030
Jack@wagonerlawfirm.com
angela@wagonerlawfirm.com

**Counsel for Plaintiffs**

*SECOND AMENDED COMPLAINT, CASE NO. CV-12-01376 EMC*