Barry Himmelstein, SBN 157736
E-mail: barry@himmellaw.com
HIMMELSTEIN LAW NETWORK
2000 Powell St., Ste. 1605
Emeryville, CA  94608
Telephone:  (510) 450-0782
Facsimile:  (510) 380-6147

Sheri L. Kelly, SBN 226993
E-mail: slk@sherikellylaw.com
LAW OFFICE OF SHERI L. KELLY
31 E. Julian St.
San Jose, CA  95112
Telephone:  (408) 287-7712
Facsimile:  (408) 583-4249

**Attorneys for Plaintiffs**
*Additional Counsel Listed on Signature Page*

## IN THE UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| STANLEY D. CANNON, PATRICIA R. CANNON, and CHERYL BULLOCK, individually, and for other persons similarly situated,<br><br>    Plaintiffs,<br><br>  vs.<br><br>WELLS FARGO BANK, N.A.; WELLS FARGO INSURANCE, INC.; and AMERICAN SECURITY INSURANCE COMPANY,<br><br>    Defendants. | Case No. 12-CV-01376 EMC<br><br>**THIRD AMENDED CLASS ACTION COMPLAINT**<br><br>Judge: Hon. Edward M. Chen<br><br>Action Filed:  March 19, 2012<br>Trial Date:   None Set |

Plaintiffs Stanley D. Cannon, Patricia R. Cannon, and Cheryl Bullock, acting individually and on behalf of all others similarly situated, for their Third Amended Complaint and demand for jury trial, state and allege as follows:

## NATURE OF THE ACTION

1.     This is an action seeking damages and other relief against Wells Fargo Bank, N.A. ("Wells Fargo"), Wells Fargo Insurance, Inc. ("Wells Fargo Insurance"), and their co-conspirator, American Security Insurance Company ("ASIC") for their wrongful and collusive business practices relating to force-placed flood and hazard insurance.

2.     Wells Fargo is one of the nation's largest mortgage servicers and lenders. The mortgages Wells Fargo services require the borrowers to maintain acceptable flood and hazard insurance on the residential property securing their loans.  When borrowers do not obtain insurance coverage in the amounts Wells Fargo requires, it purchases insurance for the borrower. This is called "force-placed" or "lender-placed insurance."  This is standard and appropriate.

3.     What is not standard and appropriate is Wells Fargo's exploitative and self-dealing arrangements with force-placed insurers.

4.     Wells Fargo entered into an exclusive purchasing arrangement with ASIC.

5.     Under this agreement, ASIC agreed to pay a kickback of 10%-20% of every force-placed insurance premium to Wells Fargo or its affiliate, Wells Fargo Insurance.

6.     In return, Wells Fargo agreed to purchase all force-placed insurance from ASIC.

7.     ASIC charges at least twice as much, and sometimes up to 10 times as much, for flood and hazard insurance as other companies participating in the marketplace.  They are able to charge these rates because Wells Fargo provides them with a captive market—all of Wells Fargo's borrowers.

8.     Wells Fargo outsources its insurance-related servicing responsibilities—such as tracking insurance coverage on borrower's properties, sending notices related to insurance coverage issues to borrowers, and force-placing insurance on borrowers' properties—to ASIC.  In effect, the company receiving force-placed insurance premiums is responsible for determining

who has to pay them.  Wells Fargo pays ASIC a below-cost fee for these services, but gets the cost of these services returned when ASIC kicks back a portion of every premium it receives to Wells Fargo. Borrowers are forced to foot the bill for Wells Fargo's outsourcing arrangement. The purpose of force-placed insurance is to protect the lender's interest in the property securing a mortgage. The purpose is not to gouge the borrower solely to profit the mortgage servicer. The purpose is not to shift the cost of the mortgage servicer's operations—such as keeping up with the status of borrowers' insurance coverage, sending notices about deficient coverage, and the like— to the borrower by outsourcing these operations to an insurance company that forces borrowers to pay two to ten times the going rate for insurance.

9.     Wells Fargo uses its sister corporation, Wells Fargo Insurance, as the "insurance agent" that gets paid for "finding" and placing the force-placed insurance policies. It thus characterizes the kickbacks as insurance agent "commissions." But there is no "finding" involved. Wells Fargo Insurance performs no services whatsoever for individual borrowers and performs none of the services insurance agents typically perform to earn commissions. Wells Fargo already has written contracts with ASIC that agree to purchase all force-placed insurance for Wells Fargo borrowers from ASIC. These payments are not "commissions." They are kickbacks.[1]

10.     Wells Fargo charges borrowers' mortgage escrow accounts for force-placed insurance premiums and Wells Fargo Insurance's kickbacks. It increases borrowers' monthly mortgage payments to recoup the escrow deficiency created when Wells Fargo withdraws these premiums and kickbacks. If the borrower refuses or fails to pay, Wells Fargo adds the premiums to the borrower's mortgage balance and charges the borrower interest on these charges, creating a new loan.

11.     Wells Fargo increased its flood insurance requirements to increase the number and amount of kickbacks it receives. Traditionally, mortgage lenders have required borrowers to maintain insurance equal to the outstanding balance on the mortgage, which is the amount

---

[1] "**Kickback**, *n.* (1920) A return of a portion of a monetary sum received, esp. as a result of coercion or a secret agreement." Black's Law Dictionary (9th Ed. 2009).

necessary to protect the lender's financial interest in the property. Wells Fargo increased this minimum requirement to replacement cost value, which is the amount of insurance necessary to rebuild the property in the event that a disaster completely destroys it. If the borrower does not maintain this amount of insurance, Wells Fargo force-places flood insurance up to the lesser of the replacement cost value of the property or $250,000 (which is the federal maximum for flood insurance), and hazard insurance up to the replacement cost value.

12.     Plaintiffs allege that (1) Wells Fargo entered into a hidden arrangement with ASIC to receive a kickback of a portion of every force-placed insurance policy it bought for its borrowers, (2) Wells Fargo purchased the most expensive insurance policies available for its borrowers to increase the amount of each kickback, (3) Wells Fargo increased its insurance requirements to increase the number and amount of kickbacks, and (4) Wells Fargo required backdated insurance to increase the number of kickbacks.

13.     Wells Fargo's practices alleged in this Third Amended Complaint constitute a breach of contract and breach of the implied covenant of good faith and fair dealing (for all class members whose loans are owned by Wells Fargo), violate the fiduciary duty Wells Fargo has with respect to the management and use of borrowers' escrow funds, violate the Truth in Lending Act ("TILA"), violate California Bus. & Prof. Code § 17200, unjustly enriched Wells Fargo, constitute conversion, and violate the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq.* ("RICO").

14.     Plaintiffs seek to recover damages equal to (1) Wells Fargo's kickbacks, (2) the excess cost of force-placed insurance, (3) the excess cost of Wells Fargo's excessive insurance requirements and practice of backdating force-placed insurance policies, and (4) three times the damages sustained by Plaintiffs and the class, pursuant to RICO, as well as injunctive relief.

**JURISDICTION AND VENUE**

15.     This Court has jurisdiction over this action under the Class Action Fairness Act of 2005, 28 U.S.C. §§ 1332(d)(2) and (6), because the aggregate claims of the putative Class

1   members exceed $5 million, exclusive of interest and costs, and because at least one Plaintiff is a

2   citizen of a different state than Wells Fargo.

3        16.   This Court also has original jurisdiction over Plaintiffs' federal claims pursuant to

4   28 U.S.C. § 1331. Plaintiffs' state law claims arose out of the same transaction and occurrence as

5   their TILA and RICO claims—specifically, all claims arose out of Wells Fargo's kickback scheme

6   and their efforts to increase kickbacks by raising their insurance requirements and requiring

7   backdated insurance—and are so related to Plaintiffs' TILA and RICO claims that they form part

8   of the same case or controversy.

9        17.   Venue is proper in this district pursuant to 28 U.S.C. § 1391(b), because Wells

10  Fargo is subject to personal jurisdiction, because its principal place of business is 420

11  Montgomery Street, San Francisco, California 94163, and because a substantial part of the acts or

12  omissions giving rise to the claims herein occurred and continue to occur in this district.

13  **PARTIES**

14       18.   Patricia R. Cannon is, and at all times relevant to this complaint has been, a

15  resident of Sarasota County, Florida.  Stanley D. Cannon was, at all times relevant to this

16  complaint, a resident of Sarasota County, Florida.  Mr. Cannon passed away subsequent to the

17  filing of this action.

18       19.   Cheryl A. Bullock is, and at all times relevant to this complaint was, a resident of

19  California City, California.

20       20.   Defendant Wells Fargo Bank, N.A. is a national bank registered to do business in

21  the State of California with its principal address in San Francisco, California.  As a result of a

22  2004 merger, Wells Fargo Bank, N.A. is the successor to Wells Fargo Home Mortgage, Inc.,

23  which no longer exists. However, Wells Fargo Bank, N.A. sometimes does business under the

24  name Wells Fargo Home Mortgage.

25       21.   Defendant Wells Fargo Insurance, Inc. is a Minnesota corporation with a principal

26  address in St. Louis Park, Minnesota.  Wells Fargo Bank, N.A. and Wells Fargo Insurance, Inc.

27  are both wholly-owned subsidiaries of Wells Fargo & Company.

28

22.    Defendant American Security Insurance Company is a Delaware corporation with a principal address in Atlanta, Georgia.

## FACTUAL ALLEGATIONS

**A.    Wells Fargo's Role as Servicer or Lender for Different Mortgagors**

23.    Wells Fargo provides services including, but not limited to, banking, insurance, investments, mortgage lending, mortgage servicing, and consumer and commercial finance across North America. It services approximately 9 million mortgages, and has assets of $1.2 trillion.

24.    Wells Fargo's mortgage business includes mortgage servicing, mortgage lending, and purchasing mortgages on the secondary market.

25.    A mortgage servicer is an entity that provides certain functions on behalf of the lender or owner of the mortgage. The heart of the mortgage servicer's job is to collect payments on behalf of the third party that is entitled to receive payments under the mortgage. For example, Stanley and Patricia Cannon's mortgage is owned by Federal National Mortgage Association ("Fannie Mae"), and Wells Fargo simply services their mortgage on Fannie Mae's behalf. Wells Fargo is not in privity of contract with mortgagors whose loans Wells Fargo services but does not own.

26.    Wells Fargo also owns many mortgages and makes mortgage loans of its own. Wells Fargo services many of these mortgages through its servicing department (formerly Wells Fargo Home Mortgage prior to its 2004 merger with Wells Fargo Bank, N.A.).  Wells Fargo owns and services Cheryl Bullock's mortgage.

27.    As servicer, Wells Fargo's responsibilities included sending monthly mortgage statements, collecting monthly mortgage payments, collecting and maintaining escrow accounts for the payment of insurance on properties used to collateralize loans, paying for such insurance on those properties from borrower's escrow accounts, monitoring and ensuring that all required forms of insurance are in full force and effect, notifying borrowers of insurance lapses and other

1   required actions, procuring and paying for force-placed insurance, and accounting for and
2   remitting borrowers' payments to the owner of each borrower's mortgage.

3       28.     Numerous lenders, or note holders, hire Wells Fargo to take on these
4   responsibilities for millions of mortgages. Wells Fargo, in turn, outsources some of its
5   responsibilities to third parties. Wells Fargo delegates many of its insurance-related
6   responsibilities to ASIC and other companies owned by ASIC's corporate parent, Assurant, Inc.,
7   such as Assurant Specialty Property. This outsourcing arrangement is the same whether Wells
8   Fargo owns or simply services a particular borrower's mortgage.

9       **B.     ASIC's Role as an Outsourcer and Insurance Company**

10      29.     Wells Fargo outsources many of its servicing responsibilities described above to
11  ASIC, or one of Assurant, Inc.'s other subsidiaries. Under this outsourcing arrangement,
12  Assurant's subsidiaries monitor borrowers' insurance coverage, send letters on Wells Fargo
13  letterhead stating when borrowers need to increase their insurance coverage, and force-place
14  coverage on borrowers' property if the borrowers do not obtain sufficient coverage to meet Wells
15  Fargo's requirements.

16      30.     As part of this "bundle" of services, Wells Fargo also authorizes Assurant, Inc.'s
17  subsidiaries to purchase every force-placed policy for Wells Fargo's borrowers from ASIC. In
18  return for this lucrative business, every time ASIC force-places an insurance policy on one of
19  Wells Fargo's borrowers' property, it pays a portion of the premium to Wells Fargo, or its affiliate
20  Wells Fargo Insurance.

21      **C.     Facts as to Stanley D. Cannon and Patricia R. Cannon**

22      31.     On September 9, 2005, the Cannons obtained their mortgage loan from Amerisave
23  Mortgage Corporation. The principal balance of their mortgage at closing was $128,000. After the
24  closing of the loan, the note and mortgage were ultimately purchased by Fannie Mae. A true and
25  correct copy of the mortgage is attached as **Exhibit A**.

26      32.     Pursuant to the mortgage, Plaintiffs are required to insure the improvements on the
27  real property:
28      5.     Property Insurance. Borrower shall keep the improvements now existing or

hereafter erected on the Property insured against loss by fire, hazards included with the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires…The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably…

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrowers expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

33.     Plaintiffs' mortgage was a Fannie Mae form mortgage. Most of the mortgages Wells Fargo serviced during the Class period were, likewise, Fannie Mae mortgages written on forms that contained provisions regarding property insurance that were substantially similar to those in Section 5 of the Cannons' mortgage.

34.     While this standardized provision states that the "cost of the [force-placed] insurance so obtained might significantly exceed the cost of insurance that Borrower could have obtained," it does not authorize or contemplate that Wells Fargo or an affiliate will derive a hidden profit or financial benefit by procuring force-placed insurance from ASIC. Nor does it authorize Wells Fargo to add these hidden kickbacks as additional debt of the borrower.

35.     The Cannons' home was located in a Special Flood Hazard Area, as defined by federal regulations, at the time they entered into the mortgage. Plaintiffs signed a "Notice of Special Flood Hazards and Availability of Federal Disaster Relief Assistance" at the time they entered into their mortgage. This notice stated that the Cannons were required to maintain flood insurance that "must cover *the* **lesser of**: (1) the outstanding principal balance of the loan; or (2)

the maximum amount of coverage allowed for the type of property under the NFIP. Flood insurance coverage under the NFIP is limited to the overall value of the property securing the loan minus the value of the land on which the property is located."

36.     Plaintiffs obtained sufficient flood insurance coverage to close on their mortgage in 2005. Neither their mortgage lender nor initial servicer (Ohio Savings Bank) advised them to increase their flood insurance coverage.

37.     Wells Fargo Home Mortgage began servicing the Cannons' mortgage on or about February 1, 2006 and continued to do so until Wells Fargo Home Mortgage and Wells Fargo merged. Since the merger, Wells Fargo has serviced the Cannons' mortgage for Fannie Mae.

38.     Beginning in April of 2006—two months after Wells Fargo began servicing their mortgage—and continuing until the present, Wells Fargo incrementally increased the amount of flood insurance Plaintiffs were required to maintain.

39.     Wells Fargo increased the Cannons' minimum flood insurance requirement pursuant to a standard practice of requiring all borrowers to maintain replacement cost value insurance. Wells Fargo implemented this policy in order to increase the probability that the Cannons and similarly situated borrowers would require force-placed insurance, which would guarantee Wells Fargo a kickback equal to a portion of the premium for the force-placed insurance policy.

40.     For example, in 2006, Wells Fargo demanded that Plaintiffs increase their flood insurance coverage by $79,200. Plaintiffs did so and maintained $227,900 of flood insurance coverage beginning in August of 2006. Despite this, Wells Fargo force-placed them into $10,200 of additional flood insurance on May 29, 2008.

41.     On April 6, 2006, Wells Fargo sent Plaintiffs a form letter stating "Our records indicate that the amount of coverage provided by your current flood insurance is less than the coverage required by Wells Fargo Home Mortgage." The letter went on to say that "your flood insurance coverage should provide replacement cost coverage for your structure/improvements…"

42. On May 30, 2006, Wells sent Plaintiffs a form letter titled "NOTICE OF TEMPORARY FLOOD INSURANCE PLACED BY LENDER DUE TO DEFICIENT COVERAGE" stating that it had purchased a flood insurance binder from ASIC to obtain $79,200 in additional flood insurance coverage for them at an annual cost of $772.18. The policy was placed with ASIC. Plaintiffs subsequently purchased $227,900 in flood insurance from Fidelity National Property & Casualty Insurance Company, which cost dramatically less than ASIC's premiums. Plaintiffs maintained this amount of insurance to avoid further force-placement in the future.

43. Again on April 21, 2008, ASIC sent Plaintiffs another "INSURANCE BINDER" force-placing an additional $10,200 in flood insurance for which Plaintiffs were charged $94.95.

44. On May 29, 2008, Wells Fargo sent Plaintiffs a form letter titled "NOTICE OF PLACEMENT OF FLOOD INSURANCE," which informed them that Wells Fargo had purchased a flood insurance policy that would cost $94.95 in annual premiums, which would be withdrawn from their escrow account. This policy was placed with ASIC. Wells Fargo withdrew $94.95 from Plaintiffs' escrow account to pay ASIC. On information and belief, ASIC returned at least $9.50 of this amount to Wells Fargo or Wells Fargo Insurance.

45. At this time, Plaintiffs' private flood insurance policy combined with ASIC's force-placed flood insurance policy provided a total of at least $238,100 in flood insurance coverage. Their mortgage balance was significantly below this amount. Plaintiffs' original principal balance at the time of closing on their mortgage was $128,000 and the total principal balance on the mortgage on November 23, 2011, when Wells Fargo filed a complaint to foreclose on Plaintiffs' mortgage, was $104,828.11.

46. At ASIC's premium rate of $772.18 for $79,200 of coverage (or about $0.0097 of premium for $1.00 of coverage), Wells Fargo's excess requirement of $238,100 gave Wells Fargo a potential kickback of $230.96 (10% of .0097 multiplied by $238,100) as compared with a potential kickback of $101.68 for mortgage balance coverage. In addition, Wells Fargo's ever increasing requirements made it impossible for the Cannons to keep their insurance sufficient in

Wells Fargo's eyes, guaranteeing that they would eventually be force-placed and pay a kickback to Wells Fargo.

47.     Wells Fargo also force-placed the Cannons into hazard insurance beginning in 2011.

48.     For example, on May 25, 2011, Wells Fargo (or ASIC acting on Wells Fargo's behalf) sent the Cannons a form letter titled "NOTICE OF TEMPORARY INSURANCE" stating that it had purchased a hazard insurance binder from ASIC to obtain $252,000 in hazard insurance coverage for them at an annual cost of $3,473.21.

49.     On July 9, 2011, Wells Fargo sent the Cannons a form letter titled "NOTICE OF PLACEMENT OF INSURANCE," which informed them that Wells Fargo had purchased a hazard insurance policy that would cost $3,473.21 in total charges (including several governmental fees) and $3,359.00 in annual premiums for $252,000 in hazard insurance coverage, which would be withdrawn from their escrow account. This policy was placed with ASIC. Wells Fargo withdrew $3,473.21 from Plaintiffs' escrow account to pay ASIC. ASIC returned at least $369.49 of this amount to Wells Fargo or Wells Fargo Insurance. The policy was retroactively placed, with an effective date of April 11, 2011.

50.     On February 15, 2012, Wells Fargo sent the Cannons a form letter informing them that it would renew their force-placed hazard insurance policy if they did not purchase hazard insurance of their own.

51.     On April 27, 2012, Wells Fargo purchased a renewal hazard insurance policy that cost $3,381.02 in total charges (including several governmental fees) and $3,305.00 in annual premiums for $255,780 in coverage. This policy was placed with ASIC. Wells Fargo withdrew $3,381.02 from Plaintiffs' escrow account to pay ASIC. ASIC returned at least $363.55 of this amount to Wells Fargo or Wells Fargo Insurance.

52.     Plaintiffs lack administrative remedies to address the wrongful conduct alleged herein.

53.     All conditions precedent to the relief sought herein have been performed, occurred or been waived. Plaintiffs' contract requires pre-suit notice, but such notice would be futile. First, Wells has already filed a complaint to foreclose on Plaintiffs' property due to a default on the mortgage that arose from Defendant's wrongful practices. Second, Defendant's practices that are the subject of this complaint—force-placing excessive insurance on borrowers in order to receive a kickback—are mandated by Wells Fargo's contracts with ASIC, such that Wells Fargo cannot correct its practices to conform with the law absent intervention of the Court.

**D.     Facts as to Cheryl Bullock**

54.     Cheryl Bullock owns her home in California City, California.

55.     Ms. Bullock is retired. She lives on a fixed income and is unable to adjust her income to meet new financial needs, such as increases in Wells Fargo's insurance requirements.

56.     Ms. Bullock entered into a mortgage agreement with Wells Fargo Home Mortgage, Inc. on June 30, 2003. Wells Fargo Home Mortgage, Inc. was designated as the lender on the face of Ms. Bullock's mortgage, and Wells Fargo Bank, N.A. now services Ms. Bullock's mortgage as a result of its merger with Wells Fargo Home Mortgage, Inc.

57.     Ms. Bullock's mortgage is a California Fannie Mae uniform security instrument with terms that are materially identical to those contained in Patricia Cannon's mortgage described above. A true and correct copy of the mortgage is attached hereto as **Exhibit B**.

58.     As of January 4, 2013, Ms. Bullock's mortgage balance was $30,306.22. As of August 6, 2012, her mortgage balance was $31,054.46. As of July 7, 2010, her mortgage balance was $40,041.45.

59.     Beginning in 2009, Wells Fargo began sending Ms. Bullock letters indicating that she was required to increase her flood insurance coverage or it would purchase the demanded coverage for her. She was force-placed and charged for force-placed insurance in 2009 and twice in 2011.

60.     For example, on January 31, 2011, Wells Fargo sent Ms. Bullock a letter indicating that it had purchased an insurance binder from ASIC on her behalf. The letter indicated that Ms.

Bullock was required to maintain $243,000 in flood insurance. An "insurance binder" is a short term insurance policy put into effect pending underwriting and entry into force of a standard year-long insurance policy.

61.     Ms. Bullock sent Wells Fargo proof of her existing flood insurance coverage, and Wells Fargo cancelled the January 31, 2011 insurance binder.

62.     Wells Fargo then purchased an additional binder with $7,000 in coverage at an annual premium of $63 on March 23, 2011. It purchased a one-year flood insurance policy with $7,000 in coverage effective March 16, 2011 on May 6, 2011. Ms. Bullock provided proof of her voluntary insurance and Wells Fargo cancelled this force-placed policy in full.

63.     The process started over in December of 2011. On December 28, 2011, Wells Fargo sent Ms. Bullock a letter advising that she was required to provide evidence of flood insurance. On February 1, 2012, it sent Ms. Bullock a notice advising that it had purchased an insurance binder providing $243,000 in coverage effective December 19, 2011. On February 17, 2012, Wells Fargo sent Ms. Bullock a notice that it had purchased a one year force-placed flood insurance policy with $243,000 in coverage effective December 19, 2011 with a premium of $2,187.00, which it would charge to her escrow account.

64.     Ms. Bullock provided Wells Fargo with evidence of her voluntary flood insurance. Wells Fargo partially cancelled the December 19, 2011 force-placed flood insurance policy. However, it determined that ASIC had "earned" approximately one month of its premium (and Wells Fargo Insurance had "earned" one month's worth of kickback payments). Wells Fargo charged Ms. Bullock's escrow account $149.00 for the December 19, 2011 force-placed insurance policy.

65.     On September 6, 2012, Ms. Bullock paid an extra $149.00 with her regular monthly mortgage payment to pay for the December 19, 2011 force-placed flood insurance policy.

66.     Wells Fargo incorrectly deposited this $149.00 payment, along with Ms. Bullock's September, November, and December 2012 mortgage payments to an "unapplied" account. As a result, it determined that Ms. Bullock defaulted on her mortgage and threatened her with

foreclosure on December 24, 2012. It subsequently corrected its error and applied Ms. Bullock's payments correctly, including her payment of $149.00 for force-placed flood insurance in early January 2013.

67.     In sum, Ms. Bullock paid $149.00 for force-placed insurance premiums. This amount included an 11% kickback that ASIC paid to Wells Fargo Insurance, as well as other fees bundled into ASIC's force-placed insurance charges to Wells Fargo, which Wells Fargo passed on to Ms. Bullock.

68.     Wells Fargo continually increased its insurance requirements, guaranteeing that Ms. Bullock would be force-placed and pay a kickback eventually. For example, on March 19, 2004, Wells Fargo required Ms. Bullock to maintain $64,400 in flood insurance coverage; on January 2, 2009, it required $234,000 in coverage; on December 19, 2010, it required $243,000 in coverage.

69.     By constantly moving the "goal posts"—Wells Fargo's insurance requirements—Wells Fargo made it impossible for Ms. Bullock to simply renew her existing flood insurance coverage every year. It was inevitable that she would be caught with "insufficient coverage" for a month and be forced to pay Wells Fargo's exorbitant force-placed insurance charges and kickbacks to Wells Fargo Insurance eventually. That is exactly what happened.

70.     Ms. Bullock lacks administrative remedies to address the wrongful conduct alleged herein.

71.     All conditions precedent to the relief sought herein have been performed, occurred, or been waived. If Ms. Bullock's contract requires pre-suit notice, such notice would be futile. First, Wells Fargo has already threatened to foreclose on Ms. Bullock's property because of a delinquency arising out of Wells Fargo's force-placed insurance practices. Second, Defendant's practices that are the subject of this complaint—force-placing insurance on borrowers with ASIC in order to receive kickbacks and discounted services from ASIC—are mandated by Wells Fargo's contracts with ASIC, such that Wells Fargo cannot correct its practices to conform with the law absent intervention of the Court.

1

     **E.**     **Facts Common to the Classes**

2        72.     Each and every mortgage at issue in this litigation, whether owned and serviced or

3  only serviced by Wells Fargo, requires borrowers, including Plaintiffs, to maintain insurance on

4  their real property. If the borrower fails to maintain the requisite insurance, the mortgage servicer

5  may force-place insurance on the property.

6        73.     The mortgages at issue in this litigation include Fannie Mae form mortgages

7  written on standardized residential mortgage instruments that contain substantially identical

8  provisions regarding flood insurance and fees that may be imposed in connection with force-

9  placed insurance to those cited above (section 5 of **Exhibits A and B**).

10        74.     Pursuant to the mortgage contracts at issue, once an insurance policy has lapsed,

11  the mortgage servicer can force-place (purchase) insurance for the home, and then charge the

12  borrower the full cost of the premium. However, these premiums are not the actual amount that

13  Wells Fargo pays, because a substantial portion of the premiums are refunded to Wells Fargo

14  through kickbacks or unearned "commissions."

15        75.     In accomplishing this force-placement, Wells Fargo, in bad faith, entered into

16  secret agreements with ASIC to guarantee that ASIC would be the exclusive force-placed

17  insurance provider for all force-placed policies on the vast majority of mortgages Wells Fargo

18  services. Under this arrangement Wells Fargo charges exorbitant rates to Plaintiffs and the Classes

19  who have no way of refusing the force-placed charges. These premium rates or charges were not

20  arrived at on a competitive basis and were well in excess of those which could have been obtained

21  in the open market by Wells Fargo, Plaintiffs or the Classes. No good faith, arms-length

22  transactions take place between Wells Fargo and ASIC. Rather, the pricing is the result of

23  collusion between Wells Fargo and ASIC.

24        76.     The premiums on force-placed insurance policies generally cost at least two times,

25  and up to ten times, more than what the borrower was either originally paying or what the

26  borrower could obtain if he or she purchased the insurance on a competitive basis on the open

27  market. For example, the Cannons' force-placed flood insurance policy cost $94.95 for $10,200 in

28

insurance coverage, or about $0.0093 for each dollar in insurance coverage. The Cannons' private flood insurance policy cost $1092 in premiums for $227,900 in coverage, or about $0.0048 in premium for each dollar in coverage.

77.    Force-placed insurance policies are extremely lucrative for ASIC and generate extremely high profit margins. Assurant, Inc., ASIC's parent company, collected $2.7 billion of premiums in 2010 through its force-placed insurance division alone. Assurant, Inc.'s family of companies paid out claims equaling only 36% of this take. With Assurant's other lines of business, the norm is a 70% claims-to-premiums ratio. 40% of the $2.7 billion in revenue is consumed by "general expenses," largely kickbacks to banks and their affiliates described as "commissions." In other lines of insurance, overhead and general expenses are usually only a fraction of policyholder claims.

78.    Wells Fargo and ASIC have reaped excessive profits relating to force-placed insurance.

79.    Wells Fargo receives commissions or kickbacks from ASIC when the high-priced, force-placed, insurance policies are purchased. These kickbacks are directly tied to the cost of the force-placed insurance and are usually a percentage of the premium for the policy.

80.    This kickback arrangement provides the mortgage servicer with an incentive to purchase the highest priced force-placed insurance policy on a non-competitive basis that it can— the higher the cost of the insurance policy, the higher their kickback. The consumer pays the bill for this anti-competitive scheme. Wells maximizes the amount of its commissions or kickbacks by force-placing borrowers into insurance policies in excess of the amounts required by federal law, in amounts greater than the note owner's secured interest in the property, and contrary to the amounts agreed upon in the homeowner's loan and mortgage documents.

81.    The commission or kickback is paid by ASIC to Wells Fargo in order to maintain their pre-existing uncompetitive and exclusive relationship, to induce Wells Fargo to purchase excessively-priced force-placed insurance policies from ASIC, and to cause Wells Fargo to not seek competitive bids in the market.

82.     Wells Fargo and ASIC have entered into an arrangement such that a competitively priced insurance policy is not actually "found" for any given property. Therefore, the notion that any "commission" is due to Wells Fargo or its affiliates is false. Rather, Wells has a pre-set arrangement by which ASIC. Under this arrangement, Wells Fargo purchases a master policy for its entire mortgage portfolio from ASIC, then grants ASIC access to search Wells Fargo's database to find lapsed insurance policies. Then ASIC writes to the homeowners to notify them of the force-placed coverage. Assuming there is a lapse in coverage, insurance is automatically placed as a portion of the master insurance policy—the provider of the insurance and the cost of the insurance are pre-determined under this relationship. Further, the cost of the insurance for each home bears no relation to each homeowner's individual home. Rather it is pre-determined based upon Well Fargo's entire portfolio of mortgages.

83.     ASIC's services—monitoring Wells Fargo's portfolio for insurance lapses, notifying borrowers of the amount of insurance they are required to maintain, and purchasing force-placed insurance—are part of Wells Fargo's job as a mortgage servicer. Wells Fargo is paid to perform these services by Fannie Mae and other mortgage owners. Wells Fargo, in turn, outsources these services to ASIC. Plaintiffs do not challenge this outsourcing arrangement in principle, but Wells Fargo pays ASIC a below-cost fee for performing these services. ASIC, in turn recoups its losses on services provided to Wells Fargo along with additional profits by charging higher premiums for force-placed insurance. Wells Fargo recoups the cost of paying ASIC for performing these services by receiving a kickback from the force-placed insurance premiums.

84.     Therefore, the borrower paying ASIC's premium rates is not just paying ASIC for force-placed insurance. The borrower is also paying ASIC for a bundle of services, including performing Well Fargo's job of administering and servicing the mortgages (monitoring Wells Fargo's entire portfolio for lapses and providing notification to homeowners). This bundle of administrative services includes Wells Fargo's cost of monitoring and servicing its entire portfolio of loans and is not chargeable to Plaintiffs under the mortgages. The lender, on whose behalf

Wells Fargo services the mortgages, already pays Wells Fargo for these services, so Wells Fargo's kickback arrangement ensures that it gets paid twice—once by the lender, and again by the borrower.

85.     Under this arrangement, the "premiums" for insurance that are charged to the Plaintiffs are exorbitant and illegal because they not only include the excessive cost of insurance, but they also include illegal kickbacks and the cost of the bundle of administrative services that ASIC is providing to Wells Fargo that Wells Fargo has already been paid to perform.

86.     This anticompetitive arrangement insures that ASIC and its affiliates are the only entities providing force-placed insurance for Wells Fargo borrowers, and the price of the premium far exceeds the market value of the insurance coverage.

87.     If the consumer cannot afford to pay the exorbitant premiums for force-placed insurance, the premiums are added to the mortgage's principal balance, and Wells Fargo can force payment of the premiums through the threat of negative credit reporting and foreclosure.

88.     Wells also force-places retroactive insurance policies covering periods of time in the past where coverage had lapsed. This is done despite the fact that there are no claims during the lapsed period and the homeowner has since secured standard insurance. For example, if a borrower's flood insurance coverage lapses, and the borrower renews or secures a new insurance policy one month later, Wells Fargo will cancel most of the force-placed insurance charge, but charge the borrower for one month of force-placed insurance.  This allows Wells Fargo to keep its kickbacks even if the borrower buys as much insurance as Wells Fargo demands.  Wells Fargo retroactively force-placed insurance in order to generate kickbacks.

89.     The actions and practices described herein represent bad faith and unconscionable practices that are an abusive and unlawful exercise of the lender's authority under the contract. Force-placing these excessively priced insurance policies on Plaintiffs' and Class Members' mortgages without regard for the market price of similar policies is merely price-rigging the premiums for the sole purpose of maximizing Wells Fargo's profits through kickbacks paid from the premiums for the force-placed policies. This conduct is prohibited by state and federal law.

90.     As a mortgage servicer, Wells Fargo has the right to purchase force-placed insurance, but Wells Fargo must discharge this duty in good faith. Plaintiffs challenge Wells Fargo's practice and business arrangements that negate the market forces that regulate the price of insurance policies, and result in the highest possible insurance premium charges to homeowners, all for the sole purpose of generating large kickbacks to Wells Fargo from those premiums.

91.     Wells Fargo was not, and is not, authorized by any federal, state, or local governing body, contract, or agreement to manipulate the price of the force-placed insurance policies, and acted in bad faith as alleged above.

92.     These fraudulent practices have recently come under fire by all fifty State Attorneys General as part of a nationwide investigation.

## CLASS ALLEGATIONS

93.     Plaintiffs bring this action on behalf of themselves and all others similarly situated pursuant to Fed. R. Civ. P. 23. This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of Rule 23(a)(1)-(4) and (b)(3).

94.     Plaintiffs Stanley Cannon, Patricia Cannon, and Cheryl Bullock bring this action on behalf of a National Flood Insurance Class, defined as all persons who were charged by Wells Fargo Bank, N.A. or any of its affiliates for force-placed flood insurance on property in the United States within the applicable statute of limitations period through the present.

95.     Plaintiff Cheryl Bullock also brings this action on behalf of a California Flood Insurance Subclass, defined as all members of the National Flood Insurance Class who were charged by Wells Fargo Bank, N.A. or any of its affiliates for force-placed flood insurance on property in California within the applicable statute of limitations period through the present.

96.     Excluded from the National Flood Insurance Class and California Flood Insurance Subclass are all persons who were charged by Wells Fargo Bank, N.A. or any of its affiliates for force-placed flood insurance on property in California with a mortgage loan secured by a Federal Housing Administration (FHA) mortgage.

97. Plaintiffs Stanley Cannon and Patricia Cannon also bring this action on behalf of a National Hazard Insurance Class, defined as all persons who were charged by Wells Fargo Bank, N.A. or any of its affiliates for force-placed hazard insurance on property in the United States within the applicable statute of limitations period through the present. Excluded from the National Hazard Insurance Class are any members of the class certified in *Williams v. Wells Fargo Bank, N.A.* in the United States District Court for the Southern District of Florida, and any persons included in the settlement class preliminarily approved therein in the event that settlement attains final approval.

98. Excluded from the National Flood Insurance Class, the California Flood Insurance Class, and the National Hazard Insurance Class (collectively, the "Classes") are Wells Fargo, its respective parents, subsidiaries, affiliates, officers, employees and directors, as well as any entity in which they have controlling interests, counsel for Plaintiffs, any judicial officer presiding over this action, and the members of his or her immediate family and judicial staff.

99. Plaintiffs reserve the right to modify or amend the definition of the proposed Classes before the Court determines whether certification is appropriate.

100. The members of the Classes are so numerous that joinder is impractical. The Classes are believed to consist of thousands of members, whose identities are within the exclusive knowledge of and can only be ascertained by resort to the records of Wells Fargo.

101. There are questions of law and fact common to Plaintiffs and the Classes that predominate over questions affecting individual Class members. These common questions include:

a. Whether Wells Fargo breached the mortgage contract with borrowers by charging borrowers a high premium "cost" for force-placed insurance when, in reality, a significant portion of this "cost" was actually returned, transferred, or paid to Wells or an affiliate of Wells;

b. Whether Wells Fargo breached the implied covenant of good faith and fair dealing by charging their residential borrowers amounts for force-placed insurance

procured from ASIC, a portion of which was returned, transferred or paid to Wells or an affiliate;

c.     Whether Wells Fargo was unjustly enriched by charging their residential borrowers amounts for force-placed insurance procured from ASIC, a portion of which was returned, transferred or paid to Wells or an affiliate;

d.     Whether Wells Fargo converted funds owned by borrowers by withdrawing such funds from borrowers' escrow accounts and requiring borrowers to pay to replenish their escrow accounts in order to pay the premiums for force-placed insurance procured from ASIC, a portion of which was returned, transferred or paid to Wells or an affiliate;

e.     Whether Wells Fargo breached its fiduciary duties to Plaintiffs and the Classes by the acts alleged, and whether Wells Fargo Insurance and/or ASIC aided and abetted Wells Fargo in breaching its fiduciary duties;

f.     Whether Wells Fargo acted unfairly by entering into exclusive buying arrangements with ASIC in order to receive kickbacks of a portion of insurance premiums paid to ASIC for force-placed insurance policies;

g.     Whether Wells Fargo should be enjoined from continuing to receive kickbacks from ASIC and withdrawing the amounts of these kickbacks from borrowers' escrow accounts;

h.     Whether Wells Fargo, Wells Fargo Insurance, and ASIC formed an association in fact for the purpose of defrauding Plaintiffs and the members of the Classes; and

i.     Whether Wells Fargo, Wells Fargo Insurance, and ASIC used the mails and wires as part of their scheme to defraud Plaintiffs and the Classes.

102.   Plaintiffs' claims are typical of the claims of other members of the Classes. Plaintiffs, like all Class members, were charged for force-placed insurance procured without seeking competitive bids on the open market by Wells Fargo from ASIC to insure property secured by a mortgage originated, owned or serviced by Wells. Wells Fargo forced all Plaintiffs to

maintain insurance exceeding their loan balances in order to increase the number and amount of kickbacks ASIC paid to Wells Fargo. Plaintiffs, like all Class members, sustained damages based on the same actions of Wells and have no interest antagonistic to the interests of any members of the Classes.

103.    Plaintiffs are committed to the vigorous prosecution of this action and have retained competent counsel experienced in the prosecution of complex litigation and consumer class actions. Plaintiffs and their counsel will fairly and adequately protect the interests of the Classes.

104.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Since the amount of each Class member's claim is small relative to the complexity of the litigation, and due to the financial resources of defendants, Class members cannot realistically afford to seek legal redress individually for the claims alleged herein. Therefore, absent a class action, members of the Classes have no realistic likelihood of recovering their damages, and Wells Fargo's wrongful practices alleged herein will continue unabated.

105.    Even if members of the Classes could afford to pursue individual litigation, individualized litigation would significantly increase the delay and expense to all parties and to the Court. Individualized litigation would also create the potential for inconsistent or contradictory rulings. In contrast, a class action presents far fewer management difficulties, allows claims to be heard which might otherwise go unheard because of the relative expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale and comprehensive supervision by a single court. Thus, a class action will allow redress for many persons whose claims would otherwise be too small to litigate individually. There will be no difficulty in the management of this action as a class action.

106.    Wells Fargo has acted or failed to act in a manner generally applicable to the Classes, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Classes as a whole.

**CAUSES OF ACTION**

**COUNT I**

**UNJUST ENRICHMENT (RESTITUTION)**

107.     Plaintiffs restate and reallege the preceding paragraphs of this Complaint as though set out here word for word.

108.     Plaintiffs Stanley and Patricia Cannon, and Cheryl Bullock bring their unjust enrichment (restitution) claim against Wells Fargo on behalf of the National Flood Insurance Class.

109.     Plaintiffs Stanley and Patricia Cannon also bring their unjust enrichment (restitution) claim against Wells Fargo on behalf of the National Hazard Insurance Class.

110.     Wells Fargo services Stanley and Patricia Cannon's mortgage loan, but does not own their loan.

111.     Plaintiffs' unjust enrichment claims against Wells Fargo arise from Wells Fargo's illegal practice of earning a hidden profit or other financial benefit by collecting money from residential borrowers for the exorbitant insurance premiums for force-placed flood and hazard insurance policies procured through ASIC where a portion of the above-market rate premiums were returned to Wells and its affiliates. These secret kickback arrangements between Wells Fargo and ASIC monetarily benefited Wells and its affiliates at the direct expense of the Plaintiffs.

112.     Wells Fargo enjoyed and accepted monetary or other financial benefits from ASIC by accepting kickbacks paid to Wells Fargo or its affiliates out of the exorbitant above-market rates being charged to the Plaintiffs under these secret kickback arrangements.

113.     Wells Fargo and its affiliates were unjustly enriched, in an amount to be proven at trial, by receiving a portion of each force-placed flood and hazard insurance premium paid by Plaintiffs and Class members. It would be inequitable to allow Wells and its affiliates to retain these benefits at the expense of Plaintiffs and the Classes.

114.    Wells Fargo should compensate Plaintiffs and the Classes in an amount equal to all payments collected from Plaintiffs and the Classes that represent the hidden profits or other financial benefits received by Wells or its affiliates.

115.    Wells Fargo and its affiliates received and are holding funds belonging to Plaintiffs and the Classes, which in equity and good conscience they should not be permitted to keep.

## COUNT II

## CONVERSION

116.    Plaintiffs restate and reallege the preceding paragraphs of this Complaint as though set out here word for word.

117.    Plaintiffs Stanley and Patricia Cannon, and Cheryl Bullock, bring their conversion claim against Wells Fargo on behalf of the National Flood Insurance Class.

118.    Plaintiffs Stanley and Patricia Cannon also bring their conversion claim against Wells Fargo on behalf of the National Hazard Insurance Class.

119.    Plaintiffs bring their conversion claims against Wells Fargo for taking a portion of Plaintiffs' force-placed flood and hazard insurance premiums.

120.    Wells Fargo improperly exercises control of the property of Plaintiffs and Class members by imposing improper kickbacks and charges on Plaintiffs' and Class members' escrow accounts and collecting those kickbacks.  For example, Wells Fargo required Plaintiffs to increase their mortgage payments to pay for ASIC's insurance premiums and Wells Fargo's kickbacks and retained these readily identifiable funds. This exercise of control is contrary to the rights of Plaintiffs and members of the proposed Classes.

121.    The acts of Wells Fargo constitute the tort of conversion.

122.    Plaintiffs and members of the proposed Classes are entitled to the immediate possession of fees improperly collected by Wells Fargo, and are entitled to a release of all escrow charges for the improper fees.

123.    Wells Fargo wrongfully converted specific and readily identifiable funds.

124.     As a direct and proximate result of Wells Fargo's acts of conversion, Plaintiffs and members of the proposed Classes have suffered and continue to suffer damages.

## COUNT III

## BREACH OF FIDUCIARY DUTY

125.     Plaintiffs restate and reallege the preceding paragraphs of this Complaint as though set out here word for word.

126.     Plaintiffs Stanley and Patricia Cannon, and Cheryl Bullock bring their breach of fiduciary duty claim against all defendants on behalf of the National Flood Insurance Class.

127.     Plaintiffs Stanley and Patricia Cannon also bring their breach of fiduciary duty claim against all defendants on behalf of the National Hazard Insurance Class.

128.     Wells Fargo holds funds in escrow on behalf of borrowers whose mortgages it services. These funds are to be used for the purpose of paying insurance premiums when due, and any excess funds are to be returned to Plaintiffs and members of the Classes under the terms of the mortgage agreements.

129.     Wells Fargo has managed borrowers' monies for insurance premiums on a monthly basis and held them in escrow.

130.     A fiduciary relationship exists between Plaintiffs and Wells Fargo because Wells Fargo received a greater economic benefit than from a typical escrow transaction. *See Capital Bank v. MVB, Inc.*, 644 So. 515, 519 (Fla. 3d DCA 1994). Specifically, the debtor-creditor relationship transformed into a fiduciary relationship when Wells Fargo took it upon itself to manage borrowers' escrow accounts and withdraw money from borrowers' escrow accounts to pay force-placed flood insurance premiums. Wells Fargo violated its fiduciary duty when it began receiving unlawful kickbacks or fees under the kickback scheme described above, which is clearly a greater economic benefit than what was contemplated under the mortgage.

131.     Wells Fargo breached its fiduciary duty to Plaintiffs and other members of the Classes, by (1) not acting in their best interest when it profiting from force-placed insurance policies that were purchased using escrow funds it held for the benefit of Plaintiffs and class

members at the expense of Plaintiffs and Class members, and (2) not disclosing the kickback scheme to Plaintiffs and Class members.

132.    These actions were undertaken by Wells Fargo in bad faith for its own benefit and were not intended to benefit Plaintiffs or other Class members.

133.    As a direct result of Wells Fargo's actions, and its subversion of Plaintiffs' interest to Wells Fargo's own interests in reaping extravagant and outrageous fees, Plaintiffs and the members of the Classes have suffered injury in the form of unnecessary and excessive escrow charges and a loss of funds from their escrow accounts.

134.    Plaintiffs and the members of the Classes are entitled to damages for Wells Fargo's breach of its fiduciary obligations and misappropriation of escrow funds. In addition, Plaintiffs and the Classes are entitled to punitive damages because Wells Fargo acted in bad faith in deliberate or reckless disregard of their rights and its obligation to hold their escrow funds in trust.

135.    By the acts alleged above, defendants ASIC and Wells Fargo Insurance aided and abetted Wells Fargo in breaching its fiduciary duties to Plaintiffs and the Classes, and are therefore equally liable to Plaintiffs and the Classes for the resulting damages.

## COUNT IV

### VIOLATIONS OF THE TRUTH IN LENDING ACT (15 U.S.C. § 1601 *et seq.*)

136.    Plaintiffs restate and reallege the preceding paragraphs of this Complaint as though set out here word for word.

137.    Plaintiffs Stanley and Patricia Cannon, and Cheryl Bullock bring their Truth in Lending Act claim against Wells Fargo on behalf of the National Flood Insurance Class.

138.    Plaintiffs Stanley and Patricia Cannon also bring their Truth in Lending Act claim against Wells Fargo on behalf of the National Hazard Insurance Class.

139.    Plaintiffs' mortgages were consumer credit plans secured by their principal dwellings, and were subject to the disclosure requirements of the Truth in Lending Act, 15 U.S.C. § 1601, *et seq.*, and all related regulations, commentary, and interpretive guidance promulgated by the Federal Reserve Board.

140.    Wells Fargo is a "creditor" as defined by the Truth in Lending Act (TILA) because it owned Plaintiffs' notes and mortgages and changed the terms of those mortgages so as to create new mortgage obligations, of which Wells Fargo was the creditor. When Wells Fargo added force-placed insurance charges to Plaintiffs' mortgage balances and charged them interest on these charges, it created a new loan subject to the requirements of TILA. Alternatively, Wells Fargo is the "assignee" of Plaintiffs' notes and mortgages as defined 15 U.S.C. § 1641.

141.    The inaccuracy on the face of Plaintiffs' TILA disclosures are apparent on the face of the disclosures because:

    a.    the inaccuracy arose out of Wells Fargo unilaterally changing the terms of Plaintiffs' loan;

    b.    anti-coercion disclosures included with Stanley and Patricia Cannon's mortgage explicitly stated that the lender was prohibited from conditioning its extension of credit on the borrowers purchasing any insurance product from the lender or its affiliates;

    c.    the force-placed insurance disclosure included with the Cannons' mortgage specifically stated that force-placed insurance would only be obtained in the amount "required" by the lender "to protect its interest in the property[,]"; and

    d.    Plaintiffs' mortgages do not authorize kickbacks or other compensation to Wells Fargo or its affiliates for the purchase of force-placed insurance.

142.    Wells Fargo was required to accurately and fully disclose the terms of the legal obligations between the parties. 12 C.F.R. § 226.17(c).

143.    Wells Fargo violated 12 C.F.R. § 226.17(c) by (i) failing to clearly, fully, and accurately disclose its insurance requirements in its mortgages; and (ii) failing at all times to disclose the amount and nature of the "commission" Wells Fargo's affiliates would receive for the purchase of force-placed insurance.

144.   Specifically, when Wells Fargo added the force-placed premium charge to the outstanding principal amount of Plaintiffs' loans, a new debt obligation was created. When Wells Fargo created this new debt obligation, it was required to provide new disclosures.

145.   12 C.F.R. § 226.18(d) requires disclosures of finance charges, which includes force-placed insurance premiums, including kickbacks under 12 C.F.R. § 226.4(b)(8). Wells Fargo failed to disclose the nature and amount of all finance charges associated with the force-placed insurance premiums it withdrew from Plaintiffs' escrow accounts and added to their principal balance. This failure violated TILA.

146.   The Cannons' TILA claim is timely because Wells Fargo added force-placed insurance charges to Plaintiffs' mortgage balance repeatedly through 2011. The last time this occurred was on November 13, 2011, when Wells Fargo filed a complaint to foreclose on the Cannons' mortgage. The foreclosure complaint included force-placed insurance charges as part of the debt to be recovered through foreclosure.

147.   Cheryl Bullock's TILA claim is timely because she was force-placed into flood insurance and had charges for backdated force-placed insurance that included kickbacks paid to Wells Fargo or its affiliate added to her mortgage balance in 2011 and 2012.

148.   Plaintiffs and members of the Classes have been injured and have suffered a monetary loss arising from Wells Fargo's violations of TILA.

149.   As a result of Wells Fargo's TILA violations, Plaintiffs and members of the Classes are entitled to recover actual damages and a penalty of the lesser of $500,000.00 or 1% of Wells Fargo's net worth, as provided by 15 U.S.C. § 1640(a)(1)-(2).

150.   Plaintiffs and members of the Classes are also entitled to recovery of attorneys' fees and costs to be paid by Wells Fargo, as provided by 15 U.S.C. § 1640(a)(3).

## COUNT V

## VIOLATION OF CALIFORNIA BUSINESS & PROFESSIONS CODE, § 17200, *et seq.*

151.   Plaintiffs restate and reallege the preceding paragraphs of this Complaint as though set out here word for word.

152.     Plaintiff Cheryl Bullock brings her claim for violations of California's Unfair Competition Law, Cal. Bus. & Prof. Code §17200 *et seq*. ("UCL"), against Wells Fargo on behalf of the California Flood Insurance Subclass.

153.     Wells Fargo was required to adhere to the requirements of the UCL when conducting business with Bullock, and the other members of the California Flood Insurance Subclass.

154.     The UCL prohibits any "unlawful" business act or practice. Wells Fargo has violated the UCL's prohibition against engaging in unlawful acts or practices by violating statutes and common law rules prohibiting its conduct as described herein, including:

a.     Wells Fargo's Unjust Enrichment;

b.     Wells Fargo's Conversion;

c.     Wells Fargo's Breach of Fiduciary Duty; and

d.     Wells Fargo's violations of the Truth in Lending Act, 15 U.S.C. § 1601, *et seq*.

Plaintiff reserves the right to allege other violations of law that constitute other unlawful business acts or practices.

155.     The UCL also prohibits any "unfair" business act or practice. As detailed in the preceding paragraphs, Wells Fargo engaged in unfair business acts or practices by, among other things, (1) charging California residents for force-placed flood insurance premiums that included kickbacks paid to Wells Fargo, (2) force-placing flood insurance in amounts exceeding borrowers' principal mortgage balance in order to receive larger kickbacks and a greater volume of kickbacks, and (3) force-placing California residents into backdated flood insurance in order to generate kickbacks.

156.     Wells Fargo systematically engaged in these unfair and/or unlawful business practices to the detriment of Ms. Bullock and other members of the California Flood Insurance Subclass.

157.    These business practices are also unfair because they are contrary to the principle that (i) "lenders should avoid creating situations where a building is over-insured," 74 Fed. Reg. 35,914, 35918 (July 21, 2009); (ii) consumers should receive "meaningful disclosure of credit terms," 15 U.S.C. § 1601(a); and other clearly articulated principles of law.

158.    The harm caused by these business practices vastly outweighs any legitimate business utility they possibly could have.

159.    Ms. Bullock and other members of the California Flood Insurance Subclass have been injured and have suffered a monetary loss as a result of Wells Fargo's violations of the UCL. They are entitled to restitution in an amount to be determined at trial. Plaintiffs also seek an injunction prohibiting the unlawful and unfair business practices alleged herein.

160.    As a result of Wells Fargo's violations of the UCL, Ms. Bullock and members of the California Flood Insurance Subclass are also entitled to recover attorneys' fees and costs to be paid by Wells Fargo, as provided by Code of Civil Procedure § 1021.5 and other applicable law.

## COUNT VI

### VIOLATION OF RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1962(c)

161.    Plaintiffs restate and reallege the preceding paragraphs of this Complaint as though set out here word for word.

162.    Plaintiffs Stanley and Patricia Cannon, and Cheryl Bullock bring claims for violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq*. ("RICO") against all defendants on behalf of the National Flood Insurance Class.

163.    Plaintiffs Stanley and Patricia Cannon also bring their claims for violation of RICO against all defendants on behalf of the National Hazard Insurance Class.

164.    At all relevant times, Wells Fargo and ASIC were employed by and associated with an illegal enterprise, and conducted and participated in that enterprise's affairs, through a pattern of racketeering activity consisting of numerous and repeated uses of the interstate mails and wire communications to execute a scheme to defraud, all in violation of 18 U.S.C. § 1962(c).

165.    The RICO enterprise, which engaged in, and the activities of which affected, interstate and foreign commerce, was comprised of an association in fact of entities and individuals that included Wells Fargo, Wells Fargo Insurance, and ASIC.

166.    The members of the RICO enterprise all had a common purpose:  to increase and maximize the revenues of Wells Fargo and ASIC by forcing Plaintiffs and members of the Classes to pay artificially inflated premiums for flood and hazard insurance through a scheme that manipulated the premiums to cover kickbacks and expenses associated with monitoring Wells Fargo's entire loan portfolio.  Wells Fargo, Wells Fargo Insurance, and ASIC shared the bounty of their enterprise, *i.e.*, by sharing the premiums generated by the joint scheme.

167.    The RICO enterprise functioned over a period of years as a continuing unit and had and maintained an ascertainable structure separate and distinct from the pattern of racketeering activity.

168.    Wells Fargo and ASIC conducted and participated in the affairs of this RICO enterprise through a pattern of racketeering activity that lasted more than one year, at a minimum, and that consisted of numerous and repeated violations of the federal mail and wire fraud statutes, which prohibit the use of any interstate or foreign mail or wire facility for the purpose of executing a scheme to defraud, in violation of 18 U.S.C. §§ 1341 and 1343.

169.    As set forth above, Wells Fargo was under a fiduciary duty not to earn secret profits at Plaintiffs' and Class members' expense, and to disclose the existence of its kickback scheme to Plaintiffs and Class members.

170.    As part and in furtherance of the scheme to defraud, Wells Fargo and ASIC made numerous material omissions and misleading representations to Plaintiffs and the members of the Classes with the intent to defraud and deceive these Plaintiffs and members of the Classes.

171.    On August 6, 2011, ASIC, with the approval of Wells Fargo, drafted and sent Plaintiff Cannon a letter on Wells Fargo letterhead. The letter stated that Wells Fargo had obtained a flood insurance policy on behalf of Ms. Cannon and her husband "in accordance with the terms of [her] Mortgage" and enclosed a copy of the policy. The policy stated that the premium for the

coverage was $2,250.00. In making these statements, Wells Fargo and ASIC knowingly and intentionally created the mistaken impression that the premium Ms. Cannon was charged was for the cost of the policy, when in fact the premium also included kickbacks to Wells Fargo or Wells Fargo Insurance, and compensation for the cost of insurance tracking. Wells Fargo had a duty to correct this mistaken impression. This omission was material, as it gave Wells Fargo and ASIC a colorable reason to charge Ms. Cannon unreasonably high premiums and would have influenced Ms. Cannon's decision whether to pay the premiums or contest them.

172.    In stating that its actions were "in accordance with the terms of [her] Mortgage," the August 6, 2011 letter to Ms. Cannon also misrepresented that the loan documents gave Wells Fargo the right to charge Plaintiff for the cost of insurance tracking and for kickbacks to Wells Fargo or Wells Fargo Insurance. Wells Fargo and ASIC knew that the loan documents did not give Wells Fargo that authority. This misrepresentation was material, as it gave Wells Fargo and ASIC a colorable reason to charge Ms. Cannon unreasonably high premiums and would have influenced Ms. Cannon's decision whether to pay the premiums or contest them.

173.    ASIC, acting on Wells Fargo's authority, sent Ms. Cannon other materially identical, and identically misleading, notices of placement of force-placed flood insurance prior to August 6, 2011.

174.    On April 27, 2012, ASIC, with the approval of Wells Fargo, drafted and sent Plaintiff Cannon a letter on Wells Fargo letterhead. The letter stated that Wells Fargo had obtained a hazard insurance policy on behalf of Ms. Cannon and her husband "in accordance with the terms of [her] Mortgage" and enclosed a copy of the policy. The policy stated that the premium for the coverage was $3,305.00. In making these statements, Wells Fargo and ASIC knowingly and intentionally created the mistaken impression that the premium Ms. Cannon was charged was for the cost of the policy, when in fact the premium also included kickbacks to Wells Fargo or Wells Fargo Insurance, and compensation for the cost of insurance tracking. Wells Fargo had a duty to correct this mistaken impression. This omission was material, as it gave Wells Fargo and ASIC a colorable reason to charge Ms. Cannon unreasonably high premiums and would have influenced

Ms. Cannon's decision whether to pay the premiums or contest them.

175.   In stating that its actions were "in accordance with the terms of [her] Mortgage," the April 27, 2012 letter to Ms. Cannon also misrepresented that the loan documents gave Wells Fargo the right to charge Plaintiff for the cost of insurance tracking and for kickbacks to Wells Fargo or Wells Fargo Insurance. Wells Fargo and ASIC knew that the loan documents did not give Wells Fargo that authority. This misrepresentation was material, as it gave Wells Fargo and ASIC a colorable reason to charge Ms. Cannon unreasonably high premiums and would have influenced Ms. Cannon's decision whether to pay the premiums or contest them.

176.   ASIC, acting on Wells Fargo's authority, sent Ms. Cannon other materially identical, and identically misleading, notices of placement of force-placed hazard insurance prior to April 28, 2012.

177.   On February 17, 2012, ASIC, with the approval of Wells Fargo, drafted and sent Plaintiff Bullock a letter on Wells Fargo letterhead. The letter stated that Wells Fargo had obtained a flood insurance policy on behalf of Ms. Bullock "in accordance with the terms of [her] Mortgage," and enclosed a copy of the policy. The policy stated that the premium for the coverage was $2,187.00. In making these statements, Wells Fargo and ASIC knowingly and intentionally fostered the mistaken impression that the premium was for the cost of the policy, when in fact the premium also included kickbacks to Wells Fargo or Wells Fargo Insurance and compensation for the cost of insurance tracking. Wells Fargo had a duty to correct this mistaken impression. This omission was material, as it gave Wells Fargo and ASIC a colorable reason to charge Ms. Bullock unreasonably high premiums and would have influenced Ms. Bullock's decision whether to pay the premiums or contest them.

178.   In stating that its actions were "in accordance with the terms of [her] Mortgage," the February 17, 2012 letter to Ms. Bullock also misrepresented that the loan documents gave Wells Fargo the right to charge Plaintiff for the cost of insurance tracking and for kickbacks to Wells Fargo or Wells Fargo Insurance. Wells Fargo and ASIC knew that the loan documents did not give Wells Fargo that authority. This misrepresentation was material, as it gave Wells Fargo

and ASIC a colorable reason to charge Ms. Bullock unreasonably high premiums and would have influenced Ms. Bullock's decision whether to pay the premiums or contest them.

179.     ASIC, with the approval of Wells Fargo, also sent Plaintiffs notices of temporary insurance on Wells Fargo letterhead prior to sending notices that annual coverage was placed. These notices informed Plaintiffs that temporary coverage had been placed on their properties, and that a one-year policy would be placed if they did not provide proof of insurance. The notice warned that if Wells Fargo and ASIC ultimately purchased additional coverage, "it *will be obtained with the assistance* of Wells Fargo Insurance, Inc." and Wells Fargo Insurance "will receive a commission on the insurance we obtain." This disclosure misleads Plaintiffs and borrowers in several respects. First, the notice represents that insurance "*will be obtained*" with the assistance of Wells Fargo Insurance. The master flood insurance policy was already in place, therefore there was nothing for Wells Fargo insurance to obtain moving forward. Second, Wells Fargo Insurance would do no work to "assist" with the procurement of any individual force-placed flood insurance policy, nor was this ever Defendants' intention. Third, the payment made to Wells Fargo Insurance, Inc. in connection with Defendants' force-placed insurance program was not a true "commission" because it did not compensate Wells Fargo Insurance, Inc. for any work performed. The letter, that is, omitted to disclose that the payment was in fact a kickback to Wells Fargo Insurance.

180.     Finally, Wells Fargo sent Plaintiffs monthly statements showing that the premiums for the force-placed insurance were being deducted from their escrow accounts. In labeling the deductions "premiums," these statements created the mistaken impression that the deductions were for the cost of the policy, when in fact the deductions included kickbacks to Wells Fargo or Wells Fargo Insurance, and compensation for the cost of insurance tracking. Wells Fargo had a duty to correct this mistaken impression. This omission was material, as it gave Wells Fargo and ASIC a colorable reason to charge Plaintiffs unreasonably high premiums and would have influenced Plaintiffs' decision whether to pay the premiums or contest them.

181.   For the purpose of executing the scheme to defraud, Wells Fargo and ASIC sent, mailed, and transmitted, or caused to be sent, mailed, and transmitted, in interstate or foreign commerce numerous materials, including but not limited to the notices and letters described above informing Plaintiffs and Class members that they would charge Plaintiffs and Class members artificially inflated and unnecessary premiums for force-placed insurance.  Wells Fargo, Wells Fargo Insurance, and ASIC also transferred sums among themselves, including but not limited to kickbacks, in furtherance of their scheme to defraud Plaintiffs and Class members, in violation of the wire fraud statutes.

182.   By reason, and as a result, of defendants' conduct and participation in the racketeering activity described herein, defendants have caused damages to Plaintiffs and members of the Classes in the form of unreasonably high force-placed insurance premiums.

183.   Pursuant to 18 U.S.C. § 1964(c), Plaintiffs and members of the class seek recovery of compensatory and treble damages, and attorneys' fees and costs.

## COUNT VII

### VIOLATION OF RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1962(d)

184.   Plaintiffs restate and reallege the preceding paragraphs of this Complaint as though set out here word for word.

185.   Plaintiffs Stanley and Patricia Cannon, and Cheryl Bullock bring claims for violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq*. ("RICO") against all defendants on behalf of the National Flood Insurance Class.

186.   Plaintiffs Stanley and Patricia Cannon also bring their claims for violation of RICO against all defendants on behalf of the National Hazard Insurance Class.

187.   At all relevant times, Wells Fargo, Wells Fargo Insurance, and ASIC were associated with the enterprise and agreed and conspired to violate 18 U.S.C. § 1962(c), that is, agreed to conduct and participate, directly and indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d).

188.     Wells Fargo, Wells Fargo Insurance, and ASIC agreed that ASIC would be Wells Fargo's exclusive provider of force-placed insurance and would extract artificially inflated premiums from Wells Fargo's customers.  Wells Fargo, Wells Fargo Insurance, and ASIC also agreed that ASIC would pay Wells Fargo's affiliate, Wells Fargo Insurance, kickbacks.

189.     Upon information and belief, Wells Fargo Insurance passes much of its profits from the scheme to defraud to Wells Fargo.

190.     Wells Fargo, Wells Fargo Insurance, and ASIC committed and caused to be committed a series of overt acts in furtherance of the conspiracy and to affect the objects thereof, including but not limited to acts set forth above.

191.     As a result of Wells Fargo's, Wells Fargo Insurance's and ASIC's violations of 18 U.S.C. § 1962(d), Plaintiffs and members of the Classes suffered damages in the form of unreasonably high force-placed insurance premiums.

192.     Pursuant to 18 U.S.C. § 1964(c), Plaintiffs and members of the Classes seek recovery of compensatory and treble damages, and attorneys' fees and costs.

## **PRAYER FOR RELIEF**

### **Equitable Remedies**

1.     Plaintiffs restate and reallege the preceding paragraphs of this Complaint as though set out here word for word and request equitable relief from the Court.

2.     Plaintiffs have no adequate remedy at law to address the wrongful conduct engaged in by Defendant. Thus Plaintiffs ask the Court to enjoin the Defendant from the practice of collecting fees for the force-placement of insurance on the grounds that the fees are neither disclosed nor permitted by Class members' mortgage contracts. Plaintiffs ask that the Court order Wells Fargo to disgorge all "commissions," kickbacks, or other fees associated with force-placed insurance to Plaintiffs and members of the Classes. Plaintiffs further ask the Court to enjoin the Defendant from force-placing insurance in excess of their and Class members' mortgage balances until such time as Wells Fargo discontinues its exclusive purchase arrangement and "commission"

1  agreement with ASIC and disgorge premiums paid for insurance in excess of loan balance

2  coverage force-placed while these agreements were in effect.

3      3.      Plaintiffs ask the Court to award restitution to return all charges Defendant or their

4  affiliates received in connection with the purchase of force-placed insurance.

5      4.      Plaintiffs ask the Court to order Defendant to remove from Class Members' escrow

6  accounts all charges that are attributable to kickbacks paid to Defendant or their affiliates for the

7  purchased of force-placed insurance.

8                          **Damages**

9      5.      Defendant should pay damages to Plaintiffs and the Classes in an amount to be

10  determined at trial according to law, in any event, in excess of five million dollars ($5,000,000).

11  Plaintiffs and members of the proposed Classes are entitled to treble damages under RICO, and

12  punitive damages or additional damages allowed by statute for Defendant's knowing and

13  intentional violation of laws or actions taken in wanton and reckless disregard for the harm caused

14  to Plaintiffs and members of the proposed Classes.

15

16                    **DEMAND FOR JURY TRIAL**

17      Plaintiffs demand a jury trial on all claims so triable.

18  Dated: October 8, 2013                    Respectfully submitted,

19                                            */s/ Barry Himmelstein*
                                              Barry Himmelstein
20                                            E-mail: barry@himmellaw.com
                                              HIMMELSTEIN LAW NETWORK
21                                            2000 Powell St., Ste. 1605
                                              Emeryville, CA  94608
22                                            Telephone:  (510) 450-0782
                                              Facsimile:  (510) 380-6147
23
                                              Sheri L. Kelly, SBN 226993
24                                            E-mail: slk@sherikellylaw.com
                                              LAW OFFICE OF SHERI L. KELLY
25                                            31 E. Julian St.
                                              San Jose, CA  95112
26                                            Telephone:  (408) 287-7712
                                              Facsimile:  (408) 583-4249
27

28

Steven A. Owings (*Pro Hac Vice*)
Alexander P. Owings (*Pro Hac Vice*)
OWINGS LAW FIRM
1400 Brookwood Drive
Little Rock, AR 72202
Telephone: (501) 661-9999
Facsimile: (501) 661-8393
sowings@owingslawfirm.com
apowings@owingslawfirm.com

Brent Walker (*Pro Hac Vice*)
WALKER LAW PLLC
2171 West Main, Suite 200
P.O. Box 628
Cabot, AR 72023
(501) 605-1346
(501) 605-1348 (facsimile)
bwalker@carterwalkerlaw.com
dcarter@carterwalkerlaw.com

Jack Wagoner, (*Pro Hac Vice*)
Angela Mann (*Pro Hac Vice*)
WAGONER LAW FIRM, P.A.
1320 Brookwood, Suite E
Little Rock, AR 72202
Telephone: (501) 663-5225
Facsimile: (501) 660-4030
Jack@wagonerlawfirm.com
angela@wagonerlawfirm.com

**Counsel for Plaintiffs**

THIRD AMENDED CLASS ACTION COMPLAINT

# EXHIBIT A

RECORDED IN OFFICIAL RECORDS
INSTRUMENT # 2005216649 19 PGS
2005 SEP 26 05:56 PM
KAREN E. RUSHING
CLERK OF THE CIRCUIT COURT
SARASOTA COUNTY, FLORIDA
CEAGLETO   Receipt#690970

Doc Stamp-Mort:    448.00
Intang. Tax:    256.00



Prepared by or under the supervision of: *Greg Hooper*
AMERISAVE MORTGAGE CORPORATION

*[Name of Natural Person]*
3525 PIEDMONT RD. SUITE 6

*[Street Address]*
ATLANTA, GA 30305

*[City, State Zip Code]*

After recording please return to:
OHIO SAVINGS BANK ATTN: DOCUMENT CONTROL

*[Company Name]*

*[Name of Natural Person]*
1111 CHESTER AVE

*[Street Address]*
CLEVELAND, OH 44114

*[City, State Zip Code]*

3216958-DCM

Requested by and
Return to:
Recording Department
First American Lenders Advantage
1801 Lakepointe Drive, Suite 111
Lewisville, TX 75057
(469) 322-2500

*[Space Above This Line For Recording Data]*

# MORTGAGE

MIN:  100162500044824473

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A)     "Security Instrument" means this document, which is dated   September  9,  2005      , together with all Riders to this document.

(B)     "Borrower" is STANLEY D. CANNON AND PATRICIA R. CANNON, HUSBAND AND WIFE.

Borrower is the mortgagor under this Security Instrument.

(C)     "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the mortgagee under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

LOAN NUMBER: 4482447
Florida Mortgage-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
—THE COMPLIANCE SOURCE, INC.—
www.compliancesource.com

Page 1 of 14

MERS Modified Form 3010 01/01
14301FL 02/04
© 2004, The Compliance Source, Inc.



**(D)** "Lender" is AMERISAVE MORTGAGE CORPORATION

Lender is a    corporation                                    organized and existing under the laws of
THE STATE OF GEORGIA                        . Lender's address is    3525 PIEDMONT RD.,
SUITE 6, ATLANTA, GA 30305   .

**(E)** "Note" means the promissory note signed by Borrower and dated    September  9, 2005   . The
Note states that Borrower owes Lender    one hundred twenty eight thousand and
NO/100ths                                              Dollars (U.S. $ 128,000.00                )
plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not
later than    October  1, 2025   .

**(F)** "Property" means the property that is described below under the heading "Transfer of Rights in the
Property."

**(G)** "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due
under the Note, and all sums due under this Security Instrument, plus interest.

**(H)** "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

☐ Adjustable Rate Rider          ☐ Condominium Rider                    ☐ Second Home Rider
☐ Balloon Rider                  ☐ Planned Unit Development Rider       ☐ Biweekly Payment Rider
☒ 1-4 Family Rider               ☐ Revocable Trust Rider
☐ Other(s) [specify]

**(I)** "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances
and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable
judicial opinions.

**(J)** "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners association or
similar organization.

**(K)** "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check,
draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer,
or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term
includes, but is not limited to, point-of-sale transfers, automated teller machine transactions; transfers initiated by
telephone, wire transfers, and automated clearinghouse transfers.

**(L)** "Escrow Items" means those items that are described in Section 3.

**(M)** "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by
any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to,
or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance
in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(N)** "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the
Loan.

LOAN NUMBER: 4482447
Florida Mortgage-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          MERS Modified Form 3010 01/01
—THE COMPLIANCE SOURCE, INC.—                                                      1-800FL 11/04
www.compliancesource.com                                  Page 2 of 14          © 2004, The Compliance Source, Inc.

(O)   "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(P)   "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(Q)   "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

County               of               SARASOTA
        [Type of Recording Jurisdiction]        [Name of Recording Jurisdiction]
which has a legal description of:
ATTACH

which currently has the address of           4814 ALMANZA AVENUE
                                                    [Street]
        SARASOTA              ,  Florida     34235
                    [City]                   [Zip Code]
                      ("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:
·  1.   Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges. Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

LOAN NUMBER: 4482447
Florida Mortgage-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          MERS Modified Form 3010 01/01
—THE COMPLIANCE SOURCE, INC.—                          Page 3 of 14                          14301FL 08/00
www.compliancesource.com                                                    © 2004, The Compliance Source, Inc.



Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2.   Application of Payments or Proceeds. Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3.   Funds for Escrow Items. Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under

LOAN NUMBER:  4482447
Florida Mortgage-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
—THE COMPLIANCE SOURCE, INC.—                                                  Page 4 of 14
www.compliancesource.com

MERS Modified Form 3010 01/01
14001FL 02/04
©2003, The Compliance Source, Inc.



RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. Property Insurance. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater

LOAN NUMBER: 4482447

Florida Mortgage-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

—THE COMPLIANCE SOURCE, INC.—
www.compliancesource.com

Page 3 of 14

MERS Modified Form 3010 01/01

1400FL 1/94
© 2004, The Compliance Source, Inc.



or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

LOAN NUMBER: 4482447

Florida Mortgage-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
—THE COMPLIANCE SOURCE, INC.—
www.compliancesource.com

Page 6 of 14

MERS Modified Form 3010 01/01

1401FL 11/04
© 2004, The Compliance Source, Inc.



Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8.   Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9.   Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10.   Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

**LOAN NUMBER:  4482447**
Florida Mortgage-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT            MERS Modified Form 3010 01/01
—THE COMPLIANCE SOURCE, INC.—                                    Page 7 of 14                                    14301FL 11/01
www.compliancesource.com                                                                         ©2004, The Compliance Source, Inc.



Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has — if any — with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

LOAN NUMBER: 4482447

Florida Mortgage-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                     MERS Modified Form 3010 01/01
—THE COMPLIANCE SOURCE, INC.—                     Page 8 of 14                     143631T, 12/04
www.compliancesource.com                     ©2004, The Compliance Source, Inc.



If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12.  **Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13.  **Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14.  **Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's

LOAN NUMBER: 4462447

Florida Mortgage-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          MERS Modified Form 3010 01/01
—THE COMPLIANCE SOURCE, INC.—          Page 9 of 14          14301FL 11/04
www.compliancesource.com          © 1994, The Compliance Source, Inc.



acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more

LOAN NUMBER: 4482447

Florida Mortgage-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
—THE COMPLIANCE SOURCE, INC.—
www.compliancesource.com

Page 10 of 14

MERS Modified Form 3010 01/01
14301FL 10/04
©2004, The Compliance Source, Inc.



of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. Sale of Note; Change of Loan Servicer; Notice of Grievance. The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. Hazardous Substances. As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.



LOAN NUMBER: 4482447
Florida Mortgage-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                    MERS Modified Form 3010 01/01
—The COMPLIANCE SOURCE, INC.—                                                                 14301FL  11/01
www.compliancesource.com                    Page 11 of 14                             ©2004, The Compliance Source, Inc.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. **Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

23. **Release.** Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. **Attorneys' Fees.** As used in this Security Instrument and the Note, attorneys' fees shall include those awarded by an appellate court and any attorneys' fees incurred in a bankruptcy proceeding.

25. **Jury Trial Waiver.** The Borrower hereby waives any right to a trial by jury in any action, proceeding, claim, or counterclaim, whether in contract or tort, at law or in equity, arising out of or in any way related to this Security Instrument or the Note.

**LOAN NUMBER: 4482447**
Florida Mortgage-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
—THE COMPLIANCE SOURCE, INC.—
www.compliancesource.com
Page 13 of 14

MERS Modified Form 3010 01/01
14301FL 11/00
© 2004, The Compliance Source, Inc.



BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Signed, sealed and delivered in the presence of:

Witnesses:

_Laurie Seesholtz_ (signature)

_Stanley D Cannon_ (signature)    (Seal)
    STANLEY D CANNON    -Borrower
                    [Printed, Typewritten, or Stamped Name]

_Laurie Seesholtz_
Printed, Typewritten, or Stamped Name:

Post-Office Address:  2436 PFEIFFER CIR, SARASOTA, FL 34235

_Chris Seesholtz_ (signature)

_Patricia R Cannon_ (signature)    (Seal)
    PATRICIA R CANNON    -Borrower
                    [Printed, Typewritten, or Stamped Name]

_Chris Seesholtz_
Printed, Typewritten, or Stamped Name:

Post-Office Address:  2430 PFEIFFER CIR, SARASOTA, FL 34235

_____ (Seal)
                   -Borrower
           [Printed, Typewritten, or Stamped Name]

Post-Office Address:

_____ (Seal)
                   -Borrower
           [Printed, Typewritten, or Stamped Name]

Post-Office Address:

LOAN NUMBER:  4482447
Florida Mortgage-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
—THE COMPLIANCE SOURCE, INC.—
www.compliancesource.com
Page 13 of 14

MERS Modified Form 3010 01/01
14601FL 10/04
© 2004, The Compliance Source, Inc.



State of **Florida**

County of **Sarasota**

The foregoing instrument was acknowledged before me this [date] by STANLEY D CANNON and PATRICIA R CANNON

### Husband and Wife

[name of person acknowledging],

who is personally known to me or who has produced [type of identification] as identification.

**Fla DIC**

_Laureen Ann Seesholtz_
Signature of Person Taking Acknowledgment

**Laureen Ann Seesholtz**
Name Typed, Printed or Stamped

**Notary Public**
Title or Rank

**DD 206674**
Serial Number, if any

LAUREEN ANN SEESHOLTZ
MY COMMISSION # DD 206674
EXPIRES: August 25, 2007
Bonded Thru Notary Public Underwriters

LOAN NUMBER: 4492447
Florida Mortgage-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
—THE COMPLIANCE SOURCE, INC.—
www.compliancesource.com
Page 14 of 14

MERS Modified Form 3010 01/01
14301FL 11/04
©2004 The Compliance Source, Inc.



# 1-4 FAMILY RIDER
## (Assignment of Rents)

THIS 1-4 FAMILY RIDER is made this **9th** day of **September, 2005**, and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Note to **AMERISAVE MORTGAGE CORPORATION**

(the "Lender")

of the same date and covering the Property described in the Security Instrument and located at:

**4814 ALMARIA AVENUE, SARASOTA, FL 34235**

*[Property Address]*

**1-4 FAMILY COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A. ADDITIONAL PROPERTY SUBJECT TO THE SECURITY INSTRUMENT.** In addition to the Property described in Security Instrument, the following items now or hereafter attached to the Property to the extent they are fixtures are added to the Property description, and shall also constitute the Property covered by the Security Instrument: building materials, appliances and goods of every nature whatsoever now or hereafter located in, on, or used, or intended to be used in connection with the Property, including, but not limited to, those for the purposes of supplying or distributing heating, cooling, electricity, gas, water, air and light, fire prevention and extinguishing apparatus, security and access control apparatus, plumbing, bath tubs, water heaters, water closets, sinks, ranges, stoves, refrigerators, dishwashers, disposals, washers, dryers, awnings, storm windows, storm doors, screens, blinds, shades, curtains and curtain rods, attached mirrors, cabinets, paneling and attached floor coverings, all of which, including replacements and additions thereto, shall be deemed to be and remain a part of the Property covered by the Security Instrument. All of the foregoing together with the Property described in the Security Instrument (or the leasehold estate if the Security Instrument is on a leasehold) are referred to in this 1-4 Family Rider and the Security Instrument as the "Property."

**B. USE OF PROPERTY; COMPLIANCE WITH LAW.** Borrower shall not seek, agree to or make a change in the use of the Property or its zoning classification, unless Lender has agreed in writing to the change. Borrower shall comply with all laws, ordinances, regulations and requirements of any governmental body applicable to the Property.

**C. SUBORDINATE LIENS.** Except as permitted by federal law, Borrower shall not allow any lien inferior to the Security Instrument to be perfected against the Property without Lender's prior written permission.

**D. RENT LOSS INSURANCE.** Borrower shall maintain insurance against rent loss in addition to the other hazards for which insurance is required by Section 5.

**E. "BORROWER'S RIGHT TO REINSTATE" DELETED.** Section 19 is deleted.

**LOAN NUMBER: 4482447**                    **MIN: 100162500044824473**

Multistate 1-4 Family Rider—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT        Form 3170  01/01
—THE COMPLIANCE SOURCE, INC.—                           Page 1 of 3          14850MU 08/00 Rev. 10/04
www.compliancesource.com                                                    ©2004, The Compliance Source, Inc.

**F. BORROWER'S OCCUPANCY.** Unless Lender and Borrower otherwise agree in writing, Section 6 concerning Borrower's occupancy of the Property is deleted.

**G. ASSIGNMENT OF LEASES.** Upon Lender's request after default, Borrower shall assign to Lender all leases of the Property and all security deposits made in connection with leases of the Property. Upon the assignment, Lender shall have the right to modify, extend or terminate the existing leases and to execute new leases, in Lender's sole discretion. As used in this paragraph G, the word "lease" shall mean "sublease" if the Security Instrument is on a leasehold.

**H. ASSIGNMENT OF RENTS; APPOINTMENT OF RECEIVER; LENDER IN POSSESSION.** Borrower absolutely and unconditionally assigns and transfers to Lender all the rents and revenues ("Rents") of the Property, regardless of to whom the Rents of the Property are payable. Borrower authorizes Lender or Lender's agents to collect the Rents, and agrees that each tenant of the Property shall pay the Rents to Lender or Lender's agents. However, Borrower shall receive the Rents until (i) Lender has given Borrower notice of default pursuant to Section 22 of the Security Instrument and (ii) Lender has given notice to the tenant(s) that the Rents are to be paid to Lender or Lender's agent. This assignment of Rents constitutes an absolute assignment and not an assignment for additional security only.

If Lender gives notices of default to Borrower: (i) all Rents received by Borrower shall be held by Borrower as trustee for the benefit of Lender only, to be applied to the sums secured by the Security Instrument; (ii) Lender shall be entitled to collect and receive all of the Rents of the Property; (iii) Borrower agrees that each tenant of the Property shall pay all Rents due and unpaid to Lender or Lender's agents upon Lender's written demand to the tenant; (iv) unless applicable law provides otherwise, all Rents collected by Lender or Lender's agents shall be applied first to the costs of taking control of and managing the Property and collecting the Rents, including, but not limited to, attorneys' fees, receiver's fees, premiums on receiver's bonds, repair and maintenance costs, insurance premiums, taxes, assessments and other charges on the Property, and then to the sums secured by the Security Instrument; (v) Lender, Lender's agents or any judicially appointed receiver shall be liable to account for only those Rents actually received; and (vi) Lender shall be entitled to have a receiver appointed to take possession of and manage the Property and collect the Rents and profits derived from the Property without any showing as to the inadequacy of the Property as security.

If the Rents of the Property are not sufficient to cover the costs of taking control of and managing the Property and of collecting the Rents any funds expended by Lender for such purposes shall become indebtedness of Borrower to Lender secured by the Security Instrument pursuant to Section 9.

Borrower represents and warrants that Borrower has not executed any prior assignment of the Rents and has not performed, and will not perform, any act that would prevent Lender from exercising its rights under this paragraph.

Lender, or Lender's agents or a judicially appointed receiver, shall not be required to enter upon, take control of or maintain the Property before or after giving notice of default to Borrower. However, Lender, or Lender's agents or a judicially appointed receiver, may do so at any time when a default occurs. Any application of Rents shall not cure or waive any default or invalidate any other right or remedy of Lender. This assignment of Rents of the Property shall terminate when all the sums secured by the Security Instrument are paid in full.

**LOAN NUMBER: 4482447**

Multistate 1-4 Family Rider—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
—THE COMPLIANCE SOURCE, INC.—
www.compliancesource.com

Page 2 of 3

Form 3170 01/01
14503MU 08/00 Rev. 11/04
©2004, The Compliance Source, Inc.



STATE OF: *Florida*
COUNTY: *Sarasota*

On <u>9/9/05</u>, before me, <u>Laureen Ann Sasholtz</u>
Personally appeared <u>Stanley D. Cannon and Patricia R.</u>
<u>Cannon</u> _____ personally known to me (or provided
to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are
subscribed to the within instrument and acknowledge to me that he/she/they executed the
same in his/her/their authorized capacity(ies); and that by his/her/their signature(s) on the
instrument the person(s) or the entity upon behalf of which the person(s) acted, executed
the instrument.

Witness my hand and official seal..

Signature <u>Laureen Ann Sasholtz</u>

Affix Stamp of Seal Here

Title of Document: Deed of Trust/Mortgage
Date of Document: _____     No. of Pages _____
Other signatures not acknowledged _____

I.   **CROSS-DEFAULT PROVISION.** Borrower's default or breach under any note or agreement in which Lender has an interest shall be a breach under the Security Instrument and Lender may invoke any of the remedies permitted by the Security Instrument.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this 1-4 Family Rider.

_____ (Seal)          _____ (Seal)
STANLEY D CANNON         -Borrower          PATRICIA R CANNON         -Borrower

_____ (Seal)          _____ (Seal)
                         -Borrower                                   -Borrower

[Sign Original Only]

LOAN NUMBER: 4482447
Multistate 1-4 Family Rider—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
—THE COMPLIANCE SOURCE, INC.—
www.compliancesource.com
Page 3 of 3

Form 3170 01/01
14591MU 08/00 Rev. 10/04
©2004, The Compliance Source, Inc.

Form No. 3301 (6/00)
Short Form Commitment, EAGLE
SUPER EAGLE

ORDER NO: 3216458
FILE NO: 25498080
LENDER REF: 151843

## Exhibit "A"

The land referred to in this policy is situated in the STATE OF FLORIDA, COUNTY OF SARASOTA; CITY OF SARASOTA, and described as follows:

BEING LOT NUMBER 418 IN DESOTO LAKES UNIT 7 AS SHOWN IN THE RECORDED PLAT/MAP THEREOF IN BOOK 8 PAGE 121 OF SARASOTA COUNTY RECORDS.

APN # 19140020

EXHIBIT B

Recording Requested By:
WELLS FARGO HOME MORTGAGE,
INC.

**James Fitch, Assessor–Recorder**
**Kern County Official Records**
Recorded at the request of
**Public**

SABRINA
8/06/2003
12:12 PM

**Recording requested by: LSI**
**When recorded return to:**
**Custom Recording Solutions**
**2550 N. Redhill Ave.**
**Santa Ana, CA. 92705**
**800-756-3524 ext. 5011**



D O C # :   **0203161624**

| Stat Types: 1 | Pages:   **16** |
|---|---|
| Fees | 52.00 |
| Taxes | 0.00 |
| Others | 0.00 |
| PAID | $52.00 |

Prepared By:
WELLS FARGO HOME MORTGAGE,
INC.

5024 PARKWAY PLAZA-BLDG 7,,
CHARLOTTE, NC  282170000

————————[Space Above This Line For Recording Data]————————

# DEED OF TRUST

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in
Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are
also provided in Section 16.

**(A) "Security Instrument"** means this document, which is dated **JUNE 30, 2003**
together with all Riders to this document.
**(B) "Borrower"** is **CHERYL BULLOCK, A MARRIED PERSON**

Borrower is the trustor under this Security Instrument.
**(C) "Lender"** is **WELLS FARGO HOME MORTGAGE, INC.**

Lender is a **CORPORATION**
organized and existing under the laws of **THE STATE OF CALIFORNIA**

**0029574886**

CALIFORNIA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3005  1/01



**VMP** -6(CA) (0005)

Page 1 of 15          Initials:_____

VMP MORTGAGE FORMS - (800)521-7291

WF/Cannon 001127

Lender's address is **P.O. BOX 10304, DES MOINES, IA 503060304**

Lender is the beneficiary under this Security Instrument.
**(D) "Trustee"** is **FIDELITY NATIONAL TITLE INS CO**
**17911 VON KARMAN, SUITE 200, IRVINE, CA 92614**
**(E) "Note"** means the promissory note signed by Borrower and dated **JUNE 30, 2003**
The Note states that Borrower owes Lender **SIXTY FOUR THOUSAND THREE HUNDRED THIRTY ONE AND 00/100** Dollars
(U.S. $**\*\*\*\*\*64,331.00** ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than **JULY 01, 2018**
**(F) "Property"** means the property that is described below under the heading "Transfer of Rights in the Property."
**(G) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.
**(H) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

☐ Adjustable Rate Rider   ☐ Condominium Rider          ☐ Second Home Rider
☐ Balloon Rider           ☐ Planned Unit Development Rider ☐ 1-4 Family Rider
☐ VA Rider                ☐ Biweekly Payment Rider     ☐ Other(s) [specify]

**(I) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.
**(J) "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.
**(K) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.
**(L) "Escrow Items"** means those items that are described in Section 3.
**(M) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.
**(N) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.
**(O) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.
**(P) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard

WF/Cannon 001128

C016116  12106GR140

to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(Q) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY
This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the
**COUNTY**                                                of **KERN**                                                :
[Type of Recording Jurisdiction]                    [Name of Recording Jurisdiction]
**See Exhibit A attached hereto**

Parcel ID Number:                                      which currently has the address of
**21661 BANCROFT DR**                                                                    [Street]
**CALIFORNIA CITY**                              [City], California **93505**          [Zip Code]
("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S.

Initials

WF/Cannon 001129
C016116  12106GR140

currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be

WF/Cannon 001130

C016116  12106GR140

in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4.  Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the

Initials:

WF/Cannon 001131

C016116  12I06GR140

lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with



WF/Cannon 001132
C016116  12106GR140

the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable


Initials:

WF/Cannon 001133

C016116  12106GR140

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

WF/Cannon 001134

C016116  12106GR140

**(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.**

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender

WF/Cannon 001135

C018116  12106GR140

to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

Initials: _CB_



WF/Cannon 001136

C016116  12106GR140

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA

WF/Cannon 001137
C016116  12106GR140

requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.



Initials: _CB_

-6(CA) (0005)

Page 12 of 15

Form 3005   1/01

WF/Cannon 001138

C016116  12106GR140

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. **Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

**If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.**

**Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.**

23. **Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

24. **Substitute Trustee.** Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

25. **Statement of Obligation Fee.** Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

Initials: _CB_

WF/Cannon 001139

C016116  12106GR140

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____

*Cheryl Bullock* _____ (Seal)
CHERYL BULLOCK                     -Borrower

_____

_____ (Seal)
                                  -Borrower

_____ (Seal)        _____ (Seal)
              -Borrower                          -Borrower

_____ (Seal)        _____ (Seal)
              -Borrower                          -Borrower

_____ (Seal)        *Richard R Bullock* _____ (Seal)
              -Borrower           RICHARD R BULLOCK          -Borrower
                                 non-vested spouse
                                 orrquired to sign

WF/Cannon 001140
C016116  12106GR140

State of California
County of Kern

On 6/25/03 before me, _the undersigned_ } ss.

personally appeared

CHERYL BULLOCK/RICHARD R BULLOCK

, personally known to me
,(or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed
to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their
authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s) or the entity
upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

_____ (Seal)

V MYERS

**V. MYERS**
COMM. #1398485
NOTARY PUBLIC • CALIFORNIA
KERN COUNTY
My Comm. Exp. Mar 3, 2007

-6(CA) (0005)                Page 15 of 15        Initials:_____        **Form 3005   1/01**



WF/Cannon 001142

# Exhibit "A"

Loan Number : 3250324076_801_D6D          Borrower : CHERYL A BULLOCK And

THE REAL PROPERTY IN THE CITY OF CALIFORNIA CITY, COUNTY OF KERN, STATE OF CALIFORNIA, DESCRIBED AS:

LOT 312 OF TRACT 2262, IN THE CITY OF CALIFORNIA, COUNTY OF KERN, STATE OF CALIFORNIA, AS PER MAP RECORDED JULY 21, 1960 IN BOOK 11, PAGES 105 THROUGH 108, INCLUSIVE OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

EXCEPTING THEREFROM ALL OIL, GAS, MINERALS AND OTHER HYDROCARBON SUBSTANCES BELOW A DEPTH OF 500 FEET, WITHOUT RIGHTS OF SURFACE ENTRY, AS RESERVED IN INSTRUMENTS OF RECORD.

APN: 212-070-17

WF/Cannon 001143