**United States District Court**
For the Northern District of California

1

2

3

4

5                     UNITED STATES DISTRICT COURT

6                    NORTHERN DISTRICT OF CALIFORNIA

7

8   STANLEY D. CANNON, *et al.*,              No. C-12-1376 EMC

9              Plaintiffs,

10        v.                                   **ORDER GRANTING IN PART AND
                                               DENYING IN PART DEFENDANTS'
11   WELLS FARGO BANK. N.A., *et al.*,         MOTION TO DISMISS THIRD
                                               AMENDED COMPLAINT**

12             Defendants.                     **(Docket Nos. 146, 148)**
   _____/

13

14

15        Plaintiffs Stanley D. Cannon, Patricia R. Cannon, and Cheryl Bullock ("Plaintiffs") have

16   filed a third amended class-action complaint ("TAC") against Wells Fargo Bank, N.A. ("Wells

17   Fargo"), Wells Fargo Insurance, Inc. ("WFI"), and American Security Insurance Company ("ASIC")

18   (collectively, "Defendants").  Plaintiffs allege that kickbacks from ASIC to Wells Fargo and WFI,

19   and "tracking charges" were improperly included in "force-placed" insurance premiums that

20   Plaintiffs paid.

21        Currently pending before the Court are Wells Fargo and WFI's motion to dismiss pursuant to

22   Federal Rules of Civil Procedure 12(b)(6) and ASIC's motion to dismiss pursuant to 12(b)(6) and

23   12(b)(1) for lack of standing.  The Court **GRANTS IN PART** and **DENIES IN PART** the motions

24   for the reasons set forth below.

25                I.   **FACTUAL AND PROCEDURAL BACKGROUND**

26        Wells Fargo is the loan servicer for Plaintiffs' home loans.  TAC ¶¶ 25, 26.  The loans are

27   secured by the homes.  Under their mortgage contracts, Plaintiffs are required to maintain acceptable

28   flood and hazard insurance on their homes, to protect the lenders' security interests in the properties.

TAC ¶¶ 32, 57.  When borrowers do not maintain the required insurance, Wells Fargo, on behalf of the lenders,  purchases the required insurance, and charges the borrowers the premiums.  *Id*.  This is what Plaintiffs call "force-placed insurance" and what Defendants call "lender-placed insurance."  Plaintiffs acknowledge that this is "standard and appropriate."  TAC ¶ 3.

Patricia R. Cannon is a resident of Florida.[1]  TAC ¶ 18.  The Cannons were charged annual premiums for force-placed flood insurance in 2006, 2008, and 2011, and force-placed hazard insurance in 2011 and 2012.  TAC ¶¶ 42, 43, 49, 52.  Cheryl Bullock is a resident of California.  She was charged annual premiums for force-placed flood insurance in 2009 and 2011.  TAC ¶ 59.  These premiums were sometimes added to Plaintiffs' mortgage escrow accounts, which Wells Fargo maintained.  TAC ¶¶ 44, 49, 64.

Plaintiffs allege that these premiums included unlawful charges for "kickbacks" and "tracking."  Plaintiffs allege that Defendants entered into a "secret agreement" whereby Wells Fargo would purchase force-placed insurance exclusively from ASIC, and in return, ASIC would pay a "kickback" of 10%-20% of every forced-placed insurance premium to Wells Fargo or WFI.  TAC ¶¶ 5, 6, 14.  WFI purportedly assisted in obtaining the insurance, and "commissions" for the assistance were included in the premiums, despite this agreement already being in place.  TAC ¶ 179.  Plaintiffs allege that ASIC was able to charge two to ten times the market rate for the insurance because Wells Fargo provided them with a captive market.  TAC ¶ 7.  Plaintiffs allege that Wells Fargo purchased "the most expensive" insurance policies to increase the amount of each kickback, increased its insurance requirements to increase the number and amount of kickbacks, and backdated insurance to increase the number of kickbacks.  TAC ¶ 12.  The premiums also included "tracking charges," for tracking insurance coverage on borrowers' properties, sending notices related to insurance coverage to borrowers, and force placing insurance on borrowers' properties, services which ASIC provided to Wells Fargo.  TAC ¶ 8.

---

[1] Stanley D. Cannon passed away subsequent to filing of this action.  TAC ¶ 18.

**United States District Court**
For the Northern District of California

1   Prior to the TAC, Wells Fargo was the only defendant.  The TAC adds two new causes of

2   action against Wells Fargo, for violations of the Racketeer Influenced and Corrupt Organizations

3   Act ("RICO"), 18 U.S.C. § 1961 *et seq.*, sections 1962(c) and (d).  The TAC adds WFI and ASIC as

4   defendants, and allege three causes of action against them: violations of RICO sections 1962(c) and

5   (d), and aiding and abetting breach of fiduciary duty.

6   Wells Fargo and WFI move to dismiss the RICO claims and ASIC moves to dismiss all the

7   claims against it.

8                                 **II.   DISCUSSION**

9   A.   RICO Claims

10   Plaintiffs allege against Defendants violations of RICO sections 1962(c) and 1962(d),

11   predicated on mail and wire fraud.  Section 1962(c) provides:

12   It shall be unlawful for any person employed by or associated with any
     enterprise engaged in, or the activities of which affect, interstate or
13   foreign commerce, to conduct or participate, directly or indirectly, in
     the conduct of such enterprise's affairs through a pattern of
14   racketeering activity or collection of unlawful debt.

15   18 U.S.C. § 1962(c).  Section 1962(d) provides:

16   It shall be unlawful for any person to conspire to violate any of the
     provisions of subsection (a), (b), or (c) of this section.
17

18   18 U.S.C. § 1962(d).  To state a violation of RICO Section 1962(c), a plaintiff must allege "(1)

19   conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity (known as 'predicate

20   acts') (5) causing injury to the 'plaintiff's business or property.'"  *Grimmett v. Brown*, 75 F.3d 506

21   (9th Cir. 1996) (quoting 18 U.S.C. §§ 1962(c), 1964(c) and *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S.

22   479, 496 (1985)).  Mail and wire fraud constitute "racketeering activity."  *See* 18 U.S.C. § 1961.

23        1.   Racketeering Activity: Mail Fraud

24   Wells Fargo and ASIC sent notices to Plaintiffs, which warned that if Wells Fargo and ASIC

25   purchased insurance coverage, "it *will be obtained with the assistance* of Wells Fargo Insurance,

26   Inc." and that Wells Fargo Insurance "will receive a *commission* on the insurance we obtain."  TAC

27   ¶ 179 (emphasis in original).

28

3

**United States District Court**
For the Northern District of California

1    On the other hand, the notices informed Plaintiffs that they had a right to purchase their own

2 insurance and that the force-placed insurance will in nearly all instances be "far more expensive"

3 than policies Plaintiffs could obtain on their own, and stated, "We strongly recommend that you

4 obtain your own insurance."  Wells Fargo's Mot. at 3.

5    Plaintiffs have plausibly alleged the elements of mail fraud.  First, Plaintiffs have alleged a

6 scheme to defraud.  Defendants' representations lead one to believe that WFI would receive a

7 commission for assisting in obtaining the insurance.  However, there was nothing for WFI to assist

8 and no "commission" to be had, since there was already in place a master insurance policy.  *Id*.  The

9 notices attempt to justify the high premium, at least in part, with the representation that

10 "commissions" for insurance agents' work is included in the premium.  As the Financial Fraud &

11 Consumer Protection Division of the New York State Department of Financial Services has found:

12          Some lenders and/or mortgage servicers have affiliated insurance
            agencies or brokers that receive commissions from force-placed
13          insurers for services the agencies or brokers purportedly provide. To
            the extent those agencies or brokers provide any services, most of
14          those services are not the ones that insurance agencies or brokers
            typically provide.

15

16 Consent Order, Plaintiffs' RJN Exh. A (Docket No. 157).  In short, the representation that a

17 "commission" would be paid implies services were performed therefor; Plaintiffs allege no such

18 services were performed and hence the "commissions" were not bona fide but simply a cover for

19 kickbacks.

20    Similarly, Defendants' non-disclosure of the kickbacks may be a basis for the scheme to

21 defraud.  The Court previously found that Plaintiffs had plausibly alleged that Wells Fargo received

22 a greater economic benefit than from a typical transaction, which may impose a fiduciary duty on

23 Wells Fargo.  Docket No. 94 at 37.

24    The Court cannot say as a matter of law that the misrepresentation and omission were

25 immaterial.  Plaintiffs allege that the omission was material because it "would have influenced

26 [Plaintiffs'] decision whether to pay the premium or contest them."  TAC ¶¶ 174, 178.  A borrower

27 who is told that the high premium includes a kickback to Wells Fargo may be unwilling to pay for

28 force-placed insurance that he otherwise might, especially if he believed the premiums were high

United States District Court

For the Northern District of California

1  partly due to bona fide earned "commissions."

2      Second, it is not disputed that Plaintiffs used mail in furtherance of the scheme; Defendants

3  mailed Plaintiffs the notices and letters regarding force-placed insurance.

4      Third, Plaintiffs have plausibly alleged specific intent to defraud.  It is plausible that

5  Defendants intended Plaintiffs to believe that the "commissions" were payment to WFI for its

6  services in assisting with obtaining insurance.  It is plausible that they chose not to disclose that the

7  commissions were "kickbacks" because, otherwise, more borrowers, including Plaintiffs, would

8  contest them, and fewer borrowers would pay for force-placed insurance.  For this reason, the Court

9  disagrees with the court in *Gustafson v. BAC Home Loans Servicing, LP*, 2012 WL 7051318 at *6

10  (C.D. Cal. Dec. 20, 2012), which found as a matter of law that disclosures similar to those here

11  "precludes a finding that these 'omissions' were reasonably calculated to deceive" borrowers.

12  Under similar circumstances, at least one court has found that predicate mail fraud was plausibly

13  alleged.  *See Rothstein* , 2013 WL 5437648 at *12 (S.D.N.Y. Sep. 30, 2013).

14      2.    Remaining RICO Elements

15      Plaintiffs have alleged that they were injured "by reason of" the defendant's wrongful

16  conduct.  18 U.S.C. § 1964(c).  When the predicate act is mail fraud, there must be a showing that

17  the mail fraud was a but for and proximate cause of the injury.  *See Bridge v. Phoenix Bond &*

18  *Indem. Co.*, 553 U.S. 639, 654 (2008).  As discussed above, it is plausible that Plaintiffs would not

19  have paid, or would have contested, the premiums for the force-placed insurance, if Defendants had

20  disclosed that the premiums included unearned kickbacks rather than earned commissions.

21      Plaintiffs have alleged a RICO enterprise.  An enterprise is "any union or group of

22  individuals" "associated together for a common purpose of engaging in a course of conduct." *United*

23  *States v. Turkette*, 452 U.S. 576, 580, 583 (1981).  An enterprise "is proved by evidence of an

24  ongoing organization, formal or informal, and by evidence that the various associates function as a

25  continuing unit."  *Id*. at 583.  ASIC allegedly agreed with Wells Fargo and WFI to pay them

26  kickbacks in exchange for purchasing force-placed insurance exclusively from ASIC, the premiums

27  of which were twice to ten times market rates.  TAC ¶¶ 4-7.  The common purpose was to "increase

28  and maximize revenues of Wells Fargo and ASIC by forcing Plaintiffs and members of the Classes

United States District Court

For the Northern District of California

to pay artificially inflated premiums for flood and hazard insurance through a scheme that manipulated the premiums to cover kickbacks and expenses associated with monitoring Wells Fargo's entire loan portfolio." TAC ¶ 166. The ongoing agreements show that the Defendants functioned as a "continuing unit." This suffices to allege a RICO enterprise.

Thus, Plaintiffs have stated a claim under RICO Section 1962(c), subject to the statute of limitations, as discussed below. Plaintiffs have also stated a claim under Section 1962(d) for conspiracy, also subject to the statute of limitations, since Defendants allegedly agreed to the scheme to defraud with specific intent.

3.    RICO Statute of Limitations

ASIC asserts that Plaintiffs' RICO claims are barred by the statute of limitations. The statute of limitations for a civil RICO claim is four years. *Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143, 156 (1987). Given that RICO requires a "pattern" of racketeering, earlier acts of racketeering may fall outside the four-year period. Under the "separate accrual rule," a new cause of action accrues, when "new overt acts occur." *Id*. at 512 (quoting *State Farm Mut. Auto. Ins. Co. v. Ammann*, 828 F.2d 4, 5 (9th Cir. 1987)).

Plaintiffs conceded in their opposition brief and during the hearing that charges for force-placed insurance made outside the statute of limitations are time barred. On the other hand, the charges made within the statute of limitations are actionable under the separate accrual rule. *Cf. Hennegan v. Pacifico Creative Service, Inc*., 787 F.2d 1299, 1301-02 (9th Cir. 1986) (where a souvenir store owner alleged that the defendant tour company conspired with other souvenir shops to "shepherd" tourists only to these shops, a new cause of action accrued each time this happened).

Thus, the Court dismisses with prejudice Plaintiffs' RICO causes of action to the extent they pertain to force-placed insurance premiums that were charged to Plaintiffs outside the four-year statute of limitations. For ASIC, the four-year period ends with the filing of the third-amended complaint; for Wells Fargo, the four-year period ends with the filing of the initial complaint. The Court otherwise denies Defendants' motions to dismiss the RICO claims.

B.    Filed Rate Doctrine

ASIC moves to dismiss all Plaintiffs' causes of action against it pursuant to Federal Rules of

United States District Court

For the Northern District of California

1  Civil Procedure 12(b)(1) for lack of standing.  ASIC asserts that the filed rate doctrine precludes

2  Plaintiffs from stating an injury.  ASIC has filed its rates with the appropriate agencies in every state

3  in which its policies are issued, including Florida and California.  ASIC Mot. at 10. ASIC argues

4  that, since the rates were approved, no legal right of Plaintiffs could have been violated.

5      The filed rate doctrine holds that "any 'filed rate' – that is, one approved by the governing

6  regulatory agency – is per se reasonable and unassailable in judicial proceedings brought by

7  ratepayers." *Wegoland Ltd. v. NYNEX Corp.*, 27 F.3d 17, 18 (2d Cir. 1994).  The rationale is

8  twofold: (1) courts are not "institutionally well suited" to determine the reasonableness of rates, and

9  (2) allowing individual ratepayers to attack the filed rate "would lead to discrimination in rates in

10  that a victorious plaintiff would end up paying less than similarly situated non-suing customers" and

11  "'would undermine the congressional scheme of uniform rate regulation.'"  *Id.* at 19 (citing *Keogh v.*

12  *Chicago & Northwestern Railway Co.*, 260 U.S. 156, 162-63 (1922) and quoting *Arkansas*

13  *Louisiana Gas Co. v. Hall*, 453 U.S. 571, 572 (1981)).

14      In a previous order, the Court rejected a similar argument made by Wells Fargo.  The Court

15  found persuasive the reasoning of *Kunzelmann v. Wells Fargo, N.A.*, 2012 WL 2003337 (S.D. Fla.

16  June 4, 2012) that Plaintiffs were "not challenging the rates as excessive, but rather the manipulation

17  of the rates."  Docket No. 94 at 14.

18      ASIC points out that the *Kunzelmann* court subsequently indicated that the filed rate doctrine

19  may in fact apply, after learning that the approved rates covered kickbacks and administrative costs

20  similar to those here.  *See Kunzelmann v. Wells Fargo Bank, N.A.*, 2013 WL 139913 at *11-12 (S.D.

21  Fla. Jan. 10, 2013).  ASIC further asserts that the alleged kickbacks (or commissions) and the

22  tracking charges at issue here were approved by the regulatory agencies as components of its rate

23  structure.  In other words, not only do the approved rates include kickbacks and tracking charges,

24  these specific components were purportedly approved by regulatory agencies.

25      ASIC relies on two decisions, one by the San Diego County Superior Court (RJN Docket No.

26  164-1) and a related decision by the Insurance Commissioner of California (RJN Docket No. 49-1).

27  As here, the lender in that case, Norwest (later part of Wells Fargo), had purchased force-placed

28  insurance from ASIC and passed on the premiums to the borrowers, which included "commissions"

**United States District Court**
For the Northern District of California

to an "insurance agent affiliated with Norwest" and "tracking expenses." The borrowers asserted that it was improper for the lenders to charge them for the commissions and tracking expenses. The Superior Court concluded that the charges would be proper if they were components of the approved insurance rate, and that the components of an insurance rate was a question for the California Department of Insurance.

The California Insurance Commissioner responded that ASIC's "commissions and tracking expenses are appropriate components of an insurance rate." Docket No. 149-1 at 2. However, the Commissioner's finding pertained only to the insured, Norwest. *Id*. at 6 n. 3. The Commissioner's decision does not support ASIC's contention that these are approved components of ASIC's insurance rate, vis-à-vis the borrower. The Commissioner expressly noted that he lacked jurisdiction to consider whether it was proper for Wells Fargo to pass the commissions and tracking expenses onto the borrower. *Id*.

Further, in approving "commissions" vis-à-vis the insured, the Commissioner explained: "Commissions have traditionally been recognized as an appropriate component of insurance rate making, so long as the overall rate does not exceed the maximum or minimum permitted earned premium under the regulations." *Id* . at 8. The Commissioner cited California Code of Regulations, Title 10, Sections 2644.2 and 2644.14. Section 2644.2 provides a mathematical formula to calculate the "maximum permitted earned premium," based on the quantitative data insurers provide. Section 2644.14 defines one of the terms used in such calculations that incorporates the "commission rate." These regulations demonstrate that the Commissioner's inquiry was limited in scope to determine whether the overall rate exceeded the permitted earned premiums; that determination is different from what is at issue here – whether the lender committed fraud on the borrower by mischaracterizing the nature of the charges.

Several courts have declined to apply the filed rate doctrine on motions to dismiss, on this ground. *See Gallo v. PHH Mortg. Corp*., 916 F. Supp. 2d 537, 546 (D.N.J. 2012) ("Defendant, the party bearing the burden to show dismissal is warranted under this doctrine, has not presented any authority to demonstrate that such pre-arranged side agreements are similarly filed with, approved by, or regulated and monitored in some way by a governing regulatory agency, such as the

**United States District Court**
For the Northern District of California

1   Department of Insurance, much like the filed rates for hazard insurance policies themselves.");

2   *Rothstein v. GMAC Mortgage, LLC*, 2013 WL 5437648 at *8 (S.D.N.Y. Sept. 30, 2013) ("Drawing

3   all reasonable inferences in the light most favorable to Plaintiffs, . . . the filed and approved rates

4   were not meant to be directly applicable to individual residential mortgage loan borrowers."). This

5   fact is underscored by the fact that the Commissioner in the Norwest matter expressly noted he

6   lacked jurisdiction over the question whether the lender wronged the borrower.

7        ASIC refutes the distinction between rates as applied to lender and borrower with *Wah*

8   *Chang v. Duke Energy Trading and Marketing, LLC*, 507 F.3d 1222 (9th Cir. 2007). There, Wah

9   Chang, a retail customer, purchased electricity from a company that in turn purchased electricity on

10  the wholesale market from energy companies. Wah Chang sued the energy companies for artificially

11  increasing wholesale prices through "anticompetitive and fraudulent manipulation of the wholesale

12  markets." *Id.* at 1224. The wholesale prices were a result of rates filed and approved with the

13  Federal Energy Regulatory Commission. The Ninth Circuit held that the filed rate doctrine barred

14  Wah Chang's claim because the rates were approved, notwithstanding that Wah Chang did not

15  directly purchase wholesale electricity.

16       *Wah Chang* is not on point; the core of the wrong in *Wah Chang* was the excessive rate.

17  Although that rate was allegedly caused by anti-competitive manipulation, the Regulatory

18  Commission approved that rate. Here, the gravamen of the complaint is not the premium rate per se,

19  but the failure to disclose the fraudulent nature of the alleged commission charged to borrowers by

20  Wells Fargo.

21       In view of the limited scope of the Insurance Commissioner's determination, the Court

22  declines to apply the filed rate doctrine.

23  C.   The McCarran-Ferguson Act

24       ASIC asserts that the Cannons' RICO claims are "reverse-preempted" by the McCarran-

25  Ferguson Act, 15 U.S.C. § 1011 *et seq*. The McCarran Ferguson Act states in relevant part:

26           No Act of Congress shall be construed to invalidate, impair, or
             supersede any law enacted by any State for the purpose of regulating
27           the business of insurance, or which imposes a fee or tax upon such
             business, unless such Act specifically relates to the business of
28           insurance[.]

9

United States District Court

For the Northern District of California

15 U.S.C. § 1012(b).  In other words, the McCarran-Ferguson Act bars the application of federal law if (1) the federal statute at issue does not specifically relate to the business of insurance; (2) the state statute at issue was enacted for the purpose of regulating the business of insurance; and (3) application of the federal statute would invalidate, impair, or supersede the state statute.  *Moore v. Liberty Nat. Life Ins. Co.*, 267 F.3d 1209, 1220 (11th Cir. 2001) (quoting *Humana Inc. v. Forsyth*, 525 U.S. 299, 307 (1999)) (internal quotation marks omitted)).  The Supreme Court has construed the meaning of "impair" in Section 1012(b):

> When federal law does not directly conflict with state regulation, and when application of the federal law would not frustrate any declared state policy or interfere with a State's administrative regime, the McCarran-Ferguson Act does not preclude its application.

*Humana*, 525 U.S. at 310.

In *Humana*, the Supreme Court held that permitting the plaintiffs' RICO claim, which alleged fraudulent misrepresentation against insurers, did not "impair" Nevada law.  Applying the formulation above, the Court held that RICO and Nevada's laws governing insurance did not "directly conflict" because the acts the plaintiffs identified as unlawful under RICO were also unlawful under Nevada law.  *Id.* at 308.  The Court held on the following grounds that RICO would not "frustrate any state policy":

(i)     RICO advanced Nevada's interest in combating insurance fraud;

(ii)    Like RICO, the Nevada Unfair Insurance Practices Act ("NUIPA") authorized private causes of action, including for fraudulent misrepresentations;

(iii)   NUIPA did not exclude application of other state laws, statutory or decisional; and

(iv)    Nevada's punitive damages statute could have allowed damages exceeding the treble damages available under RICO.

*See id.* at 312-13.  Courts often refer to these as the "*Humana* factors."

Here, as in *Humana*, the issue is whether RICO's application would "impair" Florida's law. The other requirements are not at issue: RICO does not specifically relate to the business of insurance; Florida's Unfair Insurance Trade Practices Act ("FUITPA"), Fla. Stat. § 626.951 *et seq*., was enacted to regulate the business of insurance; and "RICO's application in this action would

United States District Court

For the Northern District of California

1    neither 'invalidate' – *i.e.*, render ineffective without providing a replacement rule – nor 'supersede'

2    – *i.e.*, displace while providing a substitute rule – [Florida's] insurance laws." *Humana*, 525 U.S. at

3    300.

4         Application of RICO would not "impair" FUITPA:  RICO and Florida's insurance laws do

5    not "directly conflict" because the alleged fraudulent conduct may be unlawful under Florida law,

6    which prohibits making a "statement with respect to the business of insurance, which is untrue,

7    deceptive, or misleading," and giving something of value as inducement for an insurance contract,

8    which is not stated in the contract.  *See* Fla. Stat. § 626.9541(1)(b), (e), (h)(1).

9         However, whether application of RICO would "frustrate any state policy" is a closer

10   question than in *Humana*, because there is no private right of action for the alleged conduct.

11   Florida's insurance laws permits private causes of action for certain violations of FUITPA, but not

12   others, including the conduct alleged herein.  *See* Fla. Stat. § 624.155.  Permitting private redress

13   through RICO would, to a certain extent, frustrate the state's policy of public redress.

14        Where there is no private right of action, Circuit courts have reached different conclusions

15   under *Humana*.  The Sixth and Eighth Circuits have found reverse preemption.  *See Riverview*

16   *Health Inst. LLC v. Med. Mut. of Ohio*, 601 F.3d 505, 517 (6th Cir. 2010); *LaBarre v. Credit*

17   *Acceptance Corp.*, 175 F.3d 640, 643 (8th Cir.1999) (citing *Doe v. Norwest Bank Minnesota, N.A.*,

18   107 F.3d 1297, 1306 (8th Cir. 1997)).  The Third, Fourth, and Tenth Circuits found not.  *See Weiss*

19   *v. First Unum Life Ins. Co.*, 482 F.3d 254, 264-65 (3d Cir. 2007); *Am. Chiropractic Ass'n v. Trigon*

20   *Healthcare, Inc.*, 367 F.3d 212, 232 (4th Cir. 2004); *BancOklahoma Mortg. Corp. v. Capital Title*

21   *Co., Inc.*, 194 F.3d 1089, 1099 (10th Cir. 1999).  In these latter cases, the state's insurance laws

22   expressly permitted application of other state laws to the conduct of insurers.  The Fourth and Tenth

23   Circuits found this decisive as against the absence of a private right of action.

24        Here, the *Humana* factors weigh against finding reverse preemption.  First, while there is no

25   private right of action, Florida insurance law permits application of other state laws: "The civil

26   remedy specified in this section does not preempt any other remedy or cause of action provided for

27   pursuant to any other statute or pursuant to the common law of this state." Fla. Stat. § 624.155(8).

28   In addition, FUITPA provides: "The provisions of this part are *cumulative* to rights under the

1   general civil and common law, and no action of the department, commission, or office shall abrogate

2   such rights to damages or other relief in any court." Fla. Stat. § 626.9631 (emphasis added). In

3   particular, an insured can bring a common-law fraud action against the insurer. *See QBE Ins. Corp.*

4   *v. Chalfonte Condominium Apartment Ass'n, Inc.*, 94 So.3d 541, 548 (Fla. 2012) (citing *Indus. Fire*

5   *& Cas. Ins. Co. v. Romer*, 432 So. 2d 66, 67 (Fla. Dist. Ct. App. 1983)). The availability of a private

6   right of action under other Florida laws neutralizes the tension between public and private redress

7   under Florida's insurance laws. Thus, a RICO claim predicated on mail or wire fraud would not

8   frustrate Florida state policy. Second, RICO advances the purpose of FUITPA to combat unfair

9   insurance trade practices. Finally, Florida permits punitive damages for fraud, *see Hialeah*

10  *Automotive, LLC v. Basulto*, 22 So.3d 586, 590 (Fla. Dist. Ct. App. 2009) (citing Fla. Stat. §

11  768.72), which may be three times the amount of compensatory damages or more, *see* Fla. Stat. §

12  768.73.

13          Thus, the Cannons' RICO claims are not reverse preempted by FUITPA.

14  D.      Aiding and Abetting Breach of Fiduciary Duty

15          ASIC asserts that Plaintiffs have failed to state a claim of aiding and abetting breach of

16  fiduciary duty. Plaintiffs' claim is premised on Wells Fargo's breach of fiduciary duty, which the

17  Court previously found was plausibly alleged. Docket No. 94 at 37. Under California law, a person

18  may be liable for aiding and abetting the commission of an intentional tort if:

19              the person (a) knows the other's conduct constitutes a breach of duty
                and gives substantial assistance or encouragement to the other to so act
20              or (b) gives substantial assistance to the other in accomplishing a
                tortious result and the person's own conduct, separately considered,
21              constitutes a breach of duty to the third person.

22  *Richard B. Levine, Inc. v. Higashi*, 131 Cal. App. 4th 566, 574 (2005). Breach of fiduciary duty is

23  an intentional tort. *See id.* Under Florida law,[2] the elements are similar. *See Hogan v. Provident*

24  *Life & Acc. Ins. Co.*, 665 F. Supp. 2d 1273, 1287 (M.D. Fla. 2009).

25          Plaintiffs have stated a claim for aiding and abetting a breach of fiduciary duty against ASIC.

26  Applying California's standard, Plaintiffs have alleged ASIC's substantial assistance, since they

27  _____

28          [2] The parties do not address choice of law.

12

**United States District Court**
For the Northern District of California

1  allege ASIC played a vital role in obtaining the kickbacks.  Plaintiffs have also alleged ASIC's
2  knowledge because ASIC participated intentionally in obtaining the kickbacks, with knowledge of
3  its purpose.  *See Casey v. U.S. Bank National Ass'n*, 127 Cal. App. 4th 1138, 1147-48 (2005) (actual
4  knowledge of the wrongful act that constituted breach of fiduciary duty must be alleged).  Thus, the
5  Court denies ASIC's motion with respect to this claim.

6                                      **III.    CONCLUSION**

7          The Court dismisses with prejudice Plaintiffs' RICO claims, with respect to all Defendants,
8  to the extent the claims pertain to force-placed insurance premiums that were charged outside the
9  statute of limitations.  The Court denies Defendants' motions to dismiss on all other grounds.

10         This order disposes of Docket Nos. 146, 148.

12         IT IS SO ORDERED.

14  Dated:  January 29, 2014

15                                                              _____
                                                                EDWARD M. CHEN
16                                                              United States District Judge

13